**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:19-cv-249-FL**

|  |  |  |
|---|---|---|
| _____ | ) | |
| MATTHEW BRADLEY, | ) | **DEFENDANT ANALYTICAL** |
| | ) | **GRAMMAR, INC.'S MEMORANDUM** |
| Plaintiff, | ) | **OF POINTS AND AUTHORITIES IN** |
| v. | ) | **SUPPORT OF MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| ANALYTICAL GRAMMAR, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

FACTS NOT SUBJECT TO GENUINE DISPUTE .........................................................1

I.   Bradley's Photograph and Facebook Post ............................................................1

II.  Viral Distribution and Bradley's Acclaim ............................................................2

III. Analytical's Facebook Post ...............................................................................5

IV.  Bradley's Belated Profit Motive ........................................................................5

LEGAL STANDARD.............................................................................................7

ARGUMENT .....................................................................................................7

I.   Analytical Is Entitled to Summary Judgment on the Copyright Infringement Claim. ...........8

     A.   Bradley Gave an Unconditional Express License for Use of the Photograph. ...........8

     B.   Bradley Gave an Unconditional Implied License for Use of the Photograph. ...........9

     C.   Analytical's Use of the Photograph Was a Fair Use....................................12

          1.   Analytical's use had a transformative, educational purpose, a
               noncommercial nature, and a viral character, which weigh strongly in
               favor of a finding of fair use. ..........................................................13

          2.   The nature of Bradley's work weighs in favor of a finding of fair use. .............17

          3.   The extent of Analytical's use weighs in favor of a finding of fair use
               or is neutral. ..........................................................................18

          4.   The absence of market harm weighs strongly in favor of a finding of
               fair use.................................................................................19

          5.   Weighed together, the four factors support a finding of fair use. ...................22

     D.   Bradley Misused Copyright by Enforcing It in His Freely Shared Photograph. .........23

II.  Analytical Is Entitled to Judgment Denying Any Recovery on the Copyright Claim..........26

III. Analytical Is Entitled to Summary Judgment on the Copyright Management
     Information Claim................................................................................27

CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Agence Fr. Presse v. Morel*, No. 10-cv-2730 (AJN),
2014 U.S. Dist. LEXIS 112436 (S.D.N.Y. Aug. 13, 2014) ......................................................29

*Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994) .............................................15

*AMP, Inc. v. United States*, 389 F.2d 488 (Ct. Cl. 1968) ..............................................................11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................7

*A.V. v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) .................................................14, 15, 17

*A.V. v. iParadigms, LLC*, 544 F. Supp. 2d 473 (E.D. Va. 2008) ...................................................17

*Bell v. Worthington City Sch. Dist.*, No. 2:18-cv-961,
2020 U.S. Dist. LEXIS 96424 (S.D. Ohio June 2, 2020) ......................................................18, 22

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003)..............................................................17, 20, 22, 24

*Bond v. Blum*, Civ. A. No. MJG-01-2600, ECF No. 62 (D. Md. Feb. 7, 2002) ...........................24

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 346 F.3d 514 (4th Cir. 2003)
("*Bouchat I*").............................................................................................................................26

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010)
("*Bouchat II*") ...............................................................................................12, 13, 15, 19

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932 (4th Cir. 2013)
("*Bouchat III*") .........................................................................................................................13

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) ............................................21

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ..........................................13, 14, 18, 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................................7

*Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532 (4th Cir. 2007).........................27

*Crump v. QD3 Entm't, Inc.*, No. 10 Civ. 3564 (BSJ),
2011 U.S. Dist. LEXIS 14157 (S.D.N.Y. Feb. 8, 2011).............................................................9

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013) ....................................................................26

*De Forest Radio Telephone v. United States*, 237 U.S. 236 (1927) ..............................................11

*Drauglis v. Kappa Map Group, LLC*, 128 F. Supp. 3d 46 (D.D.C. 2015) ...................................29

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ....................................10

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)...............................................................................24

*Estate of Smith v. Graham*, 799 Fed. Appx. 36 (2d Cir. 2020)................................21, 22

*Faircloth v. United States*, 837 F. Supp. 123 (E.D.N.C. 1993) .........................................7

*Falkner v. GM, LLC*, 393 F. Supp. 3d 927 (C.D. Cal. 2018).....................................29, 30

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841)......................................................14

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985) .................13, 15, 16, 20

*I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) ....................................................9, 10

*In re Facebook, Inc.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019).............................................9

*Interferometrics, Inc. v. Mobile Commc'ns Holdings, Inc.*, 21 F.3d 422,
1994 U.S. App. LEXIS 7504 (4th Cir. Apr. 15, 1994) ....................................................11

*Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097 (Fed. Cir. 2004) ..................................11

*J.A.W. v. State*, 210 So. 3d 142 (Fla. Ct. App. 2016).......................................................16

*Katz v. Google Inc.*, 802 F.3d 1178 (11th Cir. 2015) ......................................................19

*Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898 (E.D. Mo. 2015)....................11

*Konangataa v. ABC*, No. 16-cv-7382 (LAK),
2017 U.S. Dist. LEXIS 95812 (S.D.N.Y. June 21, 2017)...............................................21

*Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970 (4th Cir. 1990).....................................23

*Laser Kitten, LLC v. Marc Jacobs Int'l, LLC*, No. 17-cv-8613,
2018 U.S. Dist. LEXIS 171962 (S.D.N.Y. Oct. 4, 2018) ...............................................28

*Latimer v. Roaring Toys, Inc.*, 601 F.3d 1224 (11th Cir. 2010) .....................................10

*Malibu Media, LLC v. Doe*, No. 13 C 3648,
2014 U.S. Dist. LEXIS 77929 (N.D. Ill. June 9, 2014) ..................................................10

*Malibu Media, LLC v. Guastaferro*, No. 14-cv-1544,
2015 U.S. Dist. LEXIS 99217 (E.D. Va. July 28, 2015) ............................................24, 25

*Marano v. Metro. Museum of Art*, No. 19-CV-8606,
2020 U.S. Dist. LEXIS 122515 (S.D.N.Y. July 13, 2020) ..............................................15

*MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) .........................................................17

*McDermott v. Monday Monday, LLC*, No. 17-cv-9230 (DLC),
2018 U.S. Dist. LEXIS 28664 (S.D.N.Y. Feb. 22, 2018) ............................................24

*Murphy v. Millennium Radio Grp., LLC*, 650 F.3d 295 (3d Cir. 2011) ...........................28

*Nat'l City Bank v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006) .........................................7

*Nat'l Rifle Ass'n v. Handgun Control Fed'n of Ohio*,
844 F. Supp. 1178 (N.D. Ohio 1992) .......................................................................17

*Nelson-Salabes, Inc. v. Morningside Dev.*, 284 F.3d 505 (4th Cir. 2002) ..........9, 10, 26

*Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) .......................19, 21

*Olan Mills Inc. v. Linn Photo Co.*, 23 F.3d 1345 (8th Cir. 1994) ................................25

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ..........................21

*Personal Keepsakes, Inc. v. PersonalizationMall.com, Inc.*,
975 F. Supp. 2d 920 (N.D. Ill. 2013) .......................................................................28

*Philpot v. Media Research Ctr. Inc.*, 279 F. Supp. 3d 708 (E.D. Va. 2018) ......9, 13, 22

*Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56 (1st Cir. 2020) ................11

*Photographic Illustrators Corp. v. Orgill, Inc.*, 118 F. Supp. 3d 398 (D. Mass. 2015) ...............29

*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) ....................................18, 19

*Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417 (1984) ......................19, 20

*Steve Altman Photography Co. v. United States*, 18 Cl. Ct. 267 (1989) ......................25

*Stevens v Corelogic, Inc.*, 899 F 3d 666 (9th Cir. 2018) ......................................28, 30

*Suid v. Newsweek Magazine*, 503 F. Supp. 146 (D.D.C. 1980) ....................................17

*Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194 (4th Cir. 1998) .........................15, 19, 20

*SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001) ...................14

*Tempo Music v. Myers*, 407 F.2d 503 (4th Cir. 1969) .................................................25

*Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743 (W.D. Va. 2014) ...........................................10

*Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*,
377 Fed. Appx. 303 (4th Cir. 2010) .......................................................................9, 10

*Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*,
629 F. Supp. 2d 526 (E.D. Va. 2008) ...................................................................9, 23

*United States v. Hansmeier*, No. 16-cr-00334-JNE-KMM,
2017 U.S. Dist. LEXIS 145990 (D. Minn. Sept. 8, 2017) ..........................................25

*Univ. City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 2d 429 (S.D. Cal. 1979) .................21

*Usherson v. Bandshell Artist Mgmt.*, No. 19-cv-6368 (JMF),
2020 U.S. Dist. LEXIS 112368 (S.D.N.Y. June 26, 2020)..........................................24

*Ward v. Atlantic C.L.R. Co.*, 167 N.C. 148 (N.C. 1914) .................................................11

*Watson v. Kappa Map Group, LLC*, No. 14-cv-100-TWT,
2015 U.S. Dist. LEXIS 33852 (N.D. Ga. Mar. 29, 2015)............................................29

*Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir. 1991)...........................................22

**Federal Statutes, Rules, and Constitutions**

U.S. Const., Art. I, § 8, cl. 8......................................................................................23

17 U.S.C. § 106 .........................................................................................................1

17 U.S.C. § 107 ...................................................................................................12, 17

17 U.S.C. § 107(1) ...............................................................................................13, 14

17 U.S.C. § 107(3) ....................................................................................................18

17 U.S.C. § 107(4) ....................................................................................................19

17 U.S.C. § 107(1)-(4) ...............................................................................................13

17 U.S.C. § 1202.....................................................................................................1, 27

17 U.S.C. § 1202(b) ..................................................................................................30

17 U.S.C. § 1202(c) ..............................................................................................28, 29

17 U.S.C. § 1202(c)(1)-(8).........................................................................................28

17 U.S.C. § 1202(c)(2)...............................................................................................28

Fed. R. Civ. P. 56(c) ..................................................................................................7

Fed. R. Civ. P. 26(a)(1)..............................................................................................20

**Other Authorities**

18 Am. Jur. 2d Copyright and Literary Property §§ 26, 27 (1965) ...............................................25

Aaron W. Brooks, *Social Media 101*, 29 No. 3 GPSolo 54 (May/June 2012) .............................16

California News Publishers Association, Submission in Support of Order Barring
Richard P. Liebowitz from Practice, *In re Liebowitz*, No. 3:19-mc-80228-JD
(N.D. Cal. filed Dec. 16, 2019)....................................................................................................23

Stacey M. Lantagne, *Famous on the Internet: The Spectrum of Internet
Memes and the Legal Challenge of Evolving Methods of Communication*,
52 U. Richmond L. Rev. 387 (2018) ............................................................................................19

Hon. Pierre Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990)) ....................14

Lee J. Matalon, *Modern Problems Require Modern Solutions:
Internet Memes and Copyright*, 98 Tex. L. Rev. 405 (2019) ........................................................15

Kate Miltner, "Internet Memes," in *The SAGE Handbook of Social Media*,
J. Burgess, A. Marwick, and T. Poell eds. (SAGE Publishing 2018)...........................................15

*Meme*, Merriam-Webster, https://www.merriam-webster.com/dictionary/meme........................16

*Viral*, Merriam-Webster, https://www.merriam-webster.com/dictionary/viral............................16

# INTRODUCTION

In a routine use of social media, Matthew Bradley ("Bradley") took a picture and publicly posted it to Facebook, allowing it to be seen, copied, and shared by anyone, with no intent to profit from or limit its distribution. To his delight it "went viral," circulated widely on Facebook and elsewhere online. Eight days after his post, Analytical Grammar, Inc. ("Analytical") joined the viral distribution by reposting the picture on Facebook. After a year passed, Bradley pulled a bait-and-switch. He began to make unfounded assertions that reposting was prohibited, though he had freely shared the picture without restriction. Bradley sued Analytical, alleging copyright infringement under 17 U.S.C. § 106 and removal of copyright management information ("CMI") under 17 U.S.C. § 1202. [DE 1.] Analytical pleaded counterclaims for a declaratory judgment that Bradley's copyright is invalid, and that Analytical did not infringe the copyright and did not remove any CMI. [DE 12.] Analytical moves for summary judgment on Bradley's claims, on its counterclaims of non-infringement and non-removal of CMI, and on all damages requested.

## FACTS NOT SUBJECT TO GENUINE DISPUTE

### I.    Bradley's Photograph and Facebook Post

Bradley is a "high tech consultant." [SOF ¶ 1.] He has not conducted any business as a professional photographer, and has not sold or licensed for financial benefit any photograph he has taken. [SOF ¶ 2.] Bradley took a photograph on December 8, 2017 that shows the word "WRONG" written on carpentry tools called "levels" (the "Photograph"). [SOF ¶¶ 3-5.] Its visual pun makes the cliché "wrong on so many levels" literal. Other images of levels that depict similar wordplay on the same cliché had circulated online for years beforehand. [SOF ¶¶ 6-8.]

At 5:02 p.m. that day, December 8, 2017, he posted the Photograph on his Facebook page at https://www.facebook.com/matthew.bradley.98434/posts/10155873949297068 (the "Post"), with the punch line "This is wrong on so many levels" as text above the Photograph. [SOF ¶ 9.]

Bradley's conduct on Facebook was subject to the terms of service set forth in Facebook's Statement of Rights and Responsibilities ("SRR"). [SOF ¶¶ 10-11.] In 2018, Facebook updated those terms of service for the first time since 2015. [SOF ¶ 11.] Under the SRR terms effective as of December 8, 2017, Bradley granted Facebook "a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license" to use the Photograph. [SOF ¶¶ 10, 12.] That permission was expressly subject to his privacy settings on Facebook. [*Id.*] Bradley had the right and ability to use Facebook's privacy settings to control how the Photograph would be shared. [SOF ¶ 13.] The SRR terms further provided: "When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information[.]" [SOF ¶ 14.] Facebook's terms specifically defined "use" to include all acts of copying and distribution: "By 'use' we mean use, run, copy, publicly perform or display, distribute, modify, translate, and create derivative works of." [SOF ¶ 15.]

Bradley made the Post using Facebook's "Public" setting. [SOF ¶ 16.] Bradley never placed any terms or conditions on the sharing, reposting, or other distribution of the Photograph by third parties. [SOF ¶ 17.] Bradley himself shares memes through social media without tracking down the original poster to ask permission, he testified, "because every time I have shared a meme it [the setting] has been public, so that is not required." [SOF ¶ 18.]

## II. Viral Distribution and Bradley's Acclaim

When he first made the Post, Bradley "did not expect it to go viral" and did not expect anyone would share it. [SOF ¶ 19.] He also did not "expect to do anything else with the meme" he had created, and "did not expect to use it on merchandise of any kind." [*Id.*] Yet the Post "became a viral meme" as thousands rapidly distributed it online. [SOF ¶¶ 20-21.]

At 5:14 p.m. on December 8, 2017, twelve minutes after the Post, Bradley's cousin's husband, Josh Vallee, added the first comment: "This is good. I just might have to steal this one."

[SOF ¶ 22.] Bradley clicked "Like" on the comment and responded, "Go ahead." [*Id.*] He realized his "meme was going viral" that night, after "maybe a hundred shares all of a sudden … that just seemed to be an enormous number for me." [SOF ¶ 23.] Other Facebook users commented that week, "Stealing," "I had to steal this," and "I'm stealing this!"[1] [SOF ¶ 24.]

Bradley was aware of the viral distribution and "stunned in a happy way when it started going viral," within a week or two of the Post. [SOF ¶ 27.] Within a week more than 10,000 Facebook users shared the Photograph. [SOF ¶ 20.] On December 14, 2017, at 11:31 a.m., Bradley edited the text of the Post to add, "Wow! I am stunned! Over 10K shares. Time for a shameless plug for my blog," and included a link to his blog. [SOF ¶ 28.] That afternoon some commenters criticized Bradley for editing the Post, and he responded in comments: "Sorry, the picture is the joke … I really didn't expect 100 shares, so this is kind of surprising to me," and "I didn't expect it to get 100 shares let alone 12,000. If I had intended it to be a plug for my blog, I would have put it in at the beginning. BTW, I make no money from my blog whatsoever, so I had no other motivation other than I hope people would enjoy it." [SOF ¶ 29.] Bradley edited the Post's text again that evening, to add an explanation for his morning edit. [SOF ¶ 30.]

Many people distributed the Photograph beyond Facebook shares. [SOF ¶¶ 31-35.] It was reposted on Imgur on December 13, 2017, and listed among the "most viral images." [SOF ¶ 32.] On December 14, 2017, it was reposted on Twitter, under the username "Dr. Sheldon Cooper," on Reddit, under the username "dickfromaccounting," and on Unilad Tech's Facebook page,

---

[1] Bradley testified that he assumed that people who say they are "stealing something" on Facebook mean only that they are sharing it (via Facebook's "Share" icon), not "literally stealing it." [SOF ¶¶ 20, 25.] However, Bradley has used "steal" in its more pejorative sense, to describe his own reuse of unattributed third-party content on Facebook. On February 8, 2018, he posted on his Facebook page text copied from a joke meme that had circulated online for at least a year, almost verbatim, without using Facebook's Share function, and without naming or providing a link to the meme's source or author. [SOF ¶ 26.] He commented, "I stole this," and urged other Facebook users, "Steal this, like I did and pass a laugh on to someone who needs it." [*Id.*]

with a link to the Reddit post. [SOF ¶ 33.] A January 4, 2018 *Trend-Chaser* article, "The Most Clever Puns The Internet Has To Offer," included the Photograph. [SOF ¶ 34.] A January 27, 2018 *BuzzFeed* article about puns also included it with a link to an Imgur repost. [SOF ¶ 35.] These reposts and articles did not credit Bradley or link back to his post. [SOF ¶¶ 33-35.]

Bradley appreciated the Photograph's circulation beyond credited Facebook shares. He admits that he "celebrated other unattributed distributions of the [P]hotograph" and "hail[ed] the viral distribution of the 'wrong on so many levels' meme." [SOF ¶ 36.] On December 24, 2017, Post commenter Buck Smith asked, "Is this your original picture?" Bradley responded, "Yes! I took it in the physics lab at SRJC." Smith replied, "Wow I have seen this a couple of times on twitter now." Bradley responded again, "My picture? Wow…" [SOF ¶ 37.] Bradley posted the *Trend-Chaser* article on his Facebook page on April 20, 2018, declaring, "Hey, I'm famous! My picture made the list of the most clever puns on the internet! Woo hoo!" [SOF ¶ 38.] Though the article "did not provide a photographer credit" and "did not identify [Bradley] as the creator of the meme," Bradley was "excited by this coverage" and "still shared this article and celebrated it." [SOF ¶ 39.] On November 7, 2018, another Facebook user commented, "I remember co opting this for my profile" and thanked Bradley, who clicked "Like" on his comment. [SOF ¶ 40.]

The viral wave petered out after a few weeks. "Almost all of the comments [on the Post] were within a couple of weeks of the original listing," Bradley testified. [SOF ¶ 41.] Fifteen days after the Post, on December 23, 2017, Bradley added the comment: "Only 295 shares to go above 20,000!" [SOF ¶ 42.] His Post remains stalled below 20,000 shares two years later. [SOF ¶ 43.] Bradley has described the Post's popularity as "lightning in a bottle." [SOF ¶ 44.]

## III. Analytical's Facebook Post

Analytical is a North Carolina corporation based in Raleigh. [SOF ¶ 45.] It offers language arts curricula and instructional materials for English grammar, punctuation, and usage,

sold at all material times through its website at analyticalgrammar.com. [SOF ¶ 46.] Analytical's educational mission is to promote and provide "grammar instruction for all." [SOF ¶ 47.] Its primary markets are public, private, charter, and home schools. [*Id.*] At all material times, Analytical furthered its educational project through a steady stream of grammar and usage-themed memes posted on its Facebook page at facebook.com/analyticalgrammar/. [SOF ¶ 48.]

Facebook user Gene Boecker sent Analytical the Photograph via Facebook Messenger on December 14, 2017. [SOF ¶ 49.] Analytical had not seen the Photograph before Mr. Boecker's message. [SOF ¶ 50.] Nothing in the message identified Bradley as the photographer or conveyed any other identifying information or copyright management information about Bradley or the Photograph. [SOF ¶ 51.] Analytical reposted the Photograph on its Facebook page on December 16, 2017, along with the text "This is wrong on so many levels." (The "Repost.") [SOF ¶ 52.] The Repost served Analytical's educational purpose. [SOF ¶ 53.] Analytical did not further share the Photograph, and did not comment on, financially "boost," or otherwise promote the Repost. [SOF ¶ 54.] Analytical sought no commercial benefit from the Repost and generated no revenue attributable to the Repost. [SOF ¶¶ 55-56, 121.] In the wake of the Repost, Analytical made only one sale to a customer who had seen its Facebook page before his purchase; that customer had followed Analytical on Facebook for months by then. [SOF ¶ 56.]

## IV.    Bradley's Belated Profit Motive

Bradley had no commercial purpose in December 2017 when he took the Photograph and distributed it freely without restriction, and he did not intend to profit from it when he posted it to Facebook. [SOF ¶¶ 16-17, 19.] He made no attempt to capitalize on the Photograph or limit its distribution for more than a year, while celebrating uncredited uses he had not directly licensed. [SOF ¶¶ 31-39.] He changed course on December 14, 2018. On that day, Bradley:

- applied to register the copyright with the Copyright Office, ultimately obtaining Copyright Registration No. VAu 1-355-121 with an effective date of registration of December 14, 2018 [SOF ¶ 57];
- replaced the unadorned Photograph in the Post with a copy that includes, as text placed directly on the Photograph, both the punch line "THIS IS WRONG ON SO MANY LEVELS" in all-caps lettering, and a copyright tag ("copyright 2018 Matthew J Bradley") [SOF ¶ 58];
- amended the text of the Post a third time to add, "Please note that this picture is copyrighted. I appreciate all of you who shared it (very unexpectedly). Some people, however, are passing it off as their own work. I took the picture with my phone. This is the original photo (meme added). If you see anyone violating this copyright, please let me know. Thanks." [SOF ¶ 59];
- made a separate post on Facebook showing dozens of third-party uses of the Photograph in a screenshot of a Google Images search for "wrong on so many levels meme" [SOF ¶ 31]; and
- sent demands to five websites where the Photograph had appeared, including Reddit and Imgur, seeking $50 payment apiece. None complied. He has never generated any revenue from the Photograph. [SOF ¶ 60.]

On or about December 14, 2018, Bradley also conducted a Google search for a "DRM attorney" (digital rights management attorney) that led him to Richard Liebowitz ("Liebowitz"). [SOF ¶ 61.] He engaged Liebowitz's firm under a contingent-fee agreement. [SOF ¶ 62.]

Bradley's initial 2018 copyright registration erroneously indicated that the Photograph was unpublished. [SOF ¶ 57.] Liebowitz filed a second application to register the copyright on behalf of Bradley on January 3, 2019 and obtained Copyright Registration No. VA 2-133-725, Bradley's basis for this action. [SOF ¶ 63.] Liebowitz's firm notified Bradley of Analytical's Repost on June 10, 2019, and Bradley authorized the firm to pursue the case. [SOF ¶ 64.] He did not contact Analytical about the Photograph before filing suit on June 18, 2019. [SOF ¶ 65.]

Bradley has no evidence of any sale of, licensing of, or revenue from the Photograph or related merchandise. [SOF ¶ 66.] He has not negotiated any license or other agreement with any third party to use the Photograph for a fee. [SOF ¶ 67.] Unrelated to the Photograph, he set up an account with the print-on-demand apparel company Custom Ink in November 2019 to make T-shirts. [SOF ¶ 68.] The following month, he claimed that he intended to sell T-shirts via Custom

Ink bearing the Photograph, though he had not yet taken any steps to make any money selling or licensing the Photograph; he had not uploaded the image to Custom Ink's website before his December 12, 2019 deposition. [*Id.*] He has not claimed or produced evidence that he, or anyone, has ordered or marketed any T-shirts or other goods bearing the Photograph via Custom Ink. [*Id.*] Beyond his *post hoc* assertions, Bradley produced no documents that reflect any sales, offers to sell, or intent to sell, market, or profit from the Photograph. [See SOF ¶¶ 2, 66-68.]

LEGAL STANDARD

"A moving party is entitled to summary judgment if the evidence shows that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Nat'l City Bank v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir. 2006) (citing Fed. R. Civ. P. 56(c)). Material facts are those that may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden to establish the absence of a genuine issue of material fact; it can meet that burden by identifying "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that show the absence of dispute regarding a material fact. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248.

Once that is shown, the burden falls on the non-moving party to identify specific facts showing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must show "both the *materiality* and the *genuineness* of the alleged fact issues." *Faircloth v. United States*, 837 F. Supp. 123, 126 (E.D.N.C. 1993). That burden is not met by relying on "irrelevant or unnecessary" factual disputes; only outcome-determinative disputes "under the governing law will properly preclude the entry of summary judgment" for the defendant. *Anderson*, 477 U.S. at 248.

## ARGUMENT

Bradley's claims fail on the merits and Analytical is entitled to judgment as a matter of law. The Repost of the Photograph on Facebook was under an express license and an implied license, and was otherwise a fair use. Bradley's infringement claim constitutes copyright misuse. And his claim that Analytical knowingly removed CMI is baseless. There was no CMI for Analytical to remove when it received the Photograph and nothing in the Post identified Bradley as the photographer. In any event, Analytical did not have the "double scienter" required to establish a CMI violation. There is no basis to find any damages or afford Bradley any relief. Because no material fact is in dispute, the Court should grant judgment in Analytical's favor.

## I.     Analytical Is Entitled to Summary Judgment on the Copyright Infringement Claim.

There is no basis to find that Analytical's use of Bradley's Photograph constitutes copyright infringement. Bradley expressly or implicitly licensed third-party distributions like Analytical's Repost. Moreover, the Repost is a classic fair use, as it transformed the Photograph with an educational context and purpose, and caused no market harm merely by propagating it on Facebook, as Bradley had in his Post. His infringement claim constitutes copyright misuse.

## A.     Bradley Gave an Unconditional Express License for Use of the Photograph.

Analytical is entitled to judgment on the infringement claim on the basis of Bradley's express license, given through the Facebook terms of service (the "SRR") effective at the time of his Post. [SOF ¶¶ 9-11.] Those terms included an "IP License," specifically granting Facebook "a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook," and identified "photos" as an example of such content. [SOF ¶ 12.] The terms of service also provided in pertinent part, "When you publish content or information using the Public setting, it means that you are allowing everyone,

including people off of Facebook, to access and use that information[.]"[2] [SOF ¶ 14.]

Bradley posted the Photograph using the Public setting. [SOF ¶ 16.] The right to "use" that Bradley authorized, by Facebook and by "everyone" else, expressly included all forms of copying, display, and distribution that are among the copyright holder's relevant statutory rights. [SOF ¶ 15; *see* 17 U.S.C. § 106.] "Everyone" included Analytical, and his license covered its use.

## B. Bradley Gave an Unconditional Implied License for Use of the Photograph.

A non-exclusive implied license also shielded the Repost. An implied license "simply permits the use of a copyrighted work in a particular manner." *Nelson-Salabes, Inc. v. Morningside Dev.*, 284 F.3d 505, 514 (4th Cir. 2002) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)). A non-exclusive copyright license may be "implied from conduct." *Id.* at 513. "Indeed, '[a] nonexclusive license may be granted unilaterally by a copyright holder' so no meeting of the minds is required." *Philpot v. Media Research Ctr. Inc.*, 279 F. Supp. 3d 708, 713 (E.D. Va. 2018) (quoting *Crump v. QD3 Entm't, Inc.*, No. 10 Civ. 3564 (BSJ), 2011 U.S. Dist. LEXIS 14157, *10 (S.D.N.Y. Feb. 8, 2011)).

"The copyright owner's intent is the touchstone for determining whether an implied license exists." *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*, 629 F. Supp. 2d 526, 531 (E.D. Va. 2008), *aff'd*, 377 Fed. Appx. 303 (4th Cir. 2010); accord *Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 767 (W.D. Va. 2014). "[C]onsent given in the form of mere

---

[2] Facebook's Data Policy reiterated the effect of posting a photograph under the Public setting:

> Whenever you post content (like a status update, photo or check-in), you can select a specific audience, or even customize our audience. To do this, simply click on the sharing icon and choose who can see it.
> Choose this icon if you want to make something **Public**. Choosing to make something public is exactly what it sounds like. It means that anyone, including people off of Facebook, will be able to see or access it.

*In re Facebook, Inc.*, 402 F. Supp. 3d 767, 819 (N.D. Cal. 2019) (quoting policy). Facebook's SRR statement incorporated Facebook's Data Policy by reference. *Id.* at 791. [SOF ¶ 14.]

Case 5:19-cv-00249-FL   Document 27   Filed 07/17/20   Page 16 of 39

permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing." *I.A.E.*, 74 F.3d at 775. Absent an express written agreement between the parties, courts "engage in a broad inquiry" and "examine the totality of the circumstances" to determine "whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement was permissible."[3] *Nelson-Salabes*, 284 F.3d at 514-16; *see Gilbert Architects*, 377 Fed. Appx. at 307.

Bradley manifested his intent that the Photograph be seen and shared without restriction. He posted it on the Public setting with, initially, no apparent copyright claim. [SOF ¶¶ 16-17.] *See generally Tharpe*, 8 F. Supp. 3d at 766-67 ("an implied license will be limited to a specific use *only* if that limitation is expressly conveyed when the work is delivered") (quoting *Latimer v. Roaring Toys, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010)). Facebook users told him they would "steal" the Photograph and he encouraged it. [SOF ¶¶ 22-26.] He testified that he was "stunned in a happy way when it started going viral," and was "pleased" when it was distributed on and beyond Facebook. [SOF ¶ 27.] He delighted in the popularity of his Post, celebrating not only Facebook users clicking the "Share" icon, but also redistributions by other means. [SOF ¶¶ 34, 36-40.] He took no steps to limit the Photograph's display, publication, or distribution until December 14, 2018, almost a year after Analytical's Repost. [SOF ¶¶ 57-62.] Until then, Bradley approved and wholly acquiesced in the viral distribution. He cannot fault Analytical for it. His unlimited permissions and lack of objection implicitly covered Analytical's use.

---

[3] Between parties with direct business dealings, the Fourth Circuit has applied a three-part test to find an implied license when one party creates and delivers a work to another, at the other's request, intending that the other party copy and distribute it. *See Nelson-Salabes*, 284 F.3d at 514 (citing *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)). But that is not "the only way to establish an implied license." *Malibu Media, LLC v. Doe*, No. 13 C 3648, 2014 U.S. Dist. LEXIS 77929, *14-15 (N.D. Ill. June 9, 2014) (weighing implied license defense where the defendant had not requested creation of the work and the parties had "no meeting of the minds").

"An implied license may be constructed where it is necessary to make sense of an agreement." *Interferometrics, Inc. v. Mobile Commc'ns Holdings, Inc.*, 21 F.3d 422, *published in full-text format at* 1994 U.S. App. LEXIS 7504, at *16 (4th Cir. Apr. 15, 1994) (citing *De Forest Radio Telephone v. United States*, 237 U.S. 236, 241 (1927)). An implicit permission to use the Photograph in the manner of the Repost must be inferred to make sense of the sublicensable IP License that Bradley granted under the SRR. [SOF ¶¶ 10-12.] By publishing the Photograph "using the Public setting," he expressly allowed "everyone" to use it. [SOF ¶¶ 13-16.] Facebook's right to sublicense the use of his Photograph would be meaningless if it did not cover a repost on Facebook by a Facebook user. "[A] copyright licensee given the unrestricted right to grant sublicenses may do so without using express language." *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 56 (1st Cir. 2020). Facebook's implied sublicense permits its users, including Analytical, to freely redistribute licensed photos elsewhere on Facebook. And granting a sublicensable right bars the licensor "from interfering with that right by prohibiting" sublicensees from exercising that right. *Jacobs v. Nintendo of Am., Inc.*, 370 F.3d 1097, 1101-02 (Fed. Cir. 2004) (citing *AMP, Inc. v. United States*, 389 F.2d 488, 453 (Ct. Cl. 1968)).

An implied license may be established not only by conduct, but also by custom. *Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 909 (E.D. Mo. 2015); *Ward v. Atlantic C.L.R. Co.*, 167 N.C. 148, 150, 83 S.E. 326 (N.C. 1914). As Analytical's expert witness Aram Sinnreich established, its use of the meme followed widely accepted customs: "Social media platforms encourage and reward the widespread repurposing of digital content, without requiring or incentivizing attribution. … On Facebook, for example, the standard user interface facilitates the easy repurposing and redistribution of memes from one user to another." [SOF ¶ 69.] "Social media users recognize that the viral distribution of memes is a common feature of social media

use, and do not understand that such use requires compensation to the viral source or originator of the meme." [SOF ¶ 70.] The practice is understood as an "implicit user right." [*Id.*] "There is no normative basis to expect credit or compensation for the viral distribution of a meme," and "it is not reasonable for a meme creator to expect a fee for recirculation." [SOF ¶ 71.]

The parties' conduct exemplifies the generally accepted practice of redistributing third-party memes on Facebook. Analytical has shared and reposted thousands of memes on its Facebook page. [SOF ¶ 72.] Facebook has never prevented Analytical from reposting third-party Facebook content. [*Id.*] Other than Bradley, no Facebook user has ever suggested to Analytical that it is not permitted. [*Id.*] Bradley also distributes memes found on Facebook without consequence. [SOF ¶ 18.] When he copied the text of a meme that had circulated on Facebook and elsewhere, and posted it nearly verbatim on Facebook without attribution, he boasted, "I stole it," and urged other Facebook users, "Steal this, like I did and pass a laugh on to someone who needs it." [SOF ¶ 26.] Another meme that Bradley created and posted on his Facebook page includes six unlicensed and uncredited photographs by other photographers. [SOF ¶ 73.] The parties' standard social media practices reflect widespread custom, consistent with Bradley's manifest permission, by which Analytical's use is implicitly authorized. Analytical is entitled to judgment on the infringement claim on the basis of Bradley's implied license.

## C.    Analytical's Use of the Photograph Was a Fair Use.

Reposting Bradley's Facebook meme on Facebook was a fair use. "Fair use is a complete defense to infringement. In other words, 'the fair use of a copyrighted work… is not an infringement of copyright.' " *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 307 (4th Cir. 2010) ("*Bouchat II*") (quoting 17 U.S.C. § 107). "[T]he fair use doctrine was predicated on the author's implied consent to 'reasonable and customary' use when he released his work for public consumption." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 550 (1985). The

statute restates and codifies common-law principles of fair use. *Id.* at 549; *Bouchat II*, 619 F.3d at 307-08. Fair use is routinely resolved as a matter of law at summary judgment by a court acting as factfinder. *Bouchat II*, 619 F.3d at 307-08; *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 936 (4th Cir. 2013) ("*Bouchat III*"); *Philpot*, 279 F. Supp. 3d at 714. The statute sets out four non-exclusive factors for courts to consider in deciding whether a use is fair:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)-(4). All factors are analyzed "together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). The first and fourth factors are considered the most significant. See *Bouchat III*, 737 F.3d at 937 ("Our precedents have placed primary focus on the first factor."); *Harper & Row*, 471 U.S. at 566 (calling the fourth factor "the single most important element of fair use"). Both of those factors substantially favor a finding of fair use. The other factors either favor fair use as well, or do not weigh against it.

1.     **Analytical's use had a transformative, educational purpose, a noncommercial nature, and a viral character, which weigh strongly in favor of a finding of fair use.**

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor favors fair use because Analytical's use of the Photograph furthered its educational purposes, which were distinct from Bradley's purpose; because its use was not commercial in nature; and because the use was consistent with widely accepted, standard usage for a viral meme.

When a court assesses the first factor,

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other

words, whether and to what extent the new work is "transformative."

*Campbell*, 510 U.S. at 579 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (Story, J.) and Hon. Pierre Leval, *Toward A Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). "A 'transformative' use is one that 'employ[s] the quoted matter in a different manner or for a different purpose from the original,' thus transforming it." *A.V. v. iParadigms, LLC*, 562 F.3d 630, 638 (4th Cir. 2009).

The "preamble paragraph" of Section 107 provides "general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." *Campbell*, 510 U.S. at 577-78. It enumerates "teaching" as a salutary fair use purpose. 17 U.S.C. § 107; *see also SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1261 (11th Cir. 2001) ("copyright has always been used to promote learning"). Analytical's use of the Photograph had a distinctly educational purpose and character. Its declared mission is: "Grammar instruction for all!" [SOF ¶ 47.] It made Facebook a forum to foster mindfulness about English usage. [SOF ¶ 48.] With that edifying aim, it used the Repost and similar visual puns to be thought-provoking, not just to entertain. [SOF ¶ 53.] The Repost exemplified and served Analytical's purpose to instruct. [*Id.*]

Bradley had a narrower goal. As he explained on Facebook, the Photograph was just a joke to him: "the picture is the joke." [SOF ¶ 29.] All that prompted Bradley to make and post the meme, he testified, was that "I frequently take pictures of things I think are amusing and share them on Facebook. That's all." [SOF ¶¶ 74-75.] "I'm just posting things that I think are funny." [SOF ¶ 75.] He has done it "for years on Facebook. … it's just something I do for fun to share with my friends." [SOF ¶ 76.] Analytical's distinct, educational purpose favors fair use.

The first factor also entails considering whether the use "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Use in a commercial context is not determinative and should not be "unduly emphasiz[ed]" in this evaluation. *A.V.*, 562 F.3d at 638-

39; accord *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 203 (4th Cir. 1998). While Analytical is a commercial business, its use of the Photograph was neither "commercial" nor "for profit," as those terms are construed under the first factor. "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material *without paying the customary price*." *Id.* (quoting *Harper & Row*, 471 U.S. at 562) (emphasis added). So "the relevant issue is not the [defendant's] business model." *Marano v. Metro. Museum of Art*, No. 19-CV-8606, 2020 U.S. Dist. LEXIS 122515, *13 (S.D.N.Y. July 13, 2020). Rather, "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).

In that light, Analytical's use militates against any unfairness. Its use was noncommercial because it charged no fee, sought and gained no "direct or immediate commercial advantage," and had no "profits, revenues, and overall commercial performance" tied to the use. *Bouchat II*, 619 F.3d at 314 (quoting *Am. Geophysical Union*, 60 F.3d at 921). [SOF ¶¶ 55-56, 77.] It did not sell the Photograph and did not profit from the Repost. [SOF ¶ 55.] It has not hosted third-party advertising on Facebook or on its website. [SOF ¶ 78.] Its use also did not bypass a traditional licensing fee, as the "customary price" for a viral use of a social media meme is free.[4] [SOF ¶ 79.] "Nobody would pay to view an internet meme, just as no meme creator expects to be paid. The stream of revenue that copyright seeks to protect simply does not exist in this context[.]" Lee J. Matalon, *Modern Problems Require Modern Solutions: Internet Memes and Copyright*, 98

---

[4] *See* Kate Miltner, "Internet Memes," in *The SAGE Handbook of Social Media*, J. Burgess, A. Marwick, and T. Poell eds. (SAGE Publishing 2018) ("Most successful memes are not created for the purpose of making money. Most memes are created for fun, to connect with a friend, or to express some kind of personally relevant statement, opinion, or joke.").

Tex. L. Rev. 405, 420 (2019). Though Bradley made anomalous demands for a $50 "fee" from certain websites that took his picture down, none complied, as no fee was required. [SOF ¶ 80.]

The viral character of the use also favors Analytical under the first factor because it was a "reasonable and customary" use of a viral meme. *Harper & Row*, 471 U.S. at 550. As Bradley acknowledges, his Post was "for public consumption" and "became a viral meme." [SOF ¶¶ 20, 76.] Viral use is, by definition, "quickly and widely spread or popularized especially by means of social media." *Viral*, Merriam-Webster, https://www.merriam-webster.com/dictionary/viral. [SOF ¶ 81.] Bradley defines "going viral" as "where all of a sudden it's all over the internet and for usually no explained reason." [SOF ¶ 21.] Viral distribution is a defining characteristic of a meme, which is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Meme*, Merriam-Webster, https://www.merriam-webster.com/dictionary/meme. [SOF ¶¶ 82-83.] And social media websites "'seem to have three defining characteristics: (1) the information being posted is not directed at anyone in particular; (2) the information being posted can be edited and/or discussed by all who see it; and (3) the information posted includes an easy way to share it with people not included within the scope of the original post.'" *J.A.W. v. State*, 210 So. 3d 142, 146 (Fla. Ct. App. 2016) (quoting Aaron W. Brooks, *Social Media 101*, 29 No. 3 GPSolo 54, 55 (May/June 2012)). "Because of these unique dynamics of communication on social media, any unprotected post can 'go viral,' by 'rapidly—and often uncontrollably—propagat[ing] across the internet.'" *Id.* As Professor Sinnreich explained, "[t]he capacity of a meme to be shared far beyond the creator's control is inherent in the common notion of the 'viral' distribution of memes." [SOF ¶ 84.] After Bradley publicly posted the Photograph on Facebook and it went viral, Analytical's public, viral Repost was a typical, reasonable, and customary use of the viral meme. [SOF ¶¶ 85, 86.]

The first factor weighs strongly in favor of a finding of fair use because Analytical's use of the Photograph had a noncommercial character, seeking no profit from a Photograph distributed for free, and a transformative purpose to educate, not merely entertain, and because the viral use of a viral meme is reasonable and customary.

## 2. The nature of Bradley's work weighs in favor of a finding of fair use.

The second factor to consider is "the nature of the copyrighted work." 17 U.S.C. § 107. Because the work is a marginally creative viral meme, circulated on social media without profit motive or restrictions, its nature weighs in favor of finding Analytical's Facebook use is fair.

The second factor " 'focuses attention on the extent to which a work falls at the core of creative expression,' and, in particular, whether 'the incentive for creativity has been diminished.' " *A.V. v. iParadigms, LLC*, 544 F. Supp. 2d 473, 482 (E.D. Va. 2008), *aff'd in pertinent part*, 562 F.3d 630 (4th Cir. 2009) (quoting *Bond v. Blum*, 317 F.3d 385, 395-96 (4th Cir. 2003)). The Photograph exhibits scant creative expression. It is a slight variation on earlier visual pun memes that literalized the same cliché. [SOF ¶¶ 6, 8, 87.] Professor Sinnreich found that "it was minimally differentiated from other prior art," and opined that the Photograph "is very limited in its novelty, creativity, and originality." [SOF ¶ 88.] And the Repost has not diminished Bradley's incentive to create in any way. He has continued to create and post memes on Facebook that he intended for people to share, "just as much" after the Post and Repost; if his rate slowed at all, he attributed it entirely to getting busier outside Facebook. [SOF ¶¶ 44, 89-90.]

The Court may also consider whether the work "represented a substantial investment of time and labor made in anticipation of a financial return." *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981). In this context, fair use is supported when the copyrighted work "was never intended to have any commercial or market value." *Suid v. Newsweek Magazine*, 503 F. Supp. 146, 148 (D.D.C. 1980); accord *Nat'l Rifle Ass'n v. Handgun Control Fed'n of Ohio*, 844 F.

Supp. 1178, 1181 (N.D. Ohio 1992) (citing *MCA*, 677 F.2d at 182), *aff'd*, 15 F.3d 559 (6th Cir. 1994). The Photograph exhibits a minimal investment of time and effort. [SOF ¶¶ 4, 91.] Bradley posted it the day he shot it. [SOF ¶¶ 3, 9.] He shared it publicly, making it freely available to all. [SOF ¶¶ 10-17.] He had no commercial aspirations for it. [SOF ¶ 19.] Posting that type of ephemeral work is "just something I do for fun to share with my friends," he testified; he has "been doing it for years on Facebook," and he is "pleased if they are shared." [SOF ¶ 76.]

The second factor also concerns "the extent to which a work has been published." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013). Prior widespread, viral dissemination weights in favor of fair use. *Bell v. Worthington City Sch. Dist.*, No. 2:18-cv-961, 2020 U.S. Dist. LEXIS 96424, *20-22 (S.D. Ohio June 2, 2020). The Photograph was sent to Analytical on December 14, 2017. [SOF ¶ 49.] By then its viral spread was in full swing, with more than 12,000 shares from Bradley's original Post, and third party reposts on Reddit, Twitter, Imgur, and elsewhere on Facebook. [SOF ¶¶ 29, 32-33.] Widespread social media distribution is inherent to the Photograph's nature as a meme. Bradley recognizes that an image, by definition, "almost has to go viral for it to be a meme." [SOF ¶ 83.] He admits that the Post "became a viral meme" when third parties quickly distributed it online. [SOF ¶ 20.] Memes are not in general a profit-based activity. [SOF ¶¶ 71, 79, 95.] And at the time of Analytical's use, Bradley was not attempting to capitalize on the meme but enthusing over its viral distribution. [SOF ¶¶ 19-28.] Such tacitly approved distribution is not unfair and cannot weigh against a finding of fair use.

### 3. The extent of Analytical's use weighs in favor of a finding of fair use or is neutral.

The third factor concerns the amount and substantiality of the portion used in relation to the copyrighted work as a whole. 17 U.S.C. § 107(3). "The extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. Using a portion "reasonable in relation to the copying's purpose" will favor fair use. *Id.* at 586. Analytical's use

of the entire Photograph was reasonable for a noncommercial, transformative use. The third factor weighs in favor of a fair use finding or it is neutral in the overall balancing.

"This factor weighs less when considering a photograph—where all or most of the work often must be used in order to preserve any meaning at all[.]" *Katz v. Google Inc.*, 802 F.3d 1178, 1183-84 (11th Cir. 2015). While typically, "[c]opying an entire work weighs against a finding of fair use," it does not preclude that finding. *Sundeman*, 142 F.3d at 205. And use of an entire work does not weigh against fair use when the work is not "meaningfully divisible." *Seltzer*, 725 F.3d at 1178; accord *Bouchat II*, 619 F.3d at 315. Photographs are a classic example. See *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000). Wholesale reuse is a typical use of internet memes. See Stacey M. Lantagne, *Famous on the Internet: The Spectrum of Internet Memes and the Legal Challenge of Evolving Methods of Communication*, 52 U. Richmond L. Rev. 387, 390 (2018). As Professor Sinnreich opined, "social media users routinely redistribute [memes] in their entirety." [SOF ¶ 97.]

When use is noncommercial and transformative, the third factor is typically neutral, as when the Supreme Court found a fair use in VCRs; because their owners "had been invited to witness [a television program] in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use." *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 449 (1984)). Likewise, Bradley welcomed free use. [SOF ¶¶ 27, 36-39.] Analytical's use of the entire Photograph was reasonably necessary to serve its noncommercial, educational purpose. That is not unfair.

**4.    The absence of market harm weighs strongly in favor of a finding of fair use.**

The fourth factor concerns "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The noncommercial character of Analytical's use, discussed in § I.C.1. above, shifts the burden to Bradley to prove market harm under the fourth

factor: "If a challenged use of a copyrighted work is noncommercial, the party alleging infringement must demonstrate 'either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work.'" *Bond*, 317 F.3d at 395 (quoting *Sony*, 464 U.S. at 451). He cannot meet that burden.

The fourth factor strongly favors fair use because the Repost caused no economic injury. Bradley "did not intend to do anything with" the Photograph in December 2017 and "did not expect to use it on merchandise of any kind." [SOF ¶ 20.] He admits he has no "documents showing any effect that any Defendant use of the Photograph has had, or is reasonably likely to have, on the market for, potential market for, or value of the Photograph or any derivative works." [SOF ¶ 92.] Likewise, he has no documents showing any damages that he suffered or injury caused by Analytical's use of the Photograph. [SOF ¶ 93.] Bradley's Rule 26(a)(1) initial disclosures did not include a computation or estimate of damages sustained or recoverable profits, and the disclosure was never supplemented. [SOF ¶ 94.] There is simply no evidence of harm.

Fair use protects copying that "does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566-67. "A use that does not materially impair the marketability of the copyrighted work generally will be deemed fair." *Sundeman*, 142 F.3d at 206. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450. "What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Id.* at 451.

There is no evidence that Analytical has caused, or is likely to cause, any market harm to the Photograph. [SOF ¶¶ 20, 92-93.] Memes and other images are distributed for free online, and the viral popularity of a meme on Facebook does not reflect a *market* demand. [SOF ¶¶ 96, 98.]

Bradley has never sold or licensed *any* photograph for financial benefit, and has not sold or licensed the Photograph or related merchandise. [SOF ¶¶ 2, 66-67.] Because Bradley does not exploit his copyright for financial gain, and does not charge Facebook users to view, copy, or display the Photograph, any harm resulting from such use is speculative. *See Univ. City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 2d 429, 453 (S.D. Cal. 1979); *accord Konangataa v. ABC*, No. 16-cv-7382 (LAK), 2017 U.S. Dist. LEXIS 95812, *2-3 (S.D.N.Y. June 21, 2017) (finding fair use of video that a Liebowitz client had "publicly live-streamed on Facebook" with no intent to commercialize; "there are no plausible allegations that would permit a conclusion that the effect of the use on the part of any of the defendants had any effect on any potential market for or any value of the copyrighted work"). Six months after filing suit, Bradley uploaded the image to a print-on-demand T-shirt website, but he ordered no T-shirts to sell and did not market their presence on that website to anyone. [SOF ¶ 68.] He was not actively exploring a market for T-shirts of the meme at the time he filed suit, or any market at all at the time of Analytical's use, and there is no evidence that he is exploiting any markets to date. He testified that Analytical's use of the Photograph *has not* impacted his efforts to sell T-shirts, because he had made no such efforts. [SOF ¶ 95.] Any potential market harm "remains hypothetical." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007).

That does not suffice. There can be little impact on a theoretical market for a picture that was "distributed for free … rather than sold for a profit." *Nunez*, 235 F.3d at 25. "Moreover, if the use is a fair use, then the copyright owner is not entitled to charge for the use, and there is no 'customary price' to be paid in the first place." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1265 (11th Cir. 2014). Bradley has no "evidence of the existence of an active market for [the original work], which is vital to defeating Defendants' fair use defense." *Estate of Smith v.*

*Graham*, 799 Fed. Appx. 36, 39 (2d Cir. 2020) (collecting cases). There is also no evidence that using the meme "would adversely affect its marketability." *Bond*, 317 F.3d at 396. "Ironically, if anything, [the defendant's use] increases the value of the work in a perverse way, but it certainly doesn't decrease it." *Id.* at 396-97. Meme creators are "far more likely to benefit" from viral use than be harmed, as Professor Sinnreich opined. [SOF ¶ 99.] If Bradley ever genuinely attempts to market T-shirts or other derivative works bearing the Photograph, Analytical's use will have served as free advertising. And additional free distributions of the Photograph on Facebook, even if widespread, would not reflect market harm to Bradley; "plaintiff would not lose out on any revenue because plaintiff contemplated allowing parties to use the Photograph[] for free." *Philpot*, 279 F. Supp. 3d at 719-20; *see also Bell*, 2020 U.S. Dist. LEXIS 96424, *26-27 (no evidence of market harm from a tweet). The total absence of evidence of market harm, and the likely market benefit resulting from Analytical's use, weigh strongly in favor of finding fair use.

5.    **Weighed together, the four factors support a finding of fair use.**

The "four statutory factors [may not] be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 577-78. "Because this is not a mechanical determination, a party need not 'shut-out' her opponent on the four factor tally to prevail" on summary judgment. *Wright v. Warner Books, Inc.*, 953 F.2d 731, 740 (2d Cir. 1991). Analytical prevails on the first factor because its use had a noncommercial character, in that it did not profit by avoiding any standard price for meme licensing; a transformative, educational purpose distinct from Bradley's aims; and a customary viral form he tacitly approved. The second factor weighs in favor of fair use, given Bradley's free, public, online distribution of the Photograph, and its marginally creative nature and meager original elements do not weigh against. The third factor favors fair use or is neutral because copying the entire work served Analytical's transformative purpose. And the fourth factor

weighs strongly in favor of fair use, as Bradley had no market purpose at the time of the Post and the Repost, there was no market for a meme that Analytical could have impaired, and there is no evidence that its use will harm any hypothetical market for any derivative work.

In sum, the two most significant factors weigh in favor of fair use and the others do too, or do not weigh against it. The infringement claim must be dismissed on the basis of fair use.

**D.      Bradley Misused Copyright by Enforcing It in His Freely Shared Photograph.**

Bradley's attempt to enforce copyright after freely sharing the Photograph is inequitable. His infringement claim, leveraging a copyright for purposes contrary to public policy, constitutes copyright misuse. *See Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977-78 (4th Cir. 1990).

The doctrine of copyright misuse prevents abuses of the public policy enshrined in the Copyright Clause: to "promote the Progress of Science and useful Arts." *Id.* at 975-77 (quoting U.S. Const., Art. I, § 8, cl. 8). It bars infringement claims where "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." *Id.* at 978. The defense, often applied to standard monopolistic behavior, is also "viable outside of anti-trust violations." *Gilbert Architects*, 629 F. Supp. 2d at 536; *accord Lasercomb*; 911 F.2d at 977-78.

The doctrine is well suited to restrict an infringement claim rooted in entrapment. "[M]any photographers make a practice of permitting their works to be distributed through means that allow unprotected copying and distribution, and then sue—often using Mr. Liebowitz as their attorney—when an unwitting publisher picks up one of their images[.]" Submission in Support of Order Barring Richard P. Liebowitz from Practice, ECF No. 13 at 1-2 & 4, *In re Liebowitz*, No. 3:19-mc-80228-JD (N.D. Cal. filed Dec. 16, 2019) (brief of non-party California News Publishers Association). Bradley publicly posted a meme on Facebook and permitted free reposting, but then sued Analytical for reposting it, seeking damages without any showing that the Repost caused any harm. He did not avail himself of Facebook's tools to request a takedown.

[SOF ¶ 100.] He did not pursue private resolution with Analytical before heading to court, eight days after learning of the Repost. [SOF ¶¶ 64-65.] He did not seek injunctive relief to have the Repost taken down. [SOF ¶ 101.] Bradley ignored Analytical's pre-answer offers to settle and take down the Photograph. [SOF ¶¶ 102-104.] He sought an inflated settlement payoff once Analytical answered. [SOF ¶¶ 105.] He is attempting to exploit his copyright solely through extortive litigation, not legitimate licensing.[5] [SOF ¶¶ 2, 66-67, 92-93, 95, 106.] This violates the policies animating copyright law. *See Malibu Media, LLC v. Guastaferro*, No. 14-cv-1544, 2015 U.S. Dist. LEXIS 99217, *5-6 (E.D. Va. July 28, 2015) (denying motion to strike copyright misuse defense based on "Plaintiff's use of its copyrights 'to obtain its principal revenue through litigation rather than through its monthly service fee' ").

Copyright law does not seek to foster the suppression of creative works. "[T]he copyright law offers a limited monopoly to encourage ultimate *public access* to the creative work of the author." *Bond*, 317 F.3d at 395. "Indeed, copyright's purpose is to *promote* the creation and publication of free expression." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Here, as in *Bond*, "[t]here was no showing that the Plaintiff had any interest in using the copyright laws to facilitate the publication of the work. Rather, the precise opposite is the case. Plaintiff sought to use the copyright law to prevent the dissemination of the work … Plaintiff by no means had a motivation faithful to the purpose of the Copyright Act." Memorandum and Order, *Bond v. Blum*, Civ. A. No. MJG-01-2600, ECF No. 62 at 4 (D. Md. Feb. 7, 2002), *aff'd*, 317 F.3d at 397-98.

---

[5] This is Bradley's counsel's modus operandi. *See McDermott v. Monday Monday, LLC*, No. 17-cv-9230 (DLC), 2018 U.S. Dist. LEXIS 28664, *8 & n. 4 (S.D.N.Y. Feb. 22, 2018) (calling Liebowitz a "copyright troll," who is "more focused on the business of litigation than on selling a product or service or licensing their copyrights to third parties to sell a product or service"); *Usherson v. Bandshell Artist Mgmt.*, No. 19-cv-6368 (JMF), 2020 U.S. Dist. LEXIS 112368, *66 (S.D.N.Y. June 26, 2020) (discussing Liebowitz and his firm's "broader strategy to use the burdens of litigation to extract settlements, even in frivolous or unmeritorious suits").

And *post hoc* surprise de-authorizations undermine copyright law. "Nor can a copyright owner authorize copying but subsequently revoke its consent, thereby entrapping an otherwise innocent party into infringement." *Olan Mills Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1348 (8th Cir. 1994) (citing *Steve Altman Photography Co. v. United States*, 18 Cl. Ct. 267, 281 (1989)). "In effect, [Bradley] 'seeded' third-party distributions of the Photograph by releasing it for wide distribution without restriction, and now seeks to 'harvest' one of the resulting acts of distribution by alleging infringement against Defendant," Professor Sinnreich found. [SOF ¶ 107.] A copyright owner who "seeds" distribution of his work by uploading it to a file-sharing website cannot contend that resulting acts of redistribution constitute infringement. *See United States v. Hansmeier*, No. 16-cr-00334-JNE-KMM, 2017 U.S. Dist. LEXIS 145990, *3-4 (D. Minn. Sept. 8, 2017) (denying motion to dismiss indictment for fraud against copyright owner); *Guastaferro*, 2015 U.S. Dist. LEXIS 99217, *6-8 (declining to strike unclean hands defense).

"[E]quitable estoppel applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact—here, the act of infringement—because of something he has done or omitted to do." *Tempo Music v. Myers*, 407 F.2d 503, 507 n.8 (4th Cir. 1969) (quoting 18 Am. Jur. 2d Copyright and Literary Property §§ 26, 27 (1965)). Bradley sprang a copyright trap: he invited and reveled in a wave of viral distribution and then, a year after it faded, he abandoned his noncommercial purpose and sued one distributor to cash in. His purpose was not to further his ability to create and market artistic work, but to wring a surprise payment from a Facebook user that justifiably relied on shared norms of meme use. He must be "estopped to assert infringement and ask for damages and counsel fees. … So to hold is merely an application of the ancient equitable doctrine of 'unclean hands.'" *Id.* at 507.

Analytical is entitled to judgment on the copyright claim on the basis of copyright misuse.

## II.    Analytical Is Entitled to Judgment Denying Any Recovery on the Copyright Claim.

Bradley should be precluded from proving any copyright damages because he failed to provide a computation of damages in his initial disclosures, and never adduced any. [SOF ¶ 94.] Any damages case should be excluded as a sanction under Rule 37(c). *Nelson-Sabales*, 284 F.3d at 513 n. 10. And he has no valid grounds for any recovery.

Bradley seeks an award of his "actual damages." [DE 1, Prayer ¶ 3.] He has no evidence of any. [SOF ¶¶ 92-94.] A plaintiff must prove that an alleged infringement caused him to lose money. *Dash v. Mayweather*, 731 F.3d 303, 313 (4th Cir. 2013). "[E]vidence of a copyright holder's prior licensing or valuation of his work can provide sufficient support for his actual damages claim," but its absence defeats the claim. *Id.* at 317. No one has purchased or licensed the Photograph or any merchandise. [SOF ¶¶ 20, 60, 66-68, 92-94.] Bradley sustained no loss.

He also seeks an award of Analytical's profits. [DE 1, Prayer ¶ 3.] Profits are awardable only if directly "attributable to the infringement." 17 U.S.C. § 504(b). A "plaintiff seeking profit damages has an affirmative duty to prove the defendant's 'gross revenue reasonably related to the infringement.'" *Dash*, 731 F.3d at 329 (quoting *Bouchat v. Baltimore Ravens Ltd. P'ship*, 346 F.3d 514, 518 (4th Cir. 2003) ("*Bouchat I*")). He must show a "rational connection between the particular source of revenue and the act of infringement." *Bouchat I*, 346 F.3d at 518. But "unrebutted evidence establishing that the revenues received from those sources were not attributable to the infringement" cannot be overcome by "mere speculation as to the existence of a causal connection." *Id.* at 518, 520. Analytical had no profits attributable to the Repost. [SOF ¶¶ 55-56.] Educators and parents buy Analytical products based on their educational content, not memes. [SOF ¶ 121.] In the wake of the Repost, Analytical had just one sale to a customer who had seen its Facebook page before his purchase. [SOF ¶ 56.] He had followed Analytical on Facebook for months by then, so his purchase cannot be attributed to the Repost. [*Id.*]

Bradley also wants "punitive damages for copyright infringement." [DE 1, Prayer ¶ 7.] No such remedy exists, as "the Copyright Act does not authorize punitive damages." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 545 (4th Cir. 2007). No admissible evidence supports any recovery for Bradley, so Analytical is entitled to judgment denying him any award.

## III. Analytical Is Entitled to Summary Judgment on the Copyright Management Information Claim.

Bradley fails to state a claim for the removal of copyright management information ("CMI"). He alleged that Analytical "intentionally and knowingly" removed CMI identifying him as the photographer. [SOF ¶ 108.] The allegation never had a factual basis. When he made the Post, no CMI identified him as the photographer. No CMI was conveyed with the Photograph when Analytical received it, so Analytical could not have removed any. And Analytical never formed any aspect of the "double scienter" required to make out a claim under 17 U.S.C. § 1202.

Bradley's Post, as it originally appeared on December 8, 2017, did not assert that he had taken the Photograph. "This is wrong on so many levels" was the only text included. [SOF ¶¶ 9, 109.] No text was superimposed on the Photograph as it appeared in the Post until December 14, 2018, when Bradley replaced the original Photograph file with a version bearing a "copyright 2018 Matthew J Bradley" tag. [SOF ¶ 114.] No CMI or watermark appeared on the Photograph and no author-identifying information was included in the Post or conveyed as metadata for the Photograph.[6] [SOF ¶¶ 9, 58-59, 110.] The original Post, like any other Facebook post, displayed his username. [SOF ¶ 115.] But that identified Bradley only as the poster, not as the

_____

[6] Bradley testified, "There is metadata on the photograph itself which identifies me as the photographer, my phone more specifically." [SOF ¶ 111.] However, he did "not know if … Facebook postings preserve the metadata information." [*Id.*] While the metadata documentation that Bradley produced for the Photograph indicates the make and model of phone used to take the Photograph, that information does not constitute CMI. [SOF ¶ 112.] Some information about a photograph, its photographer, and its copyright owner fits the statutory definition of CMI, but information about a photographer's phone does not. 17 U.S.C. § 1202(c)(1)-(8). Bradley's metadata documentation does not include any author or copyright information. [SOF ¶ 113.]

photographer. A Facebook poster's username does not indicate who created the post's content. Bradley himself has posted content on Facebook by others, in posts bearing his username, without indicating his sources and who created the content. [SOF ¶¶ 26, 73.]

The statute specifically defines CMI as certain kinds of information "conveyed in connection with" a work, including "the name of, and other identifying information about, the author of a work," but expressly excluding "any personally identifying information about a user of a work." 17 U.S.C. § 1202(c). A Facebook username is *user*-identifying information, not "author-identifying information." *Murphy v. Millennium Radio Grp., LLC*, 650 F.3d 295, 305 n. 13 (3d Cir. 2011). A name is only CMI under Section 1202(c)(2) when it is "information that identifies the author of the work." S. Rep. No. 105-190, at 35 (1998).

To qualify as CMI, the material conveyed with a photograph must "signal authorship or copyright ownership." *Laser Kitten, LLC v. Marc Jacobs Int'l, LLC*, No. 17-cv-8613, 2018 U.S. Dist. LEXIS 171962, *11 (S.D.N.Y. Oct. 4, 2018). After all, "the point of CMI is to inform the public that something is copyrighted and to prevent infringement." *Personal Keepsakes, Inc. v. PersonalizationMall.com, Inc*., 975 F. Supp. 2d 920, 928 (N.D. Ill. 2013). Plaintiffs must offer "specific evidence that removal of CMI … will impair their policing of infringement." *Stevens v Corelogic, Inc*., 899 F 3d 666, 675 (9th Cir. 2018). A Facebook username identifies an account holder, not the author or copyright holder of any content posted. It is not like a painter's signature, a reporter's byline, or a "gutter credit." *Murphy*, 650 F.3d at 305. It is not CMI for a photograph posted on Facebook because it fails to identify the user as the photographer.

Nothing at all in the Post identified Bradley as the photographer until December 24, 2017, when a commenter asked, "Is this your original picture?" and Bradley responded in a comment on the Post, "Yes!" [SOF ¶¶ 37, 116.] As that response was one of the last of more than 800

comments that the Post received, readily accessible only by scrolling through hundreds of earlier comments, it was too remote from the Photograph to give reasonable notice that Bradley claimed authorship or ownership.[7] [SOF ¶ 117.] The main body of the Post gave no such notice until the next year, on December 14, 2018, when Bradley added "I took the picture with my phone" to the Post's text, and replaced the Photograph with a version bearing a copyright tag. [SOF ¶¶ 114, 118.] That CMI in the amended Post and Photograph did not exist at the time of Analytical's use.

When a third party distributes an image from social media elsewhere online without passing on any CMI, later distributees cannot be liable for any removal. *See Watson v. Kappa Map Group, LLC*, No. 14-cv-100-TWT, 2015 U.S. Dist. LEXIS 33852 (N.D. Ga. Mar. 29, 2015). No CMI was conveyed with the Photograph when Gene Boecker sent it to Analytical on December 14, 2017. [SOF ¶¶ 49-51.] Bradley wrongly presumed that Analytical "knowingly removed his name," solely because it "was not conveyed in connection with" the Repost. [SOF ¶ 107.] "Given the existence of a third party that has not been deposed and is otherwise absent from the case, it would be too speculative to infer that [defendant] removed CMI simply because [plaintiff] avers that [the third party] received images containing copyright information." *Photographic Illustrators Corp. v. Orgill, Inc.*, 118 F. Supp. 3d 398, 407-08 (D. Mass. 2015), *aff'd*, 953 F.3d 56 (1st Cir. 2020). The Photograph had no CMI when Bradley posted it and when Analytical received it, so it had none in the Repost. [SOF ¶ 119.] This "cannot constitute *removal* or *alteration* of CMI—both of those words suggest that a defendant must take some action with respect to pre-existing CMI." *Agence Fr. Presse v. Morel*, No. 10-cv-2730 (AJN), 2014 U.S. Dist. LEXIS 112436, *24-25 (S.D.N.Y. Aug. 13, 2014); *accord Falkner v. GM, LLC*, 393 F.

---

[7] Under Section 1202(c), "information must be 'conveyed in connection with' copies of the work in question to qualify as CMI. Generally, to satisfy that requirement, a copyright notice must be 'close to' the work." *Drauglis v. Kappa Map Group, LLC*, 128 F. Supp. 3d 46, 60 (D.D.C. 2015) (collecting cases).

Case 5:19-cv-00249-FL   Document 27   Filed 07/17/20   Page 36 of 39

Supp. 3d 927, 938 (C.D. Cal. 2018) (citing Black's Law Dictionary definitions) (finding no "case standing for the proposition that failure to include copyright management information … constitutes removal or alteration"). Bradley cannot show any act of CMI removal by Analytical.

He also cannot show that Analytical had any scienter relevant to the CMI claim. "[T]here can be no knowledge of any removal or alteration if there is no underlying removal or alteration." *Falkner*, 393 F. Supp. 3d at 939. Under the "double scienter requirement" of 17 U.S.C. § 1202(b), both intentional CMI removal and knowledge of copyright infringement are elements of the claim. *Stevens*, 899 F.3d at 674. Analytical had no "reasonable grounds to know" that the Repost would "induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b). It did not know, or even believe, that reposting the meme would be an infringement at all. [SOF ¶ 120.]

Analytical simply reposted the Photograph openly, in the form in which it was received. It did not remove any CMI, intentionally or otherwise, and did not know that any had been removed. Bradley cannot make an affirmative showing of scienter or CMI removal. Therefore, Analytical is entitled to judgment on the copyright management information claim.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Analytical on both of Bradley's claims and on its corresponding counterclaims, and deny him any relief.

Respectfully submitted,

Analytical Grammar, Inc.

By its attorneys:

Signed: July 17, 2020

/s/ Dan Booth

Dan Booth
Dan Booth Law LLC
60 Thoreau Street, #121
Concord, MA 01742
dan@danboothlaw.com
Local Civil Rule 83.1(e) Special Appearance

Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Parker Poe Adams & Bernstein LLP
PNC Plaza
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 835-4626
Facsimile: (919) 834-4564
Local Civil Rule 83.1(d) Counsel

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Albert P. Allan
ALLAN LAW FIRM, PLLC
435 East Morehead Street
Charlotte, NC 28202
Email: alallan@allaniplitigation.com

This the 17th day of July, 2020.

/s/ Dan Booth
Dan Booth
Dan Booth Law LLC
60 Thoreau Street, #121
Concord, MA 01742
dan@danboothlaw.com
Local Civil Rule 83.1(e) Special Appearance

Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Parker Poe Adams & Bernstein LLP
PNC Plaza
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 835-4626
Facsimile: (919) 834-4564
Local Civil Rule 83.1(d) Counsel