IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-cv-249-FL

| | |
|---|---|
| MATTHEW BRADLEY, <br><br> Plaintiff, <br><br> v. <br><br> ANALYTICAL GRAMMAR, INC., <br><br> Defendant. | **DEFENDANT ANALYTICAL GRAMMAR, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(a)(1), defendant Analytical Grammar, Inc. ("Analytical") hereby submits the following Separate Statement of Undisputed Material Facts in Support of Analytical's Motion for Summary Judgment. These undisputed facts establish that Analytical is entitled to summary judgment in its favor as to plaintiff Matthew Bradley's ("Bradley") claims of copyright infringement and removal or alteration of copyright management information ("CMI") and his claims for any copyright damages, and as to Analytical's counterclaims for a declaratory judgment of non-infringement of copyright, and of non-removal of CMI.

| UNDISPUTED MATERIAL FACT | SUPPORTING EVIDENCE |
|---|---|
| 1. Bradley is employed as a "high tech consultant." | Booth Decl., Ex. 1 (Bradley Tr. at 7:19-22). |
| 2. Bradley has no records reflecting that he has conducted any business as a professional photographer, or that he had sold or licensed for financial benefit any photograph he has taken. | Booth Decl., Ex. 1 (Bradley Tr. at 70:20-71:5), Ex. 2 (Bradley Resp. to Doc. Req. Nos. 2-4, 18-20). |
| 3. Bradley took a photograph on December 8, 2017 (the "Photograph"). | Booth Decl., Ex. 1 (Bradley Tr. at 21:21-22:16), Ex. 3 (Bradley Resp. to Inter. No. 2), Ex. 4. |

| | |
|---|---|
| 4. The Photograph. | Booth Decl., Ex. 5, Ex. 6 p. 8 (Complaint Ex. A). |
| 5. The Photograph shows the word "WRONG" written on duct tape on five carpentry tools called "levels," or spirit levels. | Booth Decl., Ex. 5, Ex. 6 p. 8 (Complaint Ex. A), Ex. 7 (Countercl. ¶ 15), Ex. 8 (Ans. to Countercl. ¶ 15). |
| 6. Other images of levels, depicting similar wordplay on the same cliché, had circulated online for years beforehand. | Booth Decl., Exs. 9, 10, 11. |
| 7. On April 27, 2020, Analytical served on Bradley an Expert Report of Aram Sinnreich, with four exhibits. | Booth Decl. ¶ 13; Sinnreich Decl., Ex. 1 (Sinnreich Report). |
| 8. Professor Sinnreich found several earlier memes online also incorporating a pun on the "wrong on so many levels" cliché. | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 11 & Ex. C). |
| 9. On December 8, 2017 at 5:02 p.m., Bradley posted the Photograph on his Facebook page at https://www.facebook.com/matthew.bradley.98434/posts/10155873949297068 (the "Post"), with the punch line "This is wrong on so many levels" as text above the Photograph. | Booth Decl., Ex. 1 (Bradley Tr. at 49:4-18), Ex. 3 (Bradley Ans. to Inter. No. 2), Ex. 7 (Countercl. ¶ 12), Ex. 8 (Ans. to Countercl. ¶ 12), Exs. 12-15. |
| 10. Bradley's conduct on Facebook on December 8, 2017 was governed by the terms of service set forth in Facebook's Statement of Rights and Responsibilities effective as of that date ("SRR"). By using Facebook's services, Bradley agreed to the terms of service and was bound by the SRR. | Booth Decl., Ex. 1 (Bradley Tr. at 20:18-21:15), Ex. 16. |
| 11. Facebook's SRR then stated a "Date of Last Revision: January 30, 2015[.]" In 2018, Facebook updated its terms of service for the first time since 2015. An April 2018 Facebook press release stated, "we last updated our terms or data policy three years ago[.]" | Booth Decl., Ex. 16 p. 1, Ex. 17 p. 3. |
| 12. The terms of the SRR included an "IP License," by which Bradley granted Facebook "a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license" to use the Photograph. That permission was expressly subject to Bradley's "privacy and application settings." | Booth Decl., Ex. 1 (Bradley Tr. at 20:18-21:20), Ex. 16 p. 1 at ¶ 2(1). |
| 13. Bradley had the right and ability to use Facebook's privacy settings to control how the Photograph would be shared. The SRR provided to Facebook users, including Bradley, "You own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." | Booth Decl., Ex. 16 p. 1 at ¶ 2. |

| | |
|---|---|
| 14. Facebook's SRR further provided: "When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information[.]" Facebook's SRR statement also incorporated Facebook's Data Policy by reference. The Data Policy reiterated the effect of posting a photograph under the Public setting. | Booth Decl., Ex. 16 p. 1 at ¶¶ 2(4), 1. |
| 15. Facebook's SRR specifically defined "use" to include all acts of copying and distribution: "By 'use' we mean use, run, copy, publicly perform or display, distribute, modify, translate, and create derivative works of." | Booth Decl., Ex. 16 p. 3 at ¶ 17(7). |
| 16. Bradley's privacy setting on Facebook was set to "Public" when he made the Post, and for all subsequent revisions. | Booth Decl., Ex. 1 (Bradley Tr. at 10:7-25, 20:3-22), Ex. 3 (Bradley Ans. to Inter. Nos. 2-3). |
| 17. Bradley has no records reflecting that he ever placed any terms or conditions on the sharing, reposting, or other distribution of the Photograph by third parties. | Booth Decl., Ex. 2 (Bradley Resp. to Doc. Req. No. 12). |
| 18. Bradley testified that when he shares memes through social media, he does not track down the meme's history to find its original post, and he does not ask permission from the poster, "because every time I have shared a meme it [the privacy setting] has been public, so that is not required." | Booth Decl., Ex. 1 (Bradley Tr. at 15:15-16:11). |
| 19. When he first made the Post, Bradley testified, he "did not expect it to go viral" and did not expect anyone would share it. He testified that at that time, he did not "expect to do anything else with the meme" he had created, and "did not expect to use it on merchandise of any kind." He "did not intend to do anything with" the Photograph in December 2017. | Booth Decl., Ex. 1 (Bradley Tr. at 27:24-28:19, 59:13-16). |
| 20. Bradley's Post became a viral meme. It was shared, via Facebook's "Share" function, more than 10,000 times within a week. As Professor Sinnreich explained, "With a click on the Share icon, a Facebook user can take a meme or other item publicly posted by another user and retransmit it, publicly or privately, on a user's timeline or via Facebook message." | Booth Decl., Ex. 7 (Countercl. ¶ 12), Ex. 8 (Ans. to Countercl. ¶ 12); Sinnreich Decl., Ex. 1 p. 7. |
| 21. Bradley's understanding of "what it means when something goes viral," he testified, is "where all of a sudden it's all over the internet and for usually for no explained reason." | Booth Decl., Ex. 1 (Bradley Tr. at 14:3-8). |
| 22. On December 8, 2017 at 5:14 p.m., twelve minutes after Bradley's Post, his cousin's husband Josh Vallee added the first comment to the Post: "This is good. I just might have to steal this one." Bradley clicked "Like" on the comment and responded, "Go ahead." | Booth Decl., Ex. 1 (Bradley Tr. at 25:23-26:9, 32:9-16), Ex. 12 pp. 2-3. |

| | |
|---|---|
| 23. Bradley testified that he first realized his "meme was going viral" later on December 8, 2017, the Post's first night, after "maybe a hundred shares all of a sudden … that just seemed to be an enormous number for me." | Booth Decl., Ex. 1 (Bradley Tr. at 28:9-25). |
| 24. Other Facebook users also commented that week, "Stealing," "I had to steal this," and "I'm stealing this!" | Booth Decl., Ex. 1 (Bradley Tr. at 26:25-27:14), Ex. 12 pp. 3, 15, 29. |
| 25. Bradley testified that he assumed that people who say they are "stealing something" on Facebook mean only that they are sharing it (via Facebook's "Share" icon), not "literally stealing it." | Booth Decl., Ex. 1 (Bradley Tr. at 31:25-32:23). |
| 26. However, Bradley has used "steal" in its more common, pejorative sense, to describe his own reuse of unattributed third-party content on Facebook. On February 8, 2018, he posted on his Facebook page text copied from a joke meme that had circulated online for at least a year, almost verbatim, without using Facebook's Share function, and without naming or providing a link to the meme's source or author. He commented, "I stole this," and urged other Facebook users, "Steal this, like I did and pass a laugh on to someone who needs it." | Booth Decl., Exs. 18, 19, 20; Sinnreich Decl. p. 11. |
| 27. Bradley was aware of the viral distribution. He testified that he was "stunned in a happy way when it started going viral," within about a week or two of the Post. He further testified that he was "pleased" when it started going viral on Facebook, and when it was shown elsewhere. | Booth Decl., Ex. 1 (Bradley Tr. at 30:4-6, 32:24-33:14, 31:22-24, 34:4-12). |
| 28. On December 14, 2017, at 11:31 a.m., Bradley edited the text accompanying the Post to add, "Wow! I am stunned! Over 10K shares. Time for a shameless plug for my blog," and included a link to his blog. | Booth Decl., Ex. 1 (Bradley Tr. at 30:7-14, 49:14-22), Ex. 7 (Countercl. ¶ 12), Ex. 8 (Ans. to Countercl. ¶ 12), Ex. 14, Ex. 15 p. 2. |
| 29. That afternoon some commenters criticized Bradley for editing the Post, and he responded: "Sorry, the picture is the joke … I really didn't expect 100 shares, so this is kind of surprising to me," and "I didn't expect it to get 100 shares let alone 12,000. If I had intended it to be a plug for my blog, I would have put it in at the beginning. BTW, I make no money from my blog whatsoever, so I had no other motivation other than I hope people would enjoy it." "At that point there was 12,000 shares" on Facebook, he testified. | Booth Decl., Ex. 1 (Bradley Tr. at 29:7-30:14), Ex. 12 pp. 29-30, Ex. 21 pp. 4-5, Ex. 22 pp. 3-5. |
| 30. Later that evening Bradley edited the Post's text a second time, to add an explanation about that morning's edit: "I added the stuff below after I went over 10K shares. Didn't realize it would change what people shared on their pages. I apologize to those who didn't like that." | Booth Decl., Ex. 1 (Bradley Tr. at 49:23-50:1), Ex. 14. |

| | |
|---|---|
| 31. Many people distributed the Photograph beyond Facebook shares. A later post by Bradley on his Facebook page, dated December 14, 2018, shows dozens of third-party uses of the Photograph, in a screenshot of the results of a search via Google Images for the term "wrong on so many levels meme." Copies of Bradley's Photograph had been reposted on Facebook, Imgur, LinkedIn, Pinterest, Reddit, and other websites. | Booth Decl., Ex. 23. |
| 32. The Photograph was reposted on Imgur on December 13, 2017, where it was listed among the "most viral images." | Booth Decl., Ex. 24. |
| 33. On the morning of December 14, 2017, the Photograph was reposted on Twitter under the username "Dr. Sheldon Cooper"; on Reddit under the username "dickfromaccounting"; and on Unilad Tech's Facebook page with a link to the Reddit post, not back to Bradley's Post. | Booth Decl., Ex. 1 (Bradley Tr. at 51:10-52:21), Exs. 25-27. |
| 34. An article in *Trend-Chaser* dated January 4, 2018, "The Most Clever Puns The Internet Has To Offer," included the Photograph without a link to Bradley's Post and without crediting him. | Booth Decl., Ex. 7 (Countercl. ¶ 18), Ex. 8 (Ans. to Countercl. ¶ 18), Ex. 28 pp. 11-12. |
| 35. An article in *BuzzFeed* dated January 27, 2018, "17 Puns That You'll Need to Be A Little Clever To Get," included the Photograph with a link to an Imgur repost, not to Bradley's Post, also without crediting him. | Booth Decl., Ex. 29 pp. 5-6. |
| 36. In his Answer to Analytical's Counterclaims, Bradley admitted that he "celebrated other unattributed distributions of the [P]hotograph" and "hail[ed] the viral distribution of the 'wrong on so many levels' meme." | Booth Decl., Ex. 7 (Countercl. ¶¶ 18 & 19), Ex. 8 (Ans. to Countercl. ¶¶ 18 & 19). |
| 37. On December 24, 2017, a commenter on the Post with the username Buck Smith asked, "Is this your original picture?" Bradley responded, "Yes! I took it in the physics lab at SRJC." Smith replied, "Wow I have seen this a couple of times on twitter now." Bradley responded again, "My picture? Wow…" | Booth Decl., Ex. 12 p. 50, Ex. 30 pp. 4-5, Ex. 31 p. 4. |
| 38. On April 20, 2018, Bradley posted the *Trend-Chaser* article on his Facebook page with the comment, "Hey, I'm famous! My picture made the list of the most clever puns on the internet! Woo hoo!" | Booth Decl., Ex. 1 (Bradley Tr. at 33:23-34:16), Ex. 32. |
| 39. Bradley admitted that he was "excited by this coverage" and, although the *Trend-Chaser* article "did not provide a photographer credit" for Bradley and it "did not identify [him] as the creator of the meme," he "still shared this article and celebrated it." | Booth Decl., Ex. 1 (Bradley Tr. at 34:17-35:5), Ex. 7 (Countercl. ¶ 18), Ex. 8 (Ans. to Countercl. ¶ 18). |
| 40. On November 7, 2018, a Facebook user with the username Rolland C. Coutinho commented on the Post, "I remember co opting this for my profile" and thanked Bradley, who clicked "Like" on his comment. | Booth Decl., Ex. 12 p. 51. |
| 41. "Almost all of the comments [on the Post] were within a couple of weeks of the original listing," Bradley testified. | Booth Decl., Ex. 1 (Bradley Tr. at 29:7-30:3). |

| | |
|---|---|
| 42. Fifteen days after the Post, on December 23, 2017, Bradley added the comment: "Only 295 shares to go above 20,000!" | Booth Decl., Ex. 12 p. 50, Ex. 30 p. 4. |
| 43. More than two years later, his Post remains stalled below 20,000 shares on Facebook. | Booth Decl., Ex. 1 (Bradley Tr. at 30:15-23), Ex. 12 p. 2, Ex. 30 p. 1, Ex. 31 p. 1. |
| 44. Commenting on a May 21, 2018 Facebook post, Bradley reflected on the popularity of the Post: "that was lightning in a bottle. I had many before, I will have more in the future. If I get lucky again, well … it happens." | Booth Decl., Ex. 1 (Bradley Tr. at 46:1-16), Ex. 33. |
| 45. Analytical is a corporation organized and existing under the laws of North Carolina, with its principal place of business in Raleigh, North Carolina. | Booth Decl., Ex. 7 (Countercl. ¶ 10), Ex. 8 (Ans. to Countercl. ¶ 10); Karl Decl. ¶ 2. |
| 46. Analytical offers language arts curricula and instructional materials for English grammar, punctuation, and usage. At all material times, Analytical sold its learning aids through its website at analyticalgrammar.com. Effective July 1, 2020, ownership of Analytical's learning aids transferred to Math-U-See, Inc., also known as Demme Learning, a Pennsylvania corporation, which sells Analytical's materials through its own website. | Booth Decl., Ex. 7 (Countercl. ¶ 10), Ex. 8 (Ans. to Countercl. ¶ 10); Karl Decl. ¶ 3. |
| 47. Analytical's educational mission is to promote and provide "grammar instruction for all." Its primary markets are public, private, charter, and home schools. | Booth Decl., Ex. 6 p. 8 (Complaint Ex. B); Karl Decl. ¶ 4. |
| 48. Analytical made Facebook a forum to foster mindfulness about English usage. At all material times, Analytical furthered its educational project through a steady stream of grammar advice, lessons, tips, and articles, including grammar and usage-themed memes, posted on its Facebook page at facebook.com/analyticalgrammar/. Analytical's marketing manager Melissa Kenney administered its Facebook page from July 1, 2015 through June 30, 2020. Effective July 1, 2020, due to a transfer of ownership to Demme Learning, Analytical no longer administers the Facebook page. | Karl Decl. ¶ 5; Kenney Decl. ¶¶ 1-2. |
| 49. Gene Boecker, a user of Analytical's Facebook page, sent a copy of the Photograph to Analytical via Facebook Messenger on December 14, 2017 at 9:06 p.m., with the message, "New one, I hadn[']t seen before..... Wrong on so many levels." On December 15, 2017 at 7:33 p.m., Melissa Kenney responded: "I LOVE THIS! I WILL USE IT!" | Booth Decl., Ex. 34; Kenney Decl. ¶ 3. |
| 50. Analytical had not seen the Photograph before Mr. Boecker's message. | Karl Decl. ¶ 6; Kenney Decl. ¶ 3. |
| 51. Nothing in Mr. Boecker's message identified Bradley as the photographer or conveyed any other identifying information or copyright management information about Bradley or the Photograph. | Booth Decl., Ex. 4, Ex. 34, Ex. 35 p. 1; Kenney Decl. ¶ 4. |

| | |
|---|---|
| 52. Analytical reposted the Photograph on its Facebook page on December 16, 2017, along with the text, "This is wrong on so many levels." (The "Repost.") | Booth Decl., Ex. 36; Karl Decl. ¶ 7; Kenney Decl. ¶ 5. |
| 53. The Repost exemplified and served Analytical's educational purpose. Analytical used the Repost and similar visual puns on Facebook to be thought-provoking, not just to entertain. | Karl Decl. ¶ 8; Kenney Decl. ¶ 6. |
| 54. Analytical did not financially "boost" or otherwise promote the Repost. Analytical did not add any comments to the Repost or further share the Photograph thereafter. | Karl Decl., ¶ 9; Kenney Decl. ¶ 7. |
| 55. Analytical did not seek any commercial benefit from the Repost. It did not sell or attempt to sell the Photograph, or charge a fee related to its use of the Photograph, and it did not profit or seek profit from the Repost. The Repost did not advertise or refer to any particular Analytical product or service. | Booth Decl., Ex. 37 (Analytical Resp. to Inter. Nos. 14 & 15); Karl Decl. ¶ 10; Kenney Decl. ¶ 8. |
| 56. Analytical did not generate any revenue attributable to the Repost. In the wake of the Repost, Analytical made only one sale to a customer who had seen its Facebook page before his purchase. That customer, Frank Onwona, had been following Analytical on Facebook for months by then. | Booth Decl., Exs. 37-41, Ex. 42 p. 6; Karl Decl., ¶¶ 11-14. |
| 57. On December 14, 2018, Bradley applied to register the copyright for the Photograph with the Copyright Office. Based on that application, he ultimately obtained Copyright Registration No. VAu 1-355-121, with an effective date of registration of December 14, 2018. The registration certificate erroneously indicated that the Photograph was unpublished, as indicated by the "u" in the registration number. | Booth Decl., Ex. 3 (Bradley Resp. to Inter. No. 10), Ex. 7 (Countercl. ¶ 19), Ex. 8 (Ans. to Countercl. ¶ 19); Ex. 43. |
| 58. On December 14, 2018, Bradley edited the Post again. He replaced the unadorned Photograph in the Post with a copy that includes, as text placed directly on the Photograph, both the punch line "THIS IS WRONG ON SO MANY LEVELS" in all-caps lettering, and a copyright tag: "copyright 2018 Matthew J Bradley." | Booth Decl., Ex. 1 (Bradley Tr. at 50:2-23), Ex. 12 p. 2, Ex. 13, Ex. 14, Ex. 15 p. 3. |
| 59. Bradley also amended the text of the Post on December 14, 2018, for the third time, by adding (immediately below the "This is wrong on so many levels" punch line): "Please note that this picture is copyrighted. I appreciate all of you who shared it (very unexpectedly). Some people, however, are passing it off as their own work. I took the picture with my phone. This is the original photo (meme added). If you see anyone violating this copyright, please let me know. Thanks." | *Id*. |
| 60. On December 14, 2018, Bradley sent demands to five websites where the Photograph had appeared, including Reddit and Imgur, seeking $50 payment apiece. None complied. He has never generated any revenue from the Photograph. | Booth Decl., Ex. 1 (Bradley Tr. at 67:1-18), Ex. 2 (Bradley Resp. to Doc. Req. No. 19), Exs. 44-46. |

| | |
|---|---|
| 61. On or about December 14, 2018, Bradley also conducted a Google search for "DRM attorney" (digital rights management attorney) that led him to Richard Liebowitz ("Liebowitz"). | Booth Decl., Ex. 1 (Bradley Tr. at 72:4-9). |
| 62. Bradley engaged Liebowitz's firm, Liebowitz Law Firm, PLLC, under a contingent-fee agreement. | Booth Decl., Ex. 1 (Bradley Tr. at 66:2-10, 74:14-25, 81:3-83:8), Ex. 3 (Bradley Resp. to Inter. Nos. 6 & 13). |
| 63. On January 3, 2019, Liebowitz filed a second application to register the copyright on Bradley's behalf on January 3, 2019 and obtained Copyright Registration No. VA 2-133-725, Bradley's basis for this action. | Booth Decl., Ex. 3 (Bradley Resp. to Inter. No. 10), Ex. 7 (Countercl. ¶ 19), Ex. 8 (Ans. to Countercl. ¶ 19); Ex. 6 (Complaint ¶ 9), Ex. 47, Ex. 48. |
| 64. Liebowitz's firm notified Bradley of Analytical's Repost on June 10, 2019, and Bradley authorized the firm to pursue the case. | Booth Decl., Ex. 1 (Bradley Tr. at 71:6-17), Ex. 3 (Bradley Resp. to Inter. No. 7), Ex. 49. |
| 65. Before filing suit on June 18, 2019, Bradley and his counsel did not contact Analytical to request that it remove the Photograph from its Facebook page, or to request credit, or for any other purpose. | Booth Decl., Ex. 6 (Complaint), Ex. 35 p. 1; Karl Decl. ¶ 15; Kenney Decl. ¶ 9. |
| 66. Bradley has no evidence of any sale of, licensing of, or revenue from the Photograph or related merchandise. | Booth Decl., Ex. 2 (Bradley Resp. to Doc. Req. Nos. 18-20). |
| 67. Bradley has not negotiated any license or other agreement with any third party to use the Photograph for a fee. | Booth Decl., Ex. 1 (Bradley Tr. at 70:20-25). |
| 68. Unrelated to the Photograph, in the wake of the Sonoma County wildfires in November 2019, Bradley set up an account with the apparel company Custom Ink to make T-shirts available as a fundraiser for the California Fire Department. He first claimed, in December 2019, that he intends at some point to sell T-shirts bearing the Photograph via Custom Ink, but he still had taken no steps to make any money selling or licensing the Photograph by then. Bradley testified that he had not uploaded the image to Custom Ink's website before his December 12, 2019 deposition. His Custom Ink account page does not reflect any marketing or sales of any apparel that Bradley designed. | Booth Decl., ¶ 52, Ex. 1 (Bradley Tr. at 60:19-61:22, 62:2-18), Ex. 3 (Bradley Resp. to Inter. No. 4), Ex. 50. |
| 69. In his Expert Report, Professor Sinnreich explained, "Social media platforms encourage and reward the widespread repurposing of digital content, without requiring or incentivizing attribution. … On Facebook, for example, the standard user interface facilitates the easy repurposing and redistribution of memes from one user to another." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 7). |

| | |
|---|---|
| 70. Professor Sinnreich opined that "there is an <u>implicit user right</u> to participate in the 'viral' distribution of memes via social media (without which, memes could not exist), and Defendant's use was well within the normative parameters of this implicit right. Social media users recognize that the viral distribution of memes is a common feature of social media use, and do not understand that such use requires compensation to the viral source or originator of the meme." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 9). |
| 71. Professor Sinnreich opined, "There is no normative basis to expect credit or compensation for the viral distribution of a meme. … Plaintiff cannot expect to exercise control over distribution. … [I]t is <u>not reasonable for a meme creator to expect a fee</u> for recirculation." | Sinnreich Decl., Ex. 1 (Sinnreich Report pp. 12 & 13). |
| 72. Analytical has shared and reposted thousands of memes on its Facebook page. Facebook has never prevented Analytical from reposting third-party Facebook content. Other than Bradley, no Facebook user has ever claimed or suggested to Analytical that it is not permitted. | Karl Decl. ¶ 16. |
| 73. Bradley created another meme, using six unlicensed and unattributed photographs by other photographers, which he posted on Facebook on May 21, 2018. | Booth Decl., Ex. 1 (Bradley Tr. at 41:13-42:20), Ex. 33. |
| 74. Bradley testified that what prompted him to make the "wrong on so many levels meme" was that: "I frequently take pictures of things I think are amusing and share them on Facebook. That's all." | Booth Decl., Ex. 1 (Bradley Tr. at 17:2-5). |
| 75. He testified that he posted the Photograph on Facebook because "I often post pictures that I think are funny." He further testified, "I'm just posting things that I think are funny," and "I frequently post pictures like that [the Photograph]." | Booth Decl., Ex. 1 (Bradley Tr. at 20:3-11, 46:1-16). |
| 76. Bradley has created and posted many similar works. "I have been doing it for years on Facebook," he testified; "it's just something I do for fun to share with my friends." He further testified that he would be "pleased if they are shared," and that he is "posting them for public consumption." | Booth Decl., Ex. 1 (Bradley Tr. at 46:24-47:17). |
| 77. Analytical neither sought nor gained any direct or indirect commercial advantage from its use of the Photograph. Its profits, revenues, and overall commercial performance were not tied to the use. | Booth Decl., Exs. 37-40, 41; Karl Decl. ¶ 17. |
| 78. At all material times, including at any time before July 1, 2020, Analytical has not hosted third-party advertising on Facebook or on its website. Effective July 1, 2020, due to the transfer of ownership to Demme Learning, Analytical no longer administers the Facebook page. | Karl Decl. ¶¶ 5 & 18. |

| | |
|---|---|
| 79. The customary price for a viral use of a social media meme is free. As Professor Sinnreich explained, based on his research and leading academic sources on meme use and social media use, "Memes and other social media content are not commonly expected to be revenue-bearing for their creators, either via direct (e.g. retail) or indirect (e.g. content licensing) models. … [T]he overwhelming majority of memes are produced, distributed, altered, and redistributed without attribution or fee-based license agreements, and without the reasonable expectation of direct remuneration. The vast majority of people who create and/or share memes do so with the expectation, and even the hope, that they will be recirculated widely, without express permission, payment, or attribution. By the same token, people who recirculate memes on social media do so without any expectation that they are expected to get prior permission from, or make payment or attribution to, the original author." | Sinnreich Decl., Ex. 1 (Sinnreich Report pp. 7-9); Kenney Decl. ¶¶ 10-11. |
| 80. Though Bradley made anomalous demands for an *ex post facto* $50 "fee" from certain websites that took his picture down, none complied, as no fee was required. | Booth Decl., Ex. 1 (Bradley Tr. at 67:1-71:5), Exs. 44-46. |
| 81. The two main definitions of "viral" are "of, relating to, or caused by a virus," and "quickly or widely spread or popularized especially by means of social media." | Booth Decl. ¶ 53, Ex. 51. |
| 82. The two main definitions of "meme" are "an idea, behavior, style, or usage that spreads from person to person within a culture," and "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." | Booth Decl., Ex. 1 (Bradley Tr. at 14:21-15:11), Ex. 52; Sinnreich Decl., Ex. 1 (Sinnreich Report p. 7). |
| 83. Bradley testified that, according to that *Merriam-Webster* definition of memes, "it almost has to go viral for it to be a meme." | Booth Decl., Ex. 1 (Bradley Tr. at 14:21-15:11, 38:21-25), Ex. 52. |
| 84. Professor Sinnreich explained that "[t]he capacity of a meme to be shared far beyond the creator's control is inherent in the common notion of the 'viral' distribution of memes." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 8). |
| 85. Professor Sinnreich opined "that the Defendant's use of the Photograph was a normative, typical use of a meme, in a noncommercial and transformed context." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 10). |
| 86. Throughout his report, Professor Sinnreich used the term "normative" to encompass both "widespread and unremarkable practice, in the sense that is typically described as 'normal,'" and "practice that has the effect of shaping and informing widespread expectations." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 3). |

| | |
|---|---|
| 87. Professor Sinnreich opined that "the Photograph is a meme based heavily on the commons. … Not only is the text supplied with the Photograph, 'this is wrong on so many levels,' a longstanding internet trope in and of itself, but the visual pun embodied in the Photograph is also a longstanding meme and cliché, with several prior versions in wide, 'viral' circulation prior to Plaintiff's version, as a rudimentary Google Image search makes very clear." | Sinnreich Decl., Ex. 1 (Sinnreich Report pp. 10-11 & Ex. C). |
| 88. Professor Sinnreich opined that the Photograph "is very limited in its novelty, creativity, and originality," in part because "it was minimally differentiated from other prior art." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 11 & Ex. C). |
| 89. Bradley continued to create and post memes after the Post and Repost. | Booth Decl., Ex. 1 (Bradley Tr. at 39:3-40:12, 41:13-42:4, 46:24-47:19), Exs. 20, 33, 53-56. |
| 90. Bradley testified, "I just posted just as much as I had before, just as much as I have since, maybe a little less actually. I have been busier." | Booth Decl., Ex. 1 (Bradley Tr. at 46:1-23), Ex. 33. |
| 91. Professor Sinnreich found "no evidence that [Bradley] gave special consideration to the staging, lighting, or composition of the Photograph," and opined "that the nature of the Photograph is a minimally creative variation on elements of the cultural commons, to which Plaintiff can claim no ownership[.]" | Sinnreich Decl., Ex. 1 (Sinnreich Report pp. 11-12). |
| 92. In his Responses to Analytical's First Request for Production of Documents, Bradley admitted that he has no "documents showing any effect that any Defendant use of the Photograph has had, or is reasonably likely to have, on the market for, potential market for, or value of the Photograph or any derivative works." | Booth Decl., Ex. 2 (Bradley Resp. to Doc. Req. No. 26). |
| 93. In his Responses to Analytical's First Request for Production of Documents, Bradley admitted that he has no documents showing any damages that he suffered or injury caused by Analytical's use of the Photograph. | Booth Decl., Ex. 2 (Bradley Resp. to Doc. Req. No. 28). |
| 94. In his Rule 26(a)(1) Initial Disclosures, Bradley did not include a computation or estimate of damages sustained or recoverable profits. He stated, "Plaintiff refers Defendant to the Complaint for an itemization of the types of damages suffered. As Plaintiff has not yet obtained discovery of Defendant's financial, sales and other relevant records, Plaintiff cannot make a reasonable estimate of the damages sustained or infringing profits he may recover as a result of Defendant's actions. Plaintiff[] reserves his right as to if he will seek actual or statutory damages." Bradley never supplemented his Initial Disclosures to provide a computation of any damages claimed or recoverable profits. | Booth Decl. ¶¶ 58-59, Ex. 56 (Bradley Initial Disclosures p. 3). |
| 95. Bradley testified that Analytical's use of the Photograph has not impacted his efforts to sell T-shirts because he had not yet made any efforts to sell T-shirts. | Booth Decl., Ex. 1 (Bradley Tr. at 66:19-25). |

| | |
|---|---|
| 96. Professor Sinnreich opined, "It is aberrant, and contrary to widely accepted norms and practices of social media use, to regard the viral use of a meme on Facebook as having any potential negative effect on any market for the meme or on the value of the meme. There is <u>no market whatsoever</u> for the sale of memes at retail. Consumers have access to millions of memes freely via social media services, and it is unreasonable to expect that a consumer would ever pay for access to a meme. There is also <u>no substantial market</u> for the licensing of photographs for memes. … there is so much freely available memetic content that publishers have no incentive to pay a license fee to use one." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 13). |
| 97. Professor Sinnreich opined that "social media users routinely redistribute [memes] in their entirety." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 12). |
| 98. In Professor Sinnreich's opinion, the popularity of a meme on Facebook is not reasonably considered a "market demand for the meme." He posited that hypothetically, "a Facebook use of a meme could be considered an economic market use" and "the popularity of a meme could be considered a market demand for the meme," but opined that those are "two suppositions that do not reasonably reflect social practice." | Sinnreich Decl., Ex. 1 (Sinnreich Report p. 14). |
| 99. Professor Sinnreich identified a potential benefit to the value of the meme from viral use: "to the limited extent that [meme] creators do monetize them, which is infrequent, that monetization is not direct but based on the sale of derivative works (e.g. merchandise) and sponsorship … These uncommon revenue models are aided, rather than hindered, by widespread, unpermissioned sharing of the meme; its 'viral' status is what qualifies it for access to those markets." Accordingly, he opined, "meme creators are far <u>more likely to benefit</u> economically and otherwise from viral, unpermissioned recirculation of their work, through the exploitation of derivative works and endorsements." | Sinnreich Decl., Ex. 1 (Sinnreich Report pp. 8-9, 13). |
| 100. Facebook offers tools to report claims of intellectual property infringement. The notice-and-takedown provisions of 17 U.S.C. § 512 require Facebook to promptly remove allegedly infringing material posted by users, and give the users notice of the takedown and a chance to dispute the claim. Apparently Bradley and his counsel did not issue a takedown request to Facebook, alleging infringement under 17 U.S.C. § 512. Analytical did not receive notice of a takedown and Facebook did not take the Repost down. | Booth Decl., Ex. 16 p. 2 (AG0195 at ¶¶ 5.3-5.4); Karl Decl. ¶ 19; Sinnreich Decl., Ex. 1 (Sinnreich Report p. 15). |
| 101. Bradley did not seek to have the Repost taken down by requesting injunctive relief in the complaint. | Booth Decl., Ex. 6 (Complaint pp. 4-5). |

| | |
|---|---|
| 102. Before answering the complaint, Analytical's president Erin Karl apologized for the use of the Photograph and offered to make amends and settle the dispute by accepting judgment, in an email she sent to Bradley's counsel on August 16, 2019. Ms. Karl's email further stated, among other things, "We will have it [the Photograph] taken down promptly if you request it." Ms. Karl reiterated the offer in an email she sent to Bradley's counsel on August 19, 2019. | Booth Decl., Ex. 35, Ex. 58; Karl Decl. ¶¶ 20-21. |
| 103. Before answering the complaint, in emails sent to Bradley's counsel on August 20 and 21, 2019, Analytical's counsel reiterated Analytical's offer to accept entry of judgment, proposed to discuss a possible settlement, and again asked "if Mr. Bradley requests the removal of his photo from Analytical Grammar's Facebook page." | Booth Decl. ¶ 62, Ex. 59. |
| 104. Neither Bradley nor his counsel ever responded to Analytical's offers to accept judgment or to its offers to remove the Photograph from its Facebook page. | Booth Decl. ¶¶ 62-63, Exs. 35, 58-59; Karl Decl. ¶¶ 21-23. |
| 105. Analytical filed its answer to the complaint on September 13, 2019. Through counsel, Bradley sent Analytical an offer to settle the matter for $5,500, on September 17, 2019, four days after Analytical answered the complaint. | Booth Decl., ¶ 64, Exs. 7, 60. |
| 106. Professor Sinnreich opined," The only effort the Plaintiff has made to derive any revenue from the Photograph is through <u>litigation and the threat of litigation</u>. He did not proactively seek to license his work to third parties, or try to monetize the work on his own through the production and sale of derivative works, advertising, or any other means." | Sinnreich Aff, Ex. 1 (Sinnreich Rep. p. 14). |
| 107. Professor Sinnreich opined, "The Plaintiff only <u>registered the copyright in the Photograph</u> a year after he had shared it publicly and freely, without any indication of its authorship, provenance, or copyright status. In the interim year, free, anonymous, and unpermissioned distribution of the work had propelled it to 'viral meme' status — a development that the Plaintiff publicly celebrated. In effect, he 'seeded' third-party distributions of the Photograph by releasing it for wide distribution without restriction, and now seeks to 'harvest' one of the resulting acts of distribution by alleging infringement against Defendant." | *Id.* |
| 108. Bradley alleged in his complaint in this action, "Upon information and belief, [Analytical] intentionally and knowingly removed copyright management information identifying Plaintiff as the photographer of the Photograph." He later verified that the sole basis for his "presumption at the time of filing [the complaint] that Defendant knowingly removed his name" was that "Plaintiff's name was not conveyed in connection with Defendant's subsequent display of the Photograph" in the Repost. | Booth Decl., Ex. 3 (Bradley Resp. to Inter. No. 11), Ex. 6 p. 4 (Complaint ¶ 18). |

| | |
|---|---|
| 109. In the Post, as it originally appeared on December 8, 2017, Bradley did not assert that he had taken the Photograph. "This is wrong on so many levels" was the only text included with the Post. | Booth Decl., Ex. 3 (Bradley Resp. to Inter. No. 2), Exs. 12-15; Karl Decl. ¶ 24. |
| 110. In the Post, as it originally appeared on December 8, 2017, no CMI or watermark appeared on the Photograph and no author-identifying information was included or conveyed as metadata for the Photograph. | Booth Decl., Ex. 1 (Bradley Tr. 24:12-23), Ex. 4, Ex. 14, Ex. 15 p. 2. |
| 111. Bradley testified, "There is metadata on the photograph itself which identifies me as the photographer, my phone more specifically." However, he did "not know if … Facebook postings preserve the metadata information." | Booth Decl., Ex. 1 (Bradley Tr. 21:21-24:20), Ex. 4. |
| 112. The metadata documentation that Bradley produced for the Photograph identifies the make and model of phone used to take the Photograph as a Motorola Moto Z (2). | Booth Decl., Ex. 4. |
| 113. Bradley's metadata documentation does not include any author or copyright information. The "Author and Copyright" section of the documentation states only, "Copyright not found." | Booth Decl., Ex. 4. |
| 114. No text was superimposed on the Photograph as it appeared in the Post until December 14, 2018, when Bradley replaced the original Photograph file with a version bearing a "copyright 2018 Matthew J Bradley" tag. | Booth Decl., Ex. 1 (Bradley Tr. 50:2-51:19, 52:22-53:3), Ex. 12 p. 2, Ex. 13, Ex. 14, Ex. 15 pp. 2-3. |
| 115. His original Post, like any other Facebook post, displayed his Facebook username. | Booth Decl., Ex. 1 (Bradley Tr. 23:13-25, 53:13-55:4), Ex. 3 (Bradley Resp. to Inter. No. 11). |
| 116. Nothing in the Post identified Bradley as the photographer until December 24, 2017, when a commenter asked, "Is this your original picture?" and Bradley responded in a comment on the Post, "Yes! I took it in the physics lab at SRJC." | Booth Decl., Ex. 12 p. 50, Ex. 30 pp. 4-5, Ex. 31 p. 4; Karl Decl. ¶ 25. |
| 117. That response, one of the last of more than 800 comments that the Post received, was only readily accessible by scrolling through hundreds of earlier comments. | Booth Decl., Ex. 12 pp. 2 & 50, Ex. 31 p. 1. |
| 118. The first indication or assertion in the main body of the Post that Bradley asserted authorship or ownership of the Photograph appeared on December 14, 2018, when Bradley added "I took the picture with my phone" to the Post's text, and replaced the Photograph in the Post with one bearing a copyright tag. | Booth Decl., Ex. 1 (Bradley Tr. 50:2-51:22), Ex. 5, Ex. 13; Karl Decl. ¶¶ 25-26. |
| 119. The Repost shows the Photograph just as it appeared when Bradley shot it and posted it on December 8, 2017, and when Analytical received it on December 14, 2017. | Booth Decl., Ex. 1 (Bradley Tr. 49:4-51:19), Ex. 4, Ex. 14, Ex. 34; Kenney Decl. ¶ 12. |

| | |
|---|---|
| 120. Analytical did not know, or even believe, that reposting the meme would be an infringement at all. As Analytical's president Erin Karl told Bradley's counsel in her August 16, 2019 email, "The photo was a viral meme and we thought that sharing it on Facebook was permitted." As Analytical's counsel told Bradley's counsel in his August 20, 2019 email, "My client believed in good faith that its use of the viral meme was permissible and would not constitute an infringement." | Booth Decl. ¶ 62, Exs. 35 & 58-59; Karl Decl. ¶ 27; Kenney Decl. ¶¶ 10-11. |
| 121. Analytical's customers are educators and parents. They are savvy consumers who make informed decisions about educational resources. Their purchases of Analytical's instructional materials are driven by the educational content it has developed over decades, not by the fleeting appearance of a meme on its Facebook page. Analytical's president Erin Karl is not aware of any sale by Analytical that was attributable to any meme on Facebook. She has no reason to believe that a single, ephemeral repost of a meme, including Bradley's meme, has ever been a significant factor influencing or leading to any purchase from Analytical. | Karl Decl. ¶ 28. |

Dated: July 17, 2020

Respectfully submitted,

/s/ <u>Dan Booth</u>
Dan Booth

*Counsel for Defendant Analytical Grammar, Inc.*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Albert P. Allan
ALLAN LAW FIRM, PLLC
435 East Morehead Street
Charlotte, NC 28202
Email: alallan@allaniplitigation.com

This the 17th day of July, 2020.

/s/ Dan Booth
Dan Booth
Dan Booth Law LLC
60 Thoreau Street, #121
Concord, MA 01742
dan@danboothlaw.com
Local Civil Rule 83.1(e) Special Appearance

Christopher M. Thomas
N.C. State Bar No. 31834
christhomas@parkerpoe.com
Parker Poe Adams & Bernstein LLP
PNC Plaza
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 835-4626
Facsimile: (919) 834-4564
Local Civil Rule 83.1(d) Counsel