**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-cv-249-FL**

| | | |
|---|---|---|
| _____ | ) | |
| MATTHEW BRADLEY, | ) | **DEFENDANT ANALYTICAL** |
| | ) | **GRAMMAR, INC.'S APPENDIX** |
| Plaintiff, | ) | **TO LOCAL CIVIL RULE 56.1** |
| v. | ) | **STATEMENT OF** |
| | ) | **UNDISPUTED MATERIAL FACTS IN** |
| ANALYTICAL GRAMMAR, INC., | ) | **SUPPORT OF ITS MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendant. | ) | |
| _____ | ) | |

Exhibit 14: Expert Report of Aram Sinnreich dated April 27, 2020 (Ex. 1 to Declaration of A. Sinnreich)

Expert Report of Aram Sinnreich in the Matter of
*Matthew Bradley v. Analytical Grammar, Inc.*
Case No. 5:19-cv-00249 (E.D.N.C.)

Prepared by
Aram Sinnreich
School of Communication
American University
4400 Massachusetts Avenue NW
Washington, DC 20016

**Introduction**

I have been retained by Analytical Grammar, Inc. ("Defendant") to provide my expert opinions regarding a photograph (the "Photograph") that Matthew Bradley ("Plaintiff") shot and posted on his Facebook page, and its use in a post on Defendant's Facebook page. Specifically, I have been asked to opine on the nature of the Photograph, the purpose and character of Defendant's use thereof, the amount and substantiality of the portion used in relation to the Photograph as a whole, and any effect that the use may have on the potential market for, or value of, the Photograph. I have been asked to consider these matters in light of my expertise regarding customs and norms related to the use of memes in social media, and on how content creators and online user communities interpret and apply principles of copyright and fair use.

**Qualifications**

My qualifications are included in my *curriculum vitae*, annexed hereto as **Exhibit A**. A list of all publications authored by me in the previous 10 years is annexed hereto as **Exhibit B.** A summary of my background is below.

I received a Bachelor of Arts in English from Wesleyan University in 1994. I received a Masters of Science in Journalism from Columbia University in 2000. I received a Masters of Arts and a Doctorate of Philosophy in the field of Communication from the Annenberg School at the University of Southern California in 2005 and 2007, respectively. My doctoral dissertation focused on the aesthetics, ethics, and legal considerations surrounding "remix culture" — a broad category of new and emerging digital expressive forms including remixes, mashups, and memes.

My work focuses on the intersection of media, culture, law, and technology. I have worked in this field for 25 years. My professional experience has spanned multiple spheres, as a market analyst, marketing executive, book author, and tenure-track professor.

- From 1995-1996, I was employed as a paralegal at Sinnreich, Wasserman, Grubin & Cahill in New York City, where I focused on litigation relating to intellectual property infringement and construction.

- From 1996-1997, I was employed as a web developer. My principal client at the time was the law firm Davis, Polk & Wardwell in New York City.

- From 1997-2002, I worked at Jupiter Communications (renamed Jupiter Media Metrix in 2000) in New York City, where I was promoted several times from a Research Associate to the rank of Senior Analyst and Research Manager. During my time there, I produced dozens of research reports and provided consulting services to hundreds of clients. My research focus was on the transformation of the media industries as a result of digital innovation. I was in charge of two special research tracks: one dedicated to the music industry, and one dedicated to internet law and policy.

- From 2004-2012, concurrent with my time as a graduate student, marketing executive, and early-career academic, I was the co-founder and Managing Partner, with former Jupiter colleague Marissa Gluck, of Radar Research, a custom research and consulting firm based in Los Angeles, CA. We generated over a million dollars in revenue, providing assistance and expertise related to digital marketing, online culture, and media strategy to a broad range of clients including the Online Publishers Association, Google, DoubleClick, Sony Pictures, and Nokia.

- From 2007-2009, I was employed as a Visiting Assistant Professor at New York University, in the department of Media, Culture, & Communication. While I was there, I taught courses related to internet business and culture, media industries, video games, and intellectual property.

- From 2009-2010, I was employed as Director of Media Innovation (a VP-level position) at OMD Ignition Factory, a unit of Omnicom in New York City. My job there was to run a unit dedicated to innovative marketing technologies and strategies. My principal client was PepsiCo, although I also worked with clients including Visa, Levi's and Pandora.

- During 2010, I also worked briefly as a management consultant, for a firm called Rational Research, based in New York City. My principal client was a Boston-based financial services nonprofit called American Student Assistance.

- From 2010-2015, I worked at Rutgers University's department of Journalism and Media Studies in New Brunswick, New Jersey. During my time there, I was promoted from Assistant Professor to Associate Professor, and granted

tenure. I taught classes on the subject of digital media, marketing communications, musical cultures and industries, mass media, and intellectual property. I also published two books during these years, both with University of Massachusetts Press: *Mashed Up,* a book about remix music and DJ culture, and *The Piracy Crusade*, about the digital transformation of the music industry and its relationship to copyright law.

- From 2015-2020, I worked as an Associate Professor with tenure at American University's School of Communication in Washington, DC. In 2020, I was promoted to Full Professor. I have taught classes there on subjects including media theory, intellectual property, musical cultures and industries, and digital media and culture. I have also published a book during this time with Yale University Press, entitled *The Essential Guide to Intellectual Property.* Since 2017, I have also served as the chair of the school's Communication Studies division.

I have conducted extensive research, published widely, taught several classes, and given lectures and presentations around the world on the subjects of cultural, ethical, and legal issues involved in digital technologies and emergent media, and on copyright and fair use. I am a member of the International Communication Association, the National Communication Association, and the Association of Internet Researchers, and a board member of the Washington, DC chapter of the Internet Society. I have also published widely about media, culture, and technology for mainstream periodicals including *Wired*, *Billboard*, *The Daily Beast*, and *The New York Times*, and I have appeared as an expert source on those matters in roughly a thousand print, online, and broadcast news stories.

In addition to my general domain expertise in digital media and intellectual property exhibited by my CV and the brief career highlights listed above, I have researched, written, and lectured extensively about the laws and ethics of remix culture since the era when online remixes, mashups, and memes first emerged. For my research, I have designed, supervised, and implemented several studies from which I have developed extensive, longitudinal, multi-national data charting the emergence and mainstream adoption of these cultural practices, as well as the ethical frameworks adopted by social media users regarding normative digital media behaviors. My use of the term "normative" herein encompasses both senses of the word, namely a) widespread and unremarkable practice, in the sense that is typically described as "normal," and b) practice that has the effect of shaping and informing widespread expectations. Publications reporting these data include:

- Aufderheide, P., Sinnreich, A., & Silvernail, C., (2019). Norms-Shifting for Digital and Online Arts Practice: Copyright and Fair Use in the Visual Arts Community. *Visual Arts Research,* 45(2), 91–108.

- Sinnreich, A. & Aufderheide, P. (2015). Communication scholars and fair use: The case for discipline-wide education and institutional reform. *International Journal of Communication, 9*; 818–828.
- Sinnreich, A. & Latonero, M. (2014). Tracking configurable culture from the margins to the mainstream. *Journal of Computer-Mediated Communication, 19*(4); 798–823.
- Latonero, M. & Sinnreich, A. (2014). The hidden demography of new media ethics. *Information, Communication & Society, 17*(5); 572–593.
- Sinnreich, A., Latonero, M., & Gluck, M. (2009). Ethics Reconfigured: How Today's Media Consumers Evaluate the Role of Creative Reappropriation. *Information, Communication & Society, 12*(8); 1242–1260.

I have also researched, written, advocated, consulted, and served previously as an expert witness specifically regarding the legal considerations surrounding these practices, in cases involving the application of fair use principles to these practices.

**Other Cases**

In the past 10 years, I have served in an expert capacity on the following cases:

- 2019-20    Witness for the plaintiff in *Parlux Fragrances, LLC v. Carter Enterprises, LLC*, No. 065043/2016 (N.Y. Supreme Ct.)
  - Produced expert report and testified at deposition
- 2015-16    Witness for the defense in *North Jersey Media Group, Inc. v. Fox News Network LLC*, No. 13-cv-07153-ER (S.D.N.Y.)
  - Produced expert report and testified at deposition
- 2015        Witness for the defense in *Kim v. Fox News Channel*, No. 13-cv-04589 (S.D.N.Y.)
  - Produced expert report and testified at deposition
- 2013-15    Expert Consulting for Amway (pre-litigation)
- 2014        Witness for the defense in *Mattocks v. Black Entertainment Television LLC*, No. 13-cv-61582 (S.D. Fla.)
  - Produced expert report and testified at deposition
- 2011-14    Witness for plaintiff in *Jackson v. Odenat*, No. 09-cv-05583 (S.D.N.Y.)
  - Produced expert report
- 2011        Consulting for defense in *Saregama India Ltd. v. Mosley*, No. 08-cv-20373 (S.D. Fla.)
- 2010-11    Witness for defense in *Arista Records LLC vs. Lime Group* LLC, No. 06-cv-05936 (S.D.N.Y.)
  - Produced expert report and testified at deposition

I believe that my above list of expert reports and testimonies is accurate and comprehensive. However, given that I am typically asked to expunge my personal

records following a case, and therefore have no extant files to consult, there is a small chance that I have misstated my role in one or two of the cases.

**Compensation**

I am being compensated at the rate of $300 per hour for all work on this case. Payment is not contingent on the outcome of the litigation. Out of consideration for Defendant's limited funds, I am working on a deferred payment schedule and at a substantially discounted rate. In the *North Jersey Media Group, Inc. v. Fox News Network LLC* case, for example, my compensation was at the rate of $500 per hour.

**Documents**

I am familiar with the facts of this case. In the course of preparing this report, I have reviewed and relied on several court documents, online materials, and scholarly publications to help inform my opinions. These include the following materials:

- All court materials sent to me by Defendant's counsel, specifically:
    1. Plaintiff's complaint and its two exhibits (Doc. No. 1, 1-1, 1-2)
    2. Defendant's Answer and Counterclaims (Doc. No. 12)
    3. Plaintiff's Answer to Counterclaim (Doc. No. 15)
    4. Order (October 10, 2019) (Doc. No. 16)
    5. Case Management Order (Doc. No. 20)
    6. Plaintiff's Rule 26(a)(1) Initial Disclosures (October 23, 2019)
    7. Plaintiff's Answers and Objections to Defendant's First Set of Interrogatories (December 2, 2019)
    8. Plaintiff's Answers and Objections to Defendant's First Set of Requests for Production of Documents (December 2, 2019)
    9. Documents produced by Plaintiff Bates-stamped MB_001-MB_091 and MB92
    10. Transcript of Deposition of Plaintiff (December 12, 2019) and its exhibits (No. 1-34)
    11. Defendant's Expert Designation (March 20, 2020)
    12. Documents produced by Defendant Bates-stamped AG0001, AG0194-AG0197, and AG0253-AG0256
- Plaintiff's publicly available Facebook page, available at https://www.facebook.com/matthew.bradley.98434
- Defendant's publicly available Facebook page, available at https://www.facebook.com/analyticalgrammar
- Defendant's publicly available GoFundMe page, available at https://www.gofundme.com/f/analyticalgrammar
- Facebook's publicly available Terms of Service and Data Policy, available at https://www.facebook.com/terms.php and https://www.facebook.com/about/privacy/update

- Memes I found online, collected in **Exhibit C** and **Exhibit D** annexed hereto
- 17 U.S.C. § 107.
- Hon. Pierre Leval, *Toward a Fair Use Standard*, 103 Harvard Law Review 1105 (1990)
- Richard Dawkins, *The Selfish Gene* (Oxford University Press 1976)
- James Grimmelman, *Internet Law: Cases & Problems* (Semaphore Press 9th ed. 2019)
- Milner, Ryan M. Pop Polyvocality: Internet Memes, Public Participation, and the Occupy Wall Street Movement. International Journal of Communication, [S.l.], v. 7, p. 34, oct. 2013. ISSN 1932-8036. Available at: <https://ijoc.org/index.php/ijoc/article/view/1949>.
- Shifman, L. (2014). *Memes in digital culture*. MIT press.
- Navas, E., & Gallagher, O. (Eds.). (2017). *Keywords in remix studies*. Routledge.

## II. Summary of Opinions

I here briefly summarize the primary opinions I will offer and further explain in this report:

- Based on my studies and empirical research into cultural norms surrounding social media and memes, the Photograph constitutes a meme; Defendant regularly engages in a normative use of memes on its Facebook page for educational purposes; Defendant's use of the entire Photograph in a Facebook post was standard and consistent with normative uses of memes on social media; and it is not reasonable for the Plaintiff to claim that any market for the Photograph has been harmed by the Defendant's use or to expect any remuneration.

- In view of these considerations, Plaintiff's attempt to exploit a viral use of his Photograph for a financial reward is an aberration with no basis in the cultural conventions that surround memes and social media.

- A finding of infringement in this case would be likely to have consequences that extend far beyond the specific actors and the Photograph at issue, causing potential "chilling effects" that threaten to upset well-established social media norms and undermine a range of socially beneficial functions of digital culture and communication.

## III. Opinion: The Photograph Is A Meme and Defendant's Standard, Normative Social Media Use Will Not Cause Plaintiff any Likely Market Harm

### Overview: Cultural norms surrounding social media and memes

Digital culture is a broad category of forms and practices, encompassing decades of behaviors by billions of internet users around the globe. Over the past 25 years, as digital media and the internet have proliferated and given rise to countless new forms of cultural expression, and cultural communicative practices, the opportunities for a richer, more diverse, more democratic public sphere have expanded, accordingly. Two principal subcategories of digital culture at issues in this case, both broad in their scope as well, are "memes" and "social media."

The word "meme," first coined by Richard Dawkins to describe how a concept or idea evolves through the network of human social-cognitive systems, has taken on a widespread secondary meaning to describe photographs or animations that are widely shared over digital communications platforms, often with a humorous focus, and/or a textual element. These meanings correspond to Merriam-Webster's two principal definitions of "meme" in Exhibit No. 4 of the Transcript of Deposition of Plaintiff in this case. Memes are simultaneously conceptual and material; in many cases, there are multiple, different instantiations of a single meme; what might be considered "variations on a theme." The Photograph at issue in this case is definitively a meme, in both senses: it is a singular media asset with a humorous message, and a slightly modified variation on a larger, preexisting theme.

The term "social media" applies broadly to a range of internet-based services with a diversity of different functions, business models, user bases, and technological affordances. What they share in common is that they enable user to self-organize into networks, enabling them to communicate and share information intrinsically to the service, using a set of tools built into the platform. Facebook, the specific platform at issue in this case, is the closest thing to the Platonic ideal of a social media service for Western internet users over the past decade.

Several normative aspects of meme use and social media use (a consensus opinion informed by both my own extensive research and several leading academic sources cited herein) shape my understanding of the specifics in this case and shape my analysis of the Defendant's use of the Photograph. They include the following:

- Social media platforms encourage and reward the widespread repurposing of digital content, without requiring or incentivizing attribution. Their technological affordances, terms of use (TOS), marketing communications, and other factors encourage and reflect these normative behaviors by their user bases. On Facebook, for example, the standard user interface facilitates the easy repurposing and redistribution of memes from one user to another. With a click on the Share icon, a Facebook user can take a meme or other item publicly posted by another user and retransmit it, publicly or privately, on a user's timeline or via Facebook message. Similarly, a right-click on a meme or other item allows a Facebook user to copy and repost a link to a

meme found on Facebook, or to download a meme image or video file from Facebook so that it can be shared elsewhere. Social media users generally understand these standard affordances of social media sites. The capacity of a meme to be shared far beyond the creator's control is inherent in the common notion of the "viral" distribution of memes. Additionally, these kinds of uses and reuses of content were explicitly covered by the Facebook terms of service at the time that the Photograph was posted by the Plaintiff, as set out in Facebook's "Statement of Rights and Responsibilities" produced by Defendant stamped AG0194-0197. Under those terms of service, Plaintiff granted the company a "non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP [intellectual property rights bearing] content," and clarifying that content published "using the Public setting" (as was the case with the Photograph) "allow[ed] everyone, including people off of Facebook, to access and use that information" — without requiring permission from, attribution to, or payment to the author or sharer of the content.

- The function of memes on social media is principally communicative and socially demarcating, not merely distributive or entertaining (for a rich analysis of this subject, see Milner, 2013 or Navas & Gallagher, 2017). That is to say, the typical use case for a meme is more like the use of an emoji (a visual icon expressing or communicating emotion, affinity, or identity) than it is like the use of a movie, article, or song (a work of art or creative expression shared or accessed for the sake of pleasure or information-gathering).

- Memes are widely understood to be emergent, collaborative works (see the above two citations, as well as Shifman, 2014 for extensive analysis on this subject). Even when the "original" author is known by a meme's user (which isn't common), the meaning and value of a meme is understood to be the result of its reinterpretation and redistribution on a massive, horizontal scale, rather than the unique expression of a sole author. The author's intent does not determine the meaning of a meme; its meaning is socially constructed and can vary depending on the context in which it appears.

- Memes and other social media content are not commonly expected to be revenue-bearing for their creators, either via direct (e.g. retail) or indirect (e.g. content licensing) models. The transitory, intangible nature of social media limits the potential for commercialization of any meme. Instead, to the limited extent that creators do monetize them, which is infrequent, that monetization is not direct but based on the sale of derivative works (e.g. merchandise) and sponsorship; a categorical example of both is the Grumpy Cat franchise. These uncommon revenue models are aided, rather than hindered, by widespread, unpermissioned sharing of the meme; its "viral"

status is what qualifies it for access to those markets.

- Given the considerations above, the overwhelming majority of memes are produced, distributed, altered, and redistributed without attribution or fee-based license agreements, and without the reasonable expectation of direct remuneration. The vast majority of people who create and/or share memes do so with the expectation, and even the hope, that they will be recirculated widely, without express permission, payment, or attribution. By the same token, people who recirculate memes on social media do so without any expectation that they are expected to get prior permission from, or make payment or attribution to, the original author.

**Application: Analysis of the Defendant's Use of the Photograph**

As I understand the facts in this case, Plaintiff posted the Photograph on his Facebook page on December 8, 2017. He has testified that he did not have any intent to profit from the Photograph at that time, and that he shared it publicly. Defendant received a copy of the Photograph via Facebook's built-in personal messaging function on December 14, 2017, from a "friend" or follower of its Facebook account. Defendant produced a copy of the relevant Facebook Messenger communications as a document stamped AG0001. The Photograph did not have either a watermark, or identifying metadata, or any other indicator of the source or ownership of the image at that time. Defendant then posted the Photograph to its Facebook page on December 16, 2017, with the accompanying text "This is wrong on so many levels," making explicit the implicit visual pun embodied in the Photograph. This was the full extent of Defendant's use.

**1: Analysis of the Purpose and Character of the Use**

The Defendant's use of the Photograph was a completely standard and consistent use of a meme by a commercial brand on its social media page. In fact, posting and reposting memes is widely acknowledged by marketing professionals as an integral and necessary dimension of brand marketing strategy on social media. Furthermore, this was normative behavior for the Defendant. Like countless other small businesses and brand marketers on Facebook, Defendant has posted thousands of memes and similar images to its publicly available Facebook page over the past few years.

In my opinion, there is an implicit user right to participate in the "viral" distribution of memes via social media (without which, memes could not exist), and Defendant's use was well within the normative parameters of this implicit right. Social media users recognize that the viral distribution of memes is a common feature of social media use, and do not understand that such use requires compensation to the viral source or originator of the meme.

Case 5:19-cv-00249-FL    Document 29-14    Filed 07/17/20    Page 10 of 60

Additionally, while the Defendant is a commercial enterprise, its use of the Photograph on its Facebook page was <u>noncommercial</u>. It did not generate any direct revenue, or serve a vital function in generating revenue indirectly. Like the vast majority of Defendant's posts on its Facebook page, it was not a "promoted post" (that is, Defendant did not pay Facebook to promote its visibility), and it did not advertise or refer to any particular product or service. Defendant's use of the meme was at most tangentially related to Defendant's business model.

The Defendant's use of the meme was also <u>transformative</u> in that it emplaced the meme (and its visual pun) within a broader <u>educational environment</u> focused on illustrating the uses and functions of grammar, syntax, and lexicon (the rudiments of language). This environment was created through Defendant's original content, as well as its curation of third-party content, on its Facebook page. Defendant's Facebook page has an educational context and purpose that is not apparent on Plaintiff's Facebook page. Plaintiff testified, "I'm just posting things that I think are funny," and "it's just something I do for fun to share with my friends." By contrast, Defendant's posts on its Facebook page are primarily didactic. That new context gave Facebook users who saw Defendant's use of the Photograph a basis for a different understanding of its meaning than those who only saw it through Plaintiff's original post. Perhaps ironically, the instructive lesson conveyed by the Photograph, as it appeared on Defendant's page, is that the meaning of "levels" is itself context-specific. The use appears transformative in the sense described by Judge Pierre Leval in his law review article, *Toward A Fair Use Standard*: "The use must be productive and must employ the quoted matter in a different manner or for a different purpose from the original."

Finally, Analytical's use of the Photograph appears to have been fully <u>in compliance</u> with Facebook's Terms of Service effective at the time of the use in December 2017, as reflected in the document stamped AG0194-0197. According to those terms, when Bradley posted the Photograph, he allowed "everyone" "to access and use" it.

Based on these considerations, it is my opinion that the Defendant's use of the Photograph was a normative, typical use of a meme, in a noncommercial and transformed context.

## 2: Analysis of the Nature of the Photograph

In this case, the Plaintiff's Photograph is a meme based heavily on the commons. I apply the same definition of the commons (more specifically, the cultural commons) employed in my book *The Essential Guide to Intellectual Property* (Yale University Press 2019), namely, "the freely shared knowledge and culture of humankind at large." The term "applies to everything within the human sphere of experience that

is not explicitly owned by a single individual or entity, such as the air we breathe, the planet Jupiter, the D major scale, or the Pythagorean theorem." *Id.* at 53-54.

Not only is the text supplied with the Photograph, "this is wrong on so many levels," a longstanding internet trope in and of itself, but the visual pun embodied in the Photograph is also a longstanding meme and cliché, with several prior versions in wide, "viral" circulation prior to Plaintiff's version, as a rudimentary Google Image search makes very clear. I include earlier memes incorporating the same visual pun in **Exhibit C.** Other examples appear at Exhibits 5 to 8 of the Transcript of Deposition of Plaintiff.

Thus, while the Photograph itself was original, it was minimally differentiated from other prior art. In fact, this appears to be a habitual practice of the Plaintiff's: Drawing inspiration from clichéd memes, and posting minimally differentiated versions of them to his own Facebook page. For example, a subsequent meme by the Plaintiff (a photo of a hammer, using the pun "This is not a drill" and posted on September 2, 2019 to his Facebook page under with the accompanying text "These things ... occur to me...") also has several instances of minimally differentiated prior art, stretching back several years. Plaintiff's September 2, 2019 post is Exhibit 18 of the Transcript of Deposition of Plaintiff. I include earlier memes incorporating the same visual pun in **Exhibit D.** In another example, Plaintiff apparently took a textual meme that had circulated in various forms on Facebook and Reddit for more than a year (a shaggy-dog story that pays tribute to a controversial leader before revealing that its subject is not a politician but New England Patriots coach Bill Belichick), and copied it almost verbatim in his own Facebook post on February 3, 2018, without identifying his source. Defendant produced copies of that February 3, 2018 post, and prior art from Facebook and Reddit from early 2017, as documents stamped AG0253-AG0256. Instead of identifying his source, Plaintiff cheekily admitted in a comment to his post, "I stole it," and his post included a message encouraging Facebook users to "Steal this, like I did and pass a laugh on to someone who needs it" (which message he had also taken almost verbatim from prior art).

Having viewed these and other similar works, it is my opinion that the Photograph is very limited in its novelty, creativity, and originality. I have reviewed all the documents produced by the Plaintiff in discovery, the transcript of his deposition, and his written responses to the Defendant's discovery requests. There is no evidence that he gave special consideration to the staging, lighting, or composition of the Photograph, nor is there any evidence, that, even if he had done so, it played any role whatsoever in the relative success or failure of the meme to be recirculated. The success of the meme, such as it was, was dependent entirely on the fact that it repurposed a visual pun that had previously demonstrated viral potential on social media.

Based on his consistent pattern of repurposing old puns, it is reasonable to conclude that the Plaintiff's purpose in creating the Photograph was to contribute another variation on a preexisting cultural trope, rather than inventing or composing a novel and original work. Additionally, taking into account Plaintiff's public interactions with commenters on his Facebook posts, and his deposition testimony, it is clear that the Plaintiff also intended for the Photograph to become a virally circulated meme — an image that is widely recirculated on social media outside of the original poster's personal network. Plaintiff was familiar with the potential for viral distribution of a meme and sought to exploit it. There is no normative basis to expect credit or compensation for the viral distribution of a meme. Plaintiff apparently accepted that, at least initially. The Photograph was included in an online article dated January 4, 2018 compiling visual puns, which appears at Exhibit 14 of the Transcript of Deposition of Plaintiff. According to his testimony, Plaintiff did not expressly authorize that use and did not receive any credit or compensation for it, but he nevertheless rejoiced in its publication. In an April 20, 2018 post on his Facebook page, which appears at Exhibit 12 of the Transcript of Deposition of Plaintiff, he shared the article with the comment, "Hey, I'm famous! My picture made the list of the most clever puns on the internet!  Woo hoo!" It appears that Plaintiff did not expect compensation for reuse of the Photograph at that point.

Finally, at the time the Defendant redistributed the Photograph, there was no information regarding its authorship or copyright status attached to the work itself, or provided alongside the work on the Plaintiff's own Facebook page. This provides further circumstantial evidence of his intention for the Photograph to be recirculated widely without express permission.

Based on these considerations, it is my opinion that the nature of the Photograph is a minimally creative variation on elements of the cultural commons, to which Plaintiff can claim no ownership, and an attempt to create a viral meme, to which Plaintiff cannot expect to exercise control over distribution.

### 3: Analysis of the Amount and Substantiality of the Defendant's Use of the Photograph

The Defendant reproduced the Photograph in its entirety — this is not in question. However, that is normative for a reproduction of memes, which social media users routinely redistribute in their entirety.  As Cornell Law professor James Grimmelman points out in his book *Internet Law: Cases & Problems,* for any photograph, "all or most of the work often must be used in order to preserve any meaning at all" (p. 435).

This is doubly so in the case of a meme like the Photograph: the visual pun "this is wrong on so many levels" would not work at all, for instance, if the levels in question weren't visible in their entirety, or if the pieces of tape with the word "wrong"

written on them were illegible. In addition, as discussed above, the pun conveyed in the Photograph is part of the cultural commons, which is not proprietary to Plaintiff. As a result, its use is not untoward.

Furthermore, because the Defendant has posted over 10,000 photos to its Facebook page, which is regularly refreshed, the role of the Photograph on its page is insubstantial. It is akin to a single tile in a broad mosaic, and each of those tiles is a work reproduced in full, for the same reasons outlined above.

Based on these considerations, it is my opinion that the Defendant employed a reasonable amount of the Photograph, and its sole Facebook post including the Photograph was a use to a reasonable extent.

**4: Analysis of Potential Market Effects of Defendant's Use of the Photograph**

It is aberrant, and contrary to widely accepted norms and practices of social media use, to regard the viral use of a meme on Facebook as having any potential negative effect on any market for the meme or on the value of the meme.

There is no market whatsoever for the sale of memes at retail. Consumers have access to millions of memes freely via social media services, and it is unreasonable to expect that a consumer would ever pay for access to a meme.

There is also no substantial market for the licensing of photographs for memes. In fact, I am not aware of any instances in which a photograph has been licensed in order to produce a meme. There are several reasons for this. First of all, because memes are by definition intended to be used at high volume and distributed widely across a broad range of platforms, and because they do not contribute to direct revenue for publishers, there is no financial incentive for a publisher to pay for such a license; it would be prohibitively expensive, and counterproductive.

Second of all, there is so much freely available memetic content that publishers have no incentive to pay a license fee to use one. For instance, given the choice between paying a license fee for the Plaintiff's Photograph and another minimally differentiated version of the same meme from **Exhibit C**, using a different photograph or illustration to make the same pun, no publisher could reasonably be expected to pay for the former instead of using the latter for free.

Therefore, it is not reasonable for a meme creator to expect a fee for recirculation. To the contrary, as I alluded to above, meme creators are far more likely to benefit economically and otherwise from viral, unpermissioned recirculation of their work, through the exploitation of derivative works and endorsements.

Finally, it is particularly unrealistic for the Plaintiff to expect remuneration for the meme because he is <u>not a professional photographer</u>, and, according to his deposition, has never made a penny from either licensing or selling a photo, including the Photograph. Therefore, there is no reasonable way in which the Defendant's use of the Photograph could have negatively impacted Plaintiff's existing or potential business.

**5: Overall Analysis of the Defendant's Use of the Photograph**

In light of the discussion above, I believe that the Plaintiff's attempt to exploit a viral use of his Photograph for a financial reward is an aberration with no basis in the cultural conventions that surround memes and social media. There are several considerations that inform my opinion, including the following:

- The only effort the Plaintiff has made to derive any revenue from the Photograph is through <u>litigation and the threat of litigation</u>. He did not proactively seek to license his work to third parties, or try to monetize the work on his own through the production and sale of derivative works, advertising, or any other means.

- The Plaintiff only <u>registered the copyright in the Photograph</u> a year after he had shared it publicly and freely, without any indication of its authorship, provenance, or copyright status. In the interim year, free, anonymous, and unpermissioned distribution of the work had propelled it to "viral meme" status — a development that the Plaintiff publicly celebrated. In effect, he "seeded" third-party distributions of the Photograph by releasing it for wide distribution without restriction, and now seeks to "harvest" one of the resulting acts of distribution by alleging infringement against Defendant.

- The Plaintiff did not identify any harm that the Defendant's use of the Photograph has caused him. He did not know that the Defendant had used the Photograph in December 2017 until June 2019, when notified by his counsel. He testified that before then, he was not aware of Defendant at all. The fact that Plaintiff, a regular Facebook user, was not aware of Defendant's use of the Photograph indicates that he and his sphere of Facebook friends and followers did not substantially overlap with the Facebook users who interacted with Defendant's post. This lack of an overlap in their user bases further suggests that, even if a Facebook use of a meme could be considered an economic market use, and even if the popularity of a meme could be considered a market demand for the meme—two suppositions that do not reasonably reflect social practice—then there would still be no basis to view the Defendant's use of the Photograph as <u>competitive</u> with Plaintiff's use.

- The Plaintiff <u>did not issue a takedown request</u> to Facebook per the Digital Millennium Copyright Act (DMCA), using its simple and effective online form. This would have led immediately to the removal of Defendant's use of the Photograph from Facebook.

- The Plaintiff didn't even demand an ex post facto license fee from the Defendant, as he had with other parties who allegedly used the Photograph on websites without permission. Instead, he <u>proceeded directly to litigation</u>, just days after learning about Defendant.

- The Plaintiff himself has shared numerous third-party memes and images on his own Facebook page. I have seen no evidence that he offered license fees to their authors, or made any efforts to discover the identity of those authors. He testified that he has never researched a third-party meme he shared or reposted on Facebook to identify the original author and seek approval for further distribution. By this lawsuit, he faults the Defendant for doing the same. Therefore, his appeal to copyright law is not just aberrant but <u>one-sided, self-interested, and opportunistic</u>.

## IV. Opinion: Finding for the Plaintiff Would Have Large-Scale Chilling Effects

If the court finds for the Plaintiff in this case, it is my opinion that the consequences would not only be harmful to the Defendant (which appears to have acted in good faith and done no harm to the Plaintiff), but would harm the broader public sphere, through what are commonly referred to as "chilling effects" on valuable free speech.

Memes are a vital element of online public culture, with many <u>socially valuable functions</u> that enrich the public sphere. They <u>democratize cultural participation</u>, by offering a mode of discourse that is easy to make, share, access and interpret by a diverse array of social stakeholders from a diverse range of backgrounds. They are widely used in <u>educational contexts</u> (including my own classes and public lectures). They are a widely used vehicle of <u>humor, parody, commentary and critique</u>, which are widely acknowledged to be vital modes of discourse for a healthy democratic society. They are frequently used in <u>political communication</u>, at every level of government and governance, from local to federal to global. They promote <u>international and intercultural communication</u>, by providing a digital lingua franca to people and populations who are normally separated by language and geographic distance. Ultimately, they have served an important role in broadening our shared expressive and communicative palettes, offering more ways for more people to share information and build relationships.

Facebook launched in 2004, and memes have circulated through social media online for decades. But to my knowledge, the legal status of memes under American copyright law has been neither addressed definitively through statute nor

circumstantially through case law. Normative practice supports an expansive, fair use interpretation of meme creation and distribution, which has proliferated without evident harmful consequence to meme creators. On the other hand, <u>a ruling of infringement in this case would have a significant "chilling effect,"</u> making publishers, platforms, and everyday citizens more cautious about making, sharing, and accessing digital information, in ways that would negatively impact all of the socially positive functions outlined above.

A ruling against the Defendant would also create <u>undue economic burdens</u> on platform providers and their user bases, undermining the protections for good faith self-policing established by the DMCA. It would also <u>embolden copyright trolls</u> (unethical actors who misuse copyright law in order to litigate or extort, rather than to incentivize authorship and enrich the public sphere), and escalate their threat, siphoning off countless millions of dollars from businesses and individuals who actually contribute something of value to the public, into the pockets of bad-faith actors who contribute nothing, while taxing the limited resources of our federal courts. In effect, it would erect a tollbooth in the middle of the internet.

Finally, a ruling for the Plaintiff in this case would <u>distort copyright law,</u> because memes, even when they include elements of copyrighted works that have identifiable authors, are by definition collective expressions of the shared digital commons. Memes are shared speech. They gain their cultural significance and value through precisely the anonymous, "viral" distribution, reinterpretation, and redistribution practices that would be undermined by requiring the permission of a rights holder under copyright law. They must be understood as fundamentally communicative, rather than creative, forms, which are employed principally in order to aid in the development of mutual understanding, rather than for the purposes of art, entertainment, or the unique self-expression or profit motives of a given individual. For these reasons, a ruling that sharing memes constitutes infringement would do incalculable damage to a new, vital, and rapidly evolving cultural language that benefits world culture, while benefiting only a small handful of opportunistic actors. In my opinion, Defendant's use of the meme is a conventional example of a widespread form of communication, and Plaintiff's claims are not a sound basis to render that form of communication illegitimate.

Dated: __**April 27, 2020**__

_Aram S._

Aram Sinnreich

# Aram Sinnreich

## ACADEMIC POSITIONS

AMERICAN UNIVERSITY, SCHOOL OF COMMUNICATION
| | |
|---|---|
| Chair, Communication Studies | 2017 – present |
| Professor, Communication Studies | 2020 – present |
| Associate Professor, Communication Studies | 2015 – 2020 |

RUTGERS UNIVERSITY, SCHOOL OF COMMUNICATION & INFORMATION
| | |
|---|---|
| Associate Professor, Journalism & Media Studies | 2015 |
| Assistant Professor, Journalism & Media Studies | 2010 – 2015 |

NEW YORK UNIVERSITY, STEINHARDT SCHOOL
| | |
|---|---|
| Visiting Assistant Professor, Media, Culture & Communication | 2007 – 2009 |

## EDUCATION

UNIVERSITY OF SOUTHERN CALIFORNIA,
ANNENBERG SCHOOL FOR COMMUNICATION
| | |
|---|---|
| Ph.D. in Communication | 2007 |
| MA in Communication | 2005 |

COLUMBIA UNIVERSITY, GRADUATE SCHOOL OF JOURNALISM
| | |
|---|---|
| MS in Journalism | 2000 |

MANNES SCHOOL OF MUSIC
| | |
|---|---|
| Coursework in Music Composition | 1996 – 1997 |

WESLEYAN UNIVERSITY
| | |
|---|---|
| BA in English | 1994 |

## GRANTS, FELLOWSHIPS AND AWARDS

| | |
|---|---|
| 2018-21 | Advisor, Mashup Music, Copyright, and Platform Regulation (MASHED). PI: Ragnhild Brøvig-Hanssen. €744,000 in funding from The Research Council of Norway. |
| 2020 | Semifinalist, Bernard/Ebb Songwriting Award |
| 2018-20 | Advisor, Research in Arts and Cultural Industries Doctoral Program Development, Palacky University, Czech Republic. PI: Jakub Korda. 2.6 million Kč from Czech Ministry of Education. |
| 2019 | Ph.D. Mentor Award, American University SOC |
| 2018 | American University SOC Research Projects Grant Award ($1,100). |
| 2016 | "Article of the Year" award, International Communication Association, Theory, Philosophy & Critique division. |
| 2016 | American University SOC Research Projects Grant Award ($2,400). |

Case 5:19-cv-00249-FL     Document 29-14     Filed 07/17/20     Page 18 of 60

| 2015-16 | Research fellowship at the Center for Interdisciplinary Research (ZiF), Bielefeld, Germany. |
| 2015 | Rutgers Board of Trustees Research Fellowship for Scholarly Excellence |
| 2014 | Finalist, John Lennon Songwriting Competition (jazz category). |
| 2014 | Rutgers University Research Council Award with $1,300 in funding. |
| 2013 | Distinguished Achievement in Teaching Award. Rutgers SC&I, Department of Journalism & Media Studies |
| 2013 | Rutgers University Research Council Award with $1,750 in funding. |
| 2011 | Distinguished Research Award. Rutgers SC&I, Department of Journalism & Media Studies |
| 2010 | Rutgers SC&I award with $2,000 in funding for mesh network research. |
| 2007 | Project manager for $50,000 academic grant from Google at USC. |
| 2006 | Annenberg Center for Communication graduate fellowship. |
| 2004 | "Top Paper" award, National Communication Association, Critical & Cultural Studies division. |
| 2004 | "Top Paper" award, Telecommunications Policy Research Conference. |
| 2003 | Student paper award, Global Fusion Conference, UT Austin. |
| 2002 | USC Provost's Fellowship, providing full tuition and stipend for 5 years. |
| 2001 | *InformationWeek,* Top 15 "Innovators and Influencers." |
| 2001 | *Digital Music Weekly*, "15 Digital Music Industry Leaders." |
| 2001 | Jazz composition award winner, *Just Plain Folks.* |

## PUBLICATIONS

BOOKS

Sinnreich, A. (2019). *The Essential Guide to Intellectual Property.* New Haven, CT: Yale University Press.
- Reviewed in *International Journal of Communication*, *Business History Review, Choice (American Library Assoc), Authors Alliance*

Sinnreich, A. (2013). *The Piracy Crusade: How the Music Industry's War on Sharing Destroys Markets and Erodes Civil Liberties.* Amherst, MA: University of Massachusetts Press.
- Reviewed in *Information, Communication & Society, The Library Quarterly, Tulsa Law Review, EFF Deeplinks, and Techdirt*

Sinnreich, A. (2010). *Mashed Up: Music, Technology, and the Rise of Configurable Culture.* Amherst, MA: University of Massachusetts Press.
- Reviewed in *Journal of Communication, American Studies, Journal of Popular Culture, Cultural Studies, Criticism, International Journal of Communication, Critical Studies in Improvisation, The Onion A.V. Club, and Hypebot*

Case 5:19-cv-00249-FL    Document 29-14    Filed 07/17/20    Page 19 of 60

## EDITED VOLUMES

Sinnreich, A. & Carmi, E. (Eds.). (2019). Sonic Publics (Forum). *International Journal of Communication, 13.*
   * Collection of 5 essays on sound, communication technology and publics

Sinnreich, A. & Brooks, L. J. A. (Eds.). (2016). Imagining Futuretypes (Forum). *International Journal of Communication, 10.*
   * Collection of 11 essays on speculative fiction and futurism
   * Also published in print as a special issue of *ETC: A Review of General Semantics, 72*(4).

## JOURNAL ARTICLES

Davis, D. & Sinnreich, A. (in submission). Beyond fact-checking: Lexical patterns as lie detectors in Donald Trump's tweets. *International Journal of Communication.*

Sinnreich, A., Aufderheide, P., Clifford, M., & Shahin, S. (resubmitted). Access shrugged: The decline of the copyleft and the rise of instrumental openness. *New Media & Society.*

Sinnreich, A., Aufderheide, P. & Newman, D. (2020). Creative action under two copyright regimes: Filmmaking and visual arts in Australia and the U.S. *Communication, Culture & Critique.*

Sinnreich, A. & Gilbert, J. (2019). The carrier wave principle. *International Journal of Communication, 13,* 5816–5840.

Brøvig-Hanssen, R. & Sinnreich, A. (2019). Do you wanna build a wall? Remix tactics in the age of Trump. *Popular Music & Society*, *43*(5). DOI: 10.1080/03007766.2019.1650990

Sinnreich, A. (2019). Music, copyright, and technology: A dialectic in five moments. *International Journal of Communication, 13,* 422–439.

Sinnreich, A. & Carmi, E. (2019). Sonic publics: Introduction and audio transcript. *International Journal of Communication, 13,* 359–382.

Aufderheide, P., Sinnreich, A., & Silvernail, C., (2019). Norms-Shifting for Digital and Online Arts Practice: Copyright and Fair Use in the Visual Arts Community. *Visual Arts Research,* 45(2), 91–108.

Sinnreich, A. (2018). Four crises in algorithmic governance. *Annual Review of Law and Ethics, 26*, 181–190.

Sinnreich, A., Forelle, M. & Aufderheide, P. (2018). Copyright givers and takers: Mutuality, altruism and instrumentalism in open licensing. *Communication Law & Policy, 23*(3), 197–220.

Aufderheide, P., Sinnreich, A., & Graf, J. (2018). The limits of the limits of the law: How useable are DMCA anti-circumvention exceptions? *International Journal of Communication, 12,* Feature 4353–4372.

Sinnreich, A. & Brooks, L. J. A. (2016). A seat at the nerd table — Introduction. *International Journal of Communication, 10,* Forum 5664–5668.

Sinnreich, A., Lingel, J., Lichfield, G. & Rottinghaus, A. R. (2016). Everybody and nobody: Visions of individualism and collectivity in the age of AI. *International Journal of Communication, 10,* Forum 5669–5683.

Lingel, J., Sutko, D., Lichfield, G. & Sinnreich, A. (2016). Black holes as metaphysical silence. *International Journal of Communication, 10*, Forum 5684–5692.

Pluretti, R., Lingel, J. & Sinnreich, A. (2016). Towards an "other" dimension: An essay on transcendence of gender and sexuality. *International Journal of Communication, 10, Forum 5732–5739.*

Brooks, L. J. A., Sutko, D., Sinnreich, A. & Wallace, R. (2016). Afro-futuretyping generation starships and new Earths 05015 C.E. *International Journal of Communication, 10, Forum 5749–5762.*

Lingel, J. & Sinnreich, A. (2016). Incoded counter-conduct: What the incarcerated can teach us about resisting mass surveillance. *First Monday, 21*(5). DOI: http://dx.doi.org/10.5210/fm.v21i5.6172

Sinnreich, A. (2015). Sharing in spirit: Kopimism and the digital Eucharist. *Information, Communication and Society, 19*(4), 504–517.

Aufderheide, P. & Sinnreich, A. (2015). Documentarians, fair use and free expression: Changes in copyright attitudes and actions with access to best practices. *Information, Communication & Society, 19(2), 178–187.*

Sinnreich, A. & Aufderheide, P. (2015). Communication scholars and fair use: The case for discipline-wide education and institutional reform. *International Journal of Communication, 9*; 818–828.

Sinnreich, A. & Latonero, M. (2014). Tracking configurable culture from the margins to the mainstream. *Journal of Computer-Mediated Communication, 19*(4); 798–823.

Trammell, A. & Sinnreich, A. (2014). Visualizing game studies: Materiality and sociality from chessboard to circuit board. *Journal of Games Criticism, 1*(1). Published online: http://gamescriticism.org/articles/trammellsinnreich-1-1/

Latonero, M. & Sinnreich, A. (2014). The hidden demography of new media ethics. *Information, Communication & Society, 17*(5); 572–593

Bossewitch, J. & Sinnreich, A. (2013). The end of forgetting: Strategic agency beyond the Panopticon. *New Media & Society, 15*(2); 224–242.

Sinnreich, A., Graham, N. & Trammell, A. (2011). Weaving a New 'Net: A Mesh-Based Solution for Democratizing Networked Communications. *The Information Society, 27*(5); 336–345.

Sinnreich, A., Latonero, M., & Gluck, M. (2009). Ethics Reconfigured: How Today's Media Consumers Evaluate the Role of Creative Reappropriation. *Information, Communication & Society, 12*(8); 1242–1260.

Sinnreich, A., Chib, A., & Gilbert, J. (2008). Modeling information equality: Social and media latency effects on information diffusion. *International Journal of Communication, 2*(1); 1–20.

BOOK CHAPTERS

Sinnreich, A., Clifford, M., & Rosa, F. R. (forthcoming). The more things change: Who gets left behind as remix goes mainstream? In E. Navas, O. Gallagher, and x. burrough (Eds.), *The handbook of remix studies and digital humanities.* New York: Routledge.

Sinnreich, A. & Dols, S. (forthcoming). Chopping Neoliberalism, Screwing the Industry: DJ Screw, the Dirty South, and the Temporal Politics of Resistance. In R. Christopher (Ed.), *Hip-hop theory: Time, technology, and the 21st century.* University of Minnesota Press.

Sinnreich, A. (2020). Configurable Culture in Wealthy and Developing Markets: A Comparative Cross-National Perspective. In J. Macek, P. Stepan, P. Szczepanik, and P. Zahrádka (Eds.), *Digital peripheries: Online circulation of audiovisual content from the small market perspective.* New York: Springer.

Sinnreich, A. (2019). Music, Copyright, and Technology: A Historical Dance in Five Moments. In D. Diederichsen (Ed.), *100 jahre copyright.* Berlin: Matthes & Seitz; 102–124.

Davis, D. H. & Sinnreich, A. (2018). Tweet the Press: Effects of Donald Trump's "Fake News!" Epithet on Civics and Popular Culture. In M. Lockhart (Ed.), *President Donald Trump and his political discourse: Ramifications of rhetoric via Twitter.* New York: Routledge; 195–223.

Sinnreich, A. (2018). The 'thing' about music: Hearing power at the nexus of technology, property and culture. In P. Messaris & D. Park (Eds.), *The inclusive vision: Essays in honor of Larry Gross.* New York: Peter Lang; 127–140.

Sinnreich, A. (2017). Remarks on design and copyright in the age of silicon. In S. Owens (Ed.), *Design unfolds: Contemporary creative strategies from appropriation to collaboration.* Zurich: Zurich University of the Arts.

Sinnreich, A. (2017). Collaborative. In E. Navas, O. Gallagher, and x. burrough (Eds.), *Keywords in remix studies.* New York: Routledge; 56–66.

Figueres, P., Liao, C., Gunkel, D., Kanai, A., Harrison, N., Gallagher, O., Miller, P. D., burrough, x., Nunes, M., Vallier, J., Keifer-Boyd, K., Coppa, F., Jenkins, H., Tushnet, R., Wille, J., Sinnreich, A., Navas, E., Janneke, A., Spooky, DJ, et al. (2017). Appropriation. In E. Navas, O. Gallagher, and x. burrough (Eds.), *Keywords in Remix Studies.* New York: Routledge; 14–22.

Sinnreich, A. (2016). Ethics, evolved: An international perspective on copying in the networked age. In D. H. Hick and R. Schmücker, *The aesthetics and ethics of copying.* London: Bloomsbury; 315–334.

Sinnreich, A. (2016). Slicing the Pie: The Search for an Equitable Recorded Music Economy. In P. Wikström and R. DeFillippi (Eds.), *Business Innovation and Disruption in the Music Industry.* Northampton, MA: Edward Elgar; 153–174.

Sinnreich, A. (2015). Music cartels and the dematerialization of power. In A. Bennett and S. Waksman (Eds.), *The Sage Handbook of Popular Music.* Thousand Oaks, CA: Sage; 611–626.

Sinnreich, A. (2014). The emerging ethics of networked culture. In E. Navas, O. Gallagher, and x. burrough (Eds.), *The Remix Studies Reader.* New York: Routledge; 227–245.

Sinnreich, A. & Latonero, M. (2014). Uncommon knowledge: Testing persistent beliefs about configurable culture and society. In L. Lievrouw (Ed.), *Challenging Communication Research (ICA Theme Book, 2013).* Peter Lang; 123–140.

Sinnreich, A. (2013). How bad is P2P, anyway? In R. Braga and G. Caruso (Eds.), *The piracy effect.* Cinergie Books; 49–62.

Sinnreich, A. & Gluck, M. (2006). Music and fashion: the balancing act between creativity and control. In D. Bollier and L. Racine (Eds.), *Ready to share: Fashion and the ownership of creativity.* Los Angeles: Norman Lear Center Press; 47–69.

## BOOK REVIEWS & ESSAYS

Sinnreich, A. (2017). A cultural approach to Carey. [Review of the book *James W. Carey and communication research: Reputation at the university's margins*, by Jefferson Pooley]. *International Journal of Media & Cultural Politics, 13*(3), 327–330.

Sinnreich, A. (2007). Come together, right now: We know something's happening, but we don't know what it is. [Review of the book *Convergence Culture,* by Henry Jenkins]. *International Journal of Communication; 1*(1), Book Review 44–47.

Sinnreich, A. (2005). All that jazz was: Remembering the mainstream avant-garde. *American Quarterly, 57*(2); 561–572.

ENCYCLOPEDIA ENTRIES

Sinnreich, A. (forthcoming). Configurable culture: Mashed up music and technology. In J. Nussbaum (Ed.), *The Oxford Research Encyclopedia of Communication.* New York: Oxford University Press.

Sinnreich, A. (forthcoming). Global music piracy. In J. Nussbaum (Ed.), *The Oxford Research Encyclopedia of Communication.* New York: Oxford University Press.

Wang. J. & Sinnreich, A. (forthcoming, 2021). Industrial and Commercial Bank of China. In L. A. Schintler and C. L. McNeely (Eds.), *The Encyclopedia of Big Data.* New York: Springer.

Dunham, I. & Sinnreich, A. (2018). File sharing. In B. Warf (Ed.), *The Sage Encyclopedia of the Internet.* Washington, DC: Sage; 376–378.

Garlitz, J. & Sinnreich, A. (2014). Musicians and social media in politics. In K. Harvey (Ed.), *Encyclopedia of Social Media and Politics.* Washington, DC: Sage; 861–866.

JOURNALISM, OPINION & PROFESSIONAL RESEARCH

Sinnreich, A. (2019). Naked space in a networked world: Music and ritual in the 21st century. *Naxos Musicology International.*

Sinnreich, A. (2019). Stranger Things Isn't '80s Nostalgia — It's '90s Nostalgia (and it's all about 2016). *Medium.*

Sinnreich, A. (2019). Beltway expansion threatens the American dream. *Maryland Matters.*

Sinnreich, A. (2018). Plagiarists or innovators? The Led Zeppelin paradox endures. *The Conversation.* (Republished in over a dozen major news sources, including *Salon, The Wire, Alternet,* and *The Houston Chronicle*)

Sinnreich, A. (2018). Policy Briefing Note: An International Approach to Data Privacy. *Center for Media & Social Impact.*

Sinnreich, A. (2018). What Spotify's Alarming R. Kelly Censorship Means for the Future of the Internet. *The Daily Beast.*

Sinnreich, A. (2018). Cambridge Analytica: Tip of the Iceberg as Deep as the Ocean. *The Globe Post.*

Sinnreich, A. & Romzek, B. (2018). To serve a free society, social media must evolve beyond data mining. *The Conversation.* (Republished in over a dozen major news sources, including *The Daily Beast, Salon, Newsweek,* and *Phys.org*)

Romzek, B. & Sinnreich, A. (2018). Social media companies should ditch clickbait, and compete over trustworthiness. *The Conversation.* (Republished in over a dozen major news sources, including *SF Chronicle, Seattle Post-Intelligencer, Salon, Business Insider,* and *Houston Chronicle*)

Sinnreich, A. (2018). Why I left Facebook for good: A reader explains [Letter to the editor]. *USA Today.*

Sinnreich, A. (2017). Rest in power, David Vyorst [Obituary]. *BoingBoing.*

Sinnreich, A. (2017). How facial recognition technology is turning people into human bar codes. *WSJ MarketWatch.*

Sinnreich, A. (2017). Fleeing Pogroms to Fight Nazis: My Family's Secret Refugee Past. *The Daily Beast.*

Sinnreich, A. (2017). America first. [editorial cartoon]. *Truthdig.*

Sinnreich, A. (2016). Killer robots and rebel wieners: Did Hollywood's working-class revolt fantasies fuel Trump's rise? *Truthdig.*

Sinnreich, A. (2016). Will the real Wailers please (get up) stand up? *The Daily Beast.*

Sinnreich, A. (2016). If Led Zeppelin goes down, we all burn. *The Daily Beast.*

Sinnreich, A. (2015). Islamic State's dangerous effort to wipe out humanity's past. *Truthdig.*

Sinnreich, A. (2014). Net neutrality: What's really at stake (Op-Ed). *Bergen Record.*

Sinnreich, A. (2014). *How publishers can make the most of mobile advertising.* (Research report). GigaOM Research.

Sinnreich, A. (2014). The Polish parliament, masked and anonymous. *In Media Res.*

Sinnreich, A. (2014). *Legal challenges and opportunities for 3D printing.* (Research report). GigaOM Research.

Sinnreich, A. (2014). *3D printing: Hype, hope or threat?* (Research report). GigaOM Research.

Sinnreich, A. (2013). *The revolution will be targeted: RTB and the future of programmatic advertising.* (Research report). GigaOM Pro.

Sinnreich, A. (2013). *Frenemy mine: The pros and cons of social partnerships for online media companies.* (Research report). GigaOM Pro.

Sinnreich, A. (2012). Welcome to Alphaville, Avoid the Ghetto. *Truthdig.*

Sinnreich, A. (2011). Remixing Girl Talk: The Poetics and Aesthetics of Mashups. *Sounding Out!*

Sinnreich, A. (2011). 'This Is What We Do': Why I Hated Chrysler's Super Bowl Ad. *Truthdig.*

Sinnreich, A. (2010). Controllers, controlled. *Kill Screen, 0*: 30-34.

Sinnreich, A. (2010). Book Excerpt: 'Mashed Up: Music, Technology, and the Rise of Configurable Culture. *Truthdig.*

Sinnreich, A. & Zager, M. (2008). E-Speech: The (Uncertain) Future of Free Expression. *Truthdig.*

Sinnreich, A. (2008). Pin the flag on Liberty. [editorial cartoon]. *Truthdig.*

Sinnreich, A. (2007). Closing the Box on Pandora? *Truthdig.*

Sinnreich, A. (2007). Right Move, Wrong Reasons: Inside the EMI/Apple Deal. *Truthdig.*

Gluck, M. & Sinnreich, A. (2006). Clumsy To Cool: Branded Entertainment And The Rules Of In-Game Ads. *MediaPost.*

Sinnreich, A. (2003). Waiting Game: Key P2P Legal Rulings Coming. *Billboard.*

Sinnreich, A. (2003). Microsoft Plays to Film Industry. *Wired.*

Sinnreich, A. (2002). Rollout of CDs With Anti-Piracy Safeguards Limited By Tech Glitches, Labels' Fears. *Billboard.*

Sinnreich, A. (2002). Copy Protection Making Slow Progress. *Billboard.*

Sinnreich, A. (2000). SOAPBOX; Love Found on the Barricades. *New York Times.*

Sinnreich, A. (2000). Where the Solos Last Till Dawn; With Endless Music and Open Jams, Smalls Stands Out Among Jazz Clubs Like a Blue Note in a Major Scale. *New York Times.*

## CONFERENCES AND PRESENTATIONS

Contested Data Academic Workshop (invited discussant). Data and Society
Research Institute, New York, 2020.

"The Carrier Wave Principle." Values in Digital Media lecture series, Israel institute
for Advanced Studies, Jerusalem, 2020.

AoIR Early Career Scholars Workshop (invited panelist). Association for Internet
Research, Brisbane, Australia, 2019.

Social Media and Democracy (invited panelist). Tocqueville Forum for Political
Understanding, Georgetown University, Washington, DC, 2019.

"Music and Copyright: A Coevolution in Five Moments." Keynote address, 100 Years
of Copyright. Haus der Kulturen der Welt, Berlin, 2018.

Censorship, Information Control and Information Technologies from the Printing
Press to the Internet (invited panelist). Neubauer Collegium for Culture and
Society, University of Chicago, 2018.

"Streaming Media as Battleground: How Online Media Serve as a Proxy War for
Geopolitics." Keynote address, Screen industries in East-Central Europe:
Online distribution and internet TV (International Communication Association
preconference), Prague, 2018.

"Hip Hop and Copyright: Where Art, Technology and Law Collide." Indiana
University, Bloomington. 2017.

"Hip Hop and Copyright: Where Art, Technology and Law Collide." Northern Virginia
Community College. 2017.

"The Ethics of Copying in an Algorithmic Era." (Respondent to paper by Niva Elkin-
Koren). Copy Ethics: Theory & Practice. Center for Interdisciplinary
Research, University of Bielefeld. Bielefeld, Germany, 2017.

"Hip-Hop and Copyright: A Brief History." Fairleigh Dickinson University, New Jersey.
2017.

National Endowment for the Humanities/National Center for Science and Civic
Engagement. State University of New York, Stony Brook. (Invited symposium
participant). 2017.

"Following the Money Behind Intellectual Property." Research Methods in Internet
Governance. American University, Washington D.C. 2017.

"Remix Ethics: An Empirical Study." Emerging Dilemmas in Entertainment Law: Resolving Technology's New Ethical Concerns. Whittier Law School, Costa Mesa, CA. 2016.

"Journalism, Society and the Internet of Things." Shanghai Media Training Institute, Washington, DC, 2016.

"Hip-Hop and Copyright: A Brief History." Institute for Popular Music, Bochum, Germany. 2016.

"Copyright, Media Ethics, Liberty & Privacy: An International Perspective." Libraries in the Digital Age. University of Zadar, Croatia. 2016.

"Workshop: Fair Use in Libraries and the Academy." (with P. Aufderheide). Association of Internet Researchers, Berlin, Germany, 2016.

"Ethics, Evolved: An International Perspective on Copying in the Networked Age." American University Faculty Forum, Washington D.C., 2015.

"Hip-Hop and Copyright: A Brief History." Media Culture & Design Lecture Series. Woodbury University, Burbank, CA. 2015.

"Hip-Hop and Copyright: A Brief History." Utah State University Symposium on Hip-Hop and Technology. Logan, UT, 2015.

The Role of the Law and Ethics in Communication and PR (panelist). Novacom 15, Rutgers University. New Brunswick, NJ, 2015.

"Configurable Collectives and Posthuman Rights." Cornell Tech Connective Media Lunch. New York, 2014.

"The Piracy Crusade." Invited Lecture. Alexander Library, Rutgers University. New Brunswick, NJ, 2014.

"The Piracy Crusade." Invited Lecture. Rutgers University Musicological Society Colloquium. New Brunswick, NJ, 2014.

What is Music Tech For? (invited participant). Symposium at Microsoft Research New England. Cambridge, MA, 2014.

"Emerging Digital Ethics: An International Perspective." The Ethics of Copying. Center for Interdisciplinary Research, University of Bielefeld. Bielefeld, Germany, 2014.

"The Piracy Crusade." Invited Lecture. San Francisco MusicTech Summit XV. San Francisco, CA, 2014.

"Music and Copyright: A Big, Hot, Stinking Mess." Copyright Beyond Print Colloquium, Rutgers University. New Brunswick, NJ, 2014.

"Music, Apps and Copyright." Music Tech Fest Boston. Cambridge, MA, 2014.

"The Piracy Crusade." Invited lecture. Information & Society Project, Yale Law
        School. New Haven, CT, 2014.

"The Piracy Crusade." Invited lecture. Annenberg School for Communication and
        Journalism, University of Southern California. Los Angeles, CA, 2014.

"The Piracy Crusade." Invited lecture. Microsoft Research New England. Cambridge,
        MA, 2013.

Playing with Analog and Digital Media (moderator). Extending Play Conference.
        Rutgers University, 2013.

"Configurable Culture, Material Laws." Design Unfolds Symposium. University of the
        Arts, Zurich. 2013.

"The Piracy Crusade." Students for Liberty lecture series. Online. 2013.

"Protecting Ourselves To Death: Why Copyright Maximalism is Too Much of a Good
        Thing." Digitalia. Co-hosted by the Federal University of Bahia, Brazil, 2013.

Music and Transnationalism Symposium (panelist). Wesleyan University,
        Middletown, CT. 2013.

"The Piracy Crusade." Media Culture & Design Lecture Series. Woodbury University,
        Burbank, CA. 2012.

"The Piracy Crusade." Computers and Society Lecture Series, New York University.
        2012.

The Copyright Alert System (panelist). INET NY. New York Law School, 2012.

"Preparing for the Next Gen Internet: Building Business and Strengthening
        Democracy as the Network Evolves." USC Marshall CTM Annual Board
        Dinner, Los Angeles, CA. 2012.

"Beyond the internet: Innovative ideas for democratizing communication and
        societies in the networked age." Technologies Without Borders, Rutgers
        University, New Brunswick, NJ. 2011.

"The next-generation internet." TEDxUSC. University of Southern California, Los
        Angeles, CA. 2011.

Beyond the Bleeding Edge: Confronting the Ghosts in the Machine (panelist). INET
        NY. NYU Law School, 2011.

COPYleft & COPYright: An Academic and Professional Conference About Intellectual Property and Technology (panelist). SUNY Purchase. Purchase, NY. 2011.

"Ethics Remixed: Emerging Attitudes about Art, Technology and Appropriation." Masters of Amateurism: Re-Mix. Premsela/VU. Amsterdam, Netherlands. 2010.

"Mashed Up: Music, Technology and the Rise of Configurable Culture." Yale Law School, ISP/KLAMP Speaker Series. New Haven, CT. 2010.

"Configurable Culture: New Norms, Old Laws." Yale Law School. New Haven, CT. 2009.

Kauffman Internet Video Innovation Roundtable (panelist). Yale Law School. New Haven, CT. 2009.

Game Theory/Play Money (moderator). DiGRA NY Conference. Columbia Busines School. New York. 2008

24/7: A DIY Video Summit (presenter). Institute for Multimedia Literacy, University of Southern California, Los Angeles. 2008.

Foundations and Parameters of Media Sociology Research (moderator). NYU/Columbia University Media Sociology Forum. New York. 2007.

The Roots and Future of Remix (panelist). TransFormations I: Remixing the Archive, Annenberg Center for Communication, Los Angeles. 2006.

Annenberg Center Social Software in the Academy Workshop (panelist). University of Southern California, Los Angeles. 2005.

Indies in the digital age (panelist). UCLA EGSO Conference on The Music Industry. Los Angeles. 2003.

CONFERENCE PAPERS

"Beyond Fact-Checking: Lexical Patterns as Lie Detectors in Donald Trump's Tweets" (with D. Davis). International Communication Association, Gold Coast, Australia, 2020.

"Content Moderation and the Power of Platforms — Emerging Interventions" (panelist and presenter). Association of Internet Researchers, Brisbane, Australia, 2019

"The Carrier Wave Principle" (with J. Gilbert). Association of Internet Researchers, Brisbane, Australia, 2019

"Creative Action under Two Copyright Regimes: Filmmaking and Visual Arts in Australia and the U.S." (with D. Newman). International Communication Association, Washington DC, 2019.

"Do You Wanna Build a Wall? Remix Tactics in the Age of Trump." (with R. Brøvig-Hanssen). International Communication Association, Washington DC, 2019.

"Four Crises in Algorithmic Copyright Governance." International Communication Association, Washington DC, 2019.

"Hidden Levers of IP Control" (panelist and presenter). Fifth Global Congress on Intellectual Property and the Public Interest. Washington College of Law, Washington DC, 2018.

"Do You Wanna Build a Wall? Remix as Rhetoric in the Age of Trump." (presented by coauthor R. Brøvig-Hanssen). Crosstown Traffic: Popular Music Theory and Practice. University of Huddersfield, Queensgate, UK, 2018.

"The limits of the limits of the law: DMCA anti-circumvention exceptions in a configurable culture." (with P. Aufderheide and J. Graf). Association of Internet Researchers, Montreal, 2018.

"Does stronger copyright weaken creative expression in a globalized, digital media environment?" (with D. Newman). Association of Internet Researchers, Montreal, 2018.

"Copyright as censorship: Capturing political bias in the use of DMCA takedown provisions." International Communication Association, Prague, 2018.

"Copyright givers and takers: Mutuality, altruism and instrumentalism in open licensing." (with M. Forrelle). International Communication Association, Prague, 2018.

"Tweet the Press: Fake News as a Reputation-Management Device in President Trump's Tweets." (with D. Davis). International Communication Association, Prague, 2018.

"Copyright and musical style: A coevolution in five movements." Association of Internet Researchers, Tartu, Estonia, 2017.

"Following the Money Behind Intellectual Property." International Communication Association, San Diego, CA. 2017.

"Visual Arts in Digital and Online Environments: Changing Copyright and Fair Use Practice among Institutions and Individuals." (with P. Aufderheide). Association of Internet Researchers, Berlin, Germany, 2016.

"The More Things Change: Who Gets Left Behind as Remix Goes Mainstream?" (with F. Rosa). Association of Internet Researchers, Berlin, Germany, 2016.

"Slicing The Pie: The Search For An Equitable Recorded Music Economy."
International Communication Association, Fukuoka, Japan, 2016.

"Incoded Counter-Conduct: What the Incarcerated Can Teach Us About Resisting
Mass Surveillance." (with J. Lingel). International Communication
Association, Fukuoka, Japan, 2016.

"Ethics, Evolved: An International Perspective on Copying in the Networked Age".
International Communication Association, Fukuoka, Japan, 2016.

"Fair Use and Academic Freedom: Copyright Attitudes and Practices Among
Communication Scholars in a Digital Environment." (with P. Aufderheide).
Internet Research 16. Phoenix, AZ, 2015.

"From Fear to Fair: Knowledge-Grounded Change in Documentary Practice
regarding Copyright." (with P. Aufderheide). Internet Research 16. Phoenix,
AZ, 2015.

"Beyond the Pirate Code: The Spiritual Geist of Digital Sharing." Openness and
Intellectual Property: ISHTIP Annual Workshop 2015. University of
Pennsylvania, Philadelphia, PA, 2015.

"Resisting Sovereign Surveillance: An Activist Agenda From the Incarcerated." (with
J. Lingel). Internet Research 15. Daegu, South Korea, 2014.

"View from the Paragon: Hi-So Culture, Social Capital and the Most Instagrammed
Building in the World." (with J. Gershon; accepted, not presented). Internet
Research 15. Daegu, South Korea, 2014.

"Sharing in Spirit: Kopimism's Religious and Legal Antecedents." ICA Preconference
on Sharing. Seattle, WA. 2014.

"Kopimism Considered: Sophistry, Sacrament or Scam?" National Communication
Association, Washington, D.C. 2013.

"Tracking Configurable Culture from the Margins to the Mainstream." (with M.
Latonero) International Communication Association, London. 2013.

"'Nowadays It's Like Remix World': The Hidden Demography of New Media Ethics."
(with M. Latonero, M. Gluck, & N. Riley) International Communication
Association, Phoenix, AZ. 2012.

"The end of forgetting: Strategic agency beyond the Panopticon." (with J.
Bossewitch) International Communication Association, Phoenix, AZ. 2012.

"Beyond the Panopticon: Strategic Agency in an Age of Limitless Information." (with
J. Bossewitch) MIT's Media in Transition 6. Cambridge, MA. 2009.

"Ethics Remixed: How Today's Media Consumers Evaluate the Role of Creative Reappropriation." (with M. Latonero & M. Gluck) International Communication Association. Montreal. 2008.

"Ethics Remixed: How American Consumers Evaluate Creative Reappropriation." (with M. Latonero & M. Gluck) International Symposium: New Trends in Socio-information in East Asia. Tokyo. 2007.

"Niche is the New Mainstream: Measuring the Growth and Impact of Configurable Culture." (with M. Gluck) International Communication Association, San Francisco. 2007.

"Remix Goes Mainstream: Emerging Attitudes about the Reappropriation of Media Content." (with M. Latonero & M. Gluck) Media in Transition 5: creativity, ownership and collaboration in the digital age. Cambridge, MA. 2007.

"Modeling information equality: A real world approach. (with A. Chib & J. Gilbert) INSNA Sunbelt Social Networks Conference, Redondo Beach. 2005.

"Mash it up!: Hearing a new musical form as an aesthetic resistance movement." National Communication Association, Chicago. 2004.

"Modeling information equality: Social and media latency effects on information diffusion." (with A. Chib & J. Gilbert) National Communication Association, Chicago. 2004.

"The role of enforced structural holes in independent radio promotion." (with P. Monge) International Communication Association, New Orleans. 2004.

"Modeling information equality: Social and media latency effects on information diffusion." (with A. Chib & J. Gilbert) Telecommunications Policy and Research Conference, Virginia. 2004.

"An institution worth preserving: The battle over *Barbershop* and the Black public sphere." Global Fusion Conference, Austin. 2003.

PROFESSIONAL EVENTS (SELECTED)

Roundtable: Responding to the Fake News Challenge. Center for Strategic and International Studies. Washington DC, 2019.

Roundtable Breakfast on Cybersecurity. Atlantic Live. Washington, DC, 2017.

Breakfast Salon: Fake News and Algorithms. Internet Society. Washington, DC, 2017.

Bitcoin for Rockstars – A Fireside Chat with D.A. Wallach (moderator). Internet Society. New York, 2015.

"Why Doesn't the 'Brooklyn Sound' Sound Like Brooklyn?" EMP Pop Conference. Seattle, WA, 2014.

Streaming Music: Will It Sustain Musicians, Labels, and the Industry? (panelist). APAP World Music Preconference. New York, 2014.

"The Future is Weird: Media, Technology and Configurable Culture." Daimler Group NAFTA Lawyers Meeting. Weehawken, NJ. 2013.

Debate: Is the Music Industry Getting Better? (panelist). New Music Seminar. New York, 2013.

Making Money off Mobile Media (panelist). GigaOM PaidContent Live. New York, 2013.

"Mixing things up: should content be a freebie?" iMinds Creative Media Days. Ghent, 2012.

Culture: Create or Copy? (panelist). Google Big Tent Event. Moscow, 2012.

*Barbershop Punk,* New York Premiere. New York, 2011.

"Look Ma, No Contract: Making Money Making Music in the Post-Label Economy." EMP Pop Conference. Los Angeles, CA. 2011.

"Ethics Remixed: Emerging Attitudes About Art, Technology and Appropriation." Copy/Culture Symposium, DMY Berlin, 2011.

"Striking the Balance Between Copyright and Innovation." International Conference of New Approaches to Copyright Online. Co-hosted by Google and the Russian Federation. Moscow, 2011.

"Mashed Up: Music, Technology & the Rise of Configurable Culture." World's Fair Use Day. Public Knowledge. Washington, DC, 2011.

*RIP: A Remix Manifesto,* New York Premiere. New York, 2009.

O'Reilly Media's Foo Camp East. Cambridge, MA, 2009.

Independent Games Festival Awards. San Francisco, CA, 2009.

"Today is Opposite Day: Music in the Network Age." Halifax Pop Explosion. Halifax, Canada, 2008.

"Search Engine Marketing: State of the Market." SEMPO Conference. New York, 2008.

The Stinging Reach of the RIAA (panelist). CMJ Music Festival. New York, 2008.

The Kids Are Alright: The Tween, Teen & College Market for Music (moderator). Digital Music Forum. New York, 2008.

The Power of Music: A Roundtable Discussion About Music & Millennials (moderator). The Millennials Conference. New York, 2007.

"Consumer Generated Marketing". Online Marketing Summit. San Diego, CA, February 2007.

Subscription, Free, Download, or …? (moderator). Music 2.0. Los Angeles, 2007.

"Remix and Marketing." Interactive Advertising Bureau Research Council. 2006.

DVDs, New and Improved (moderator). Digital Media Summit, Los Angeles, 2006.

"From Clumsy to Cool - Navigating Branded Entertainment". OMMA Hollywood, Los Angeles, 2006.

When Does It Get Better? The Labels' Outlook. Music 2.0, Los Angeles, 2006.

The Next Wave for Audio Electronics (moderator). Music 2.0, Los Angeles, 2003.

"Clearing the Portability Hurdle: A Brass-Tacks Approach to Selling Digital Music." Plug.In, New York, 2002.

"Music Retail Redux: Awake, Ye Sleeping Giants." NARM Convention, San Francisco, 2002.

"Apocalypse Now? Rethinking the Music Industry." Canadian Music Week, Toronto, 2002.

Heard it Though the Grapevine: Internet Radio Makes its Mark (moderator). CMJ Music Festival, New York, 2001.

Billboard Dance Music Summit, New York, 2001.

"Music Supply Chain (Digital Remix)". Plug.In, New York, 2001.

Billboard Latin Music Conference, Miami, FL, 2001.

"Digital Music in Europe." Plug.In Europe, Barcelona, 2001.

Digital Music Business Models – Version 2.0 (moderator). SXSW, Austin, TX, 2001.

Music Publishing: New Business Models. MIDEM, Cannes, 2001.

"The Future of Music: The Shift to a Service Model." NARM, Orlando, FL, 2001.

"The Future of Music: The Shift to a Service Model." Plug.In, New York, 2000.

**TEACHING/INSTRUCTIONAL DESIGN**

AMERICAN UNIVERSITY, SCHOOL OF COMMUNICATION

### Curriculum Revision (undergraduate and graduate)
- Led development of new Communication Studies masters program, 2019-21
- Led initiative to revamp the Communication Studies undergraduate major curriculum, 2016-18
- Faculty lead on revisions to Communication minor curriculum, 2018
- Faculty lead on revisions to PhD curriculum, 2017-2018

### Advanced Research and Project Development
- Doctoral seminar
- Managed qualifying examinations preparation
- Designed syllabus and assignments

### Advanced Media Theory
- Doctoral seminar
- Designed syllabus and assignments

### Capstone Seminar in International Media
- Masters capstone project course

### Senior Research Capstone Seminar
- Designed new course, added to UG curriculum

### Communication, Copyright and Culture
- Undergraduate/Masters lecture course
- Designed syllabus and assignments
- New to permanent curriculum

### Musical Cultures and Industries
- Undergraduate/Masters lecture course
- Designed syllabus and assignments
- New to permanent curriculum

### Digital Media and Society
- Undergraduate seminar
- Designed syllabus and assignments

### Contemporary Media in a Global Society
- Undergraduate seminar
- Designed syllabus and assignments

### Graduate Academic Integrity Tutorial
- Led initiative to develop and deploy a mandatory academic integrity tutorial for incoming graduate students

**Digital Media Criticism**
- Doctoral seminar
- Designed syllabus and assignments

**Critiquing Marketing Communications**
- Flagship course for digital media masters track
- Designed syllabus and assignments
- Organized eCollege platform

**Musical Cultures and Industries**
- Undergraduate lecture course
- Designed syllabus and assignments

**Copyright, Media and Commerce**
- Undergraduate lecture course
- Designed syllabus and assignments

**Development of Mass Media**
- Undergraduate lecture course
- Revised existing syllabus

**Exploring New Media**
- Online-only course
- Revised existing syllabus

NYU, DEPT. OF MEDIA, CULTURE & COMMUNICATION

**Visions and Revisions of Cyberspace**
- Masters seminar
- Designed syllabus and assignments

**Communication and the Culture Industries**
- Masters seminar
- Revised syllabus and assignments

**Video Games: Culture and Industry**
- Undergraduate lecture course
- Designed syllabus and assignments

**Copyright, Commerce and Culture**
- Undergraduate lecture course
- Revised syllabus and assignments

**Introduction to Media Criticism**
- Undergraduate lecture course
- Revised syllabus and assignment

**Communication, Culture & Commerce in the Video Game Industry**
- Masters seminar course
- Designed syllabus and assignments

**Music as Communication**
- Undergraduate lecture course
- Designed syllabus and assignments

**Communication in the Virtual Group**
- Undergraduate lecture course
- Designed syllabus and assignments

Student Research Supervision

**PhD Comps/Thesis Committees**
- Asvatha Babu (AU) *Co-chair
- Margaret Clifford (AU) *Chair
- MC Forelle (USC)
- Samantha Dols (AU)
- Dorian Davis (AU) *Chair
- Mariana Leyton Escobar (AU) *Chair
- Louisa Imperiale (AU) *Chair
- Donte Newman (AU) *Chair
- Angela Hart (AU) *Chair
- Fernanda Rosa (AU)
- Olga Khrustaleva (AU)
- Janet Lazar (RU)
- Ian Dunham (RU)
- Robyn Caplan (RU)
- Steve Voorhees (RU) *Chair
- Nadav Lipkin (RU) *Chair
- Trystram Spiro-Costello (RU) *Chair
- Frank Bridges (RU) *Chair
- Qun Wang (RU)
- Alptug Okten (RU)
- Dara Murray (RU)
- Anne Gilbert (RU)
- Bryan Sacks (RU)
- Camille Reyes (RU)
- Danielle Graci Flam (RU)
- Mary Ray (Temple University)
- Jonathan Bullinger (RU)
- Aaron Trammell (RU)
- Nathan Graham (RU)
- Bryce Renninger (RU)

- Karl Babij (RU)
- Joost van Dreunen (Columbia University)
- Gayla Blaisdell (NYU)

**Masters Research Supervision**
- Daniel Farber (AU)
- Candice Norwood (AU)
- Modupeola Oyebolu (AU)
- Allan Roberts (AU)
- Micchean Nichols (RU)
- Jit Teo (RU)
- Kim Williams (RU)
- Lin Zhang (NYU)
- Tomas Minc (NYU)
- Vicki Simon (NYU)
- Arielle Chavkin (NYU)
- Mike Goren (NYU)
- Casey Brienza (NYU)

**Independent Study**
- Chelsea Horne (AU PhD)
- Maggie Clifford (AU PhD)
- Asvatha Babu (AU PhD)
- Olga Khrustaleva (AU PhD)
- Donte Newman (AU PhD)
- Fernanda Rosa (AU PhD)
- Aras Coskuntuncel (AU PhD)
- Dorian Davis (AU PhD)
- Louisa Imperiale (AU PhD)
- Jing Wang (RU PhD)
- Josh Kelly (RU)
- Ian MacDonald (RU)
- Parker Higgins (NYU)
- Maxwell Gray (NYU)

## SERVICE CONTRIBUTIONS

ACADEMIC COMMITTEES AND POSITIONS

2018-21    Chair, Communication Studies Division, American University SOC

2019-20    Dean Search Committee, American University SOC

2019-20    Chair, Search Committee, Media, Technology & Democracy, American University SOC

2018-20    Nominations Committee, American University SOC

Case 5:19-cv-00249-FL        Document 29-14        Filed 07/17/20        Page 39 of 60

| | |
|---|---|
| 2015-20 | PhD Steering Committee, American University SOC |
| 2019 | Reappointment Committee for Prof. Saif Shahin, American University SOC |
| 2018-19 | Chair, Search Committee, Media, Policy & Justice, American University SOC |
| 2018-19 | International Communication Association Urban Issues Planning Committee, 2018-2019. |
| 2018-19 | Advisory Group Member, Activism, Communication & Social Justice Interest Group, International Communication Association |
| 2017-18 | Chair, Search Committee, Data, Media & Identity, American University SOC |
| 2017 | Reappointment Committee for Prof. Benjamin Stokes, American University SOC |
| 2017 | Co-designer, Academic Integrity Certification Program for Graduate Students, American University SOC |
| 2017 | Faculty Retreat Planning Committee, American University SOC |
| 2017 | Acting Chair, Communication Studies Division, American University SOC |
| 2017 | Acting Director, Doctoral Program, American University SOC |
| 2016-17 | Search Committee, Race & Media, American University SOC |
| 2016-17 | Undergraduate Research Committee, American University SOC |
| 2015-17 | Outcomes and Assessments Committee, American University SOC |
| 2015-17 | Co-chair, Curriculum Committee, American University SOC |
| 2016 | Program Curriculum Reviewer, Digital Media and Communication, Virginia International University |
| 2014-15 | Area Coordinator, Rutgers SC&I Media Studies Doctoral Program |
| 2014 | JMS Undergraduate Scholarship Review Committee, Rutgers University |
| 2012-13 | PR/Promotional Communication curriculum planning committee. Assisting in the development of a new academic program to train public relations and communications professionals. Rutgers University. |

| 2012-13 | New Brunswick GA/TA Grievance Process Committee, Rutgers University |
|---------|---|
| 2012 | Faculty Search Committee, Department of Journalism & Media Studies, Rutgers University |
| 2011-12 | Rutgers SC&I New Building Feasibility Planning Committee |
| 2011 | Ph.D. Admissions Committee, Department of Journalism & Media Studies, Rutgers University |
| 2010-11 | Masters in Media Innovation Curriculum Development Committee, Department of Journalism & Media Studies, Rutgers University |
| 2010 | Rutgers SC&I Web Development Committee |

EVENTS

**Organizing**

| 2020 | Organizer and host, Media Distortions: Understanding the Power Behind Spam, Noise, and Other Deviant Media. Book talk by Dr. Elinor Carmi at American University, Washington DC. |
|------|---|
| 2020 | Organizer and host, The Craigslist Ethic: A Web 1.0 Vision of Online Democracy. Book talk by Dr. Jessa Lingel at American University, Washington DC. |
| 2020 | Organizer and host, The Digital Street. Book talk by Dr. Jeffrey Lane at American University, Washington DC. |
| 2019 | Organizer and host, Black Software. Book talk and diversity and inclusion in the academy workshop by Dr. Charlton McIlwain at American University, Washington DC. |
| 2019 | Co-organizer, Antitrust: Does it Work for Tech? Internet Governance Forum USA, Washington, DC. |
| 2019 | Co-organizer and presenter, How Can We Help? Issues in Development, Support, Advancement of Activist/Engaged Communication Scholars. International Communication Association, Washington, DC. |
| 2019 | Co-organizer and host, Preconference on Activist/Engaged Scholars: Issues, Challenges, and Options in Career Development. International Communication Association, American University, Washington, DC. |
| 2019 | Organizer and host, Urban Communication Issues Planning Committee Special Event: A Celebration of DC Music, Culture and Politics, official off-site event for the International Communication Association, Washington, DC. |

| 2019 | Co-organizer and host, Data Privacy: Challenges, Opportunities, and the Prospects for Meaningful Data Privacy Legislation in the U.S. Co-sponsored by the Internet Society and Internet Governance Lab, American University, Washington, DC. |
|---|---|
| 2018 | Co-organizer and host, Data Privacy Convening. Co-sponsored by the Internet Society and Internet Governance Lab, American University, Washington, DC. |
| 2017 | Co-organizer and presenter, Sonic Publics panel at Association of Internet Researchers, Tartu, Estonia |
| 2017 | Organizer and host, Data Hygiene Clinic, American University SOC |
| 2017 | Event co-organizer and moderator: Content Rules?! News feeds and algorithms and ethics. Internet Society, Washington DC and New York. |
| 2015 | Panel co-organizer: Copyright and Remix Attitudes in Digital Spaces: How Do They Differ with Age, Experience and Kind of Use? Internet Research 16 Conference, Phoenix, AZ |
| 2015 | Faculty sponsor: "Extending Play 2" Graduate student conference. Rutgers SC&I. |
| 2014 | Panel co-organizer and co-chair: From Cybertypes to Futuretypes: Reading science and science fiction alongside emerging digital subjectivities. National Communication Association, Chicago. |
| 2013 | Panel co-organizer. "Media Outlaws: Contested Subjectivities of Cultural Production and Communication Policy." National Communication Association, Washington, D.C. |
| 2013 | Faculty sponsor: "Extending Play" Graduate student conference. Rutgers. |
| 2011 | Obtained multi-departmental funding for, and hosted, a talk by war correspondent Peter Maass at the Rutgers Student Center. |
| 2011 | Obtained funding for and organized "Beyond the Internet" event, including a keynote by me, and a panel discussion that was live-streamed by ISOC at Rutgers as part of the university-wide Technologies Without Borders: Technologies Across Borders initiative. |
| 2011 | Panel organizer and moderator. Look Ma, No Contract: Making Money Making Music in the Post-Label Economy. EMP Pop Conference. UCLA. |
| 2008 | Conference committee member and moderator. DiGRA NY Conference. Columbia Business School. |

| 2008 | Conference co-organizer and co-host. 24/7 DIY Video Summit. University of Southern California. |
|------|-----------|
| 2007 | Panel organizer. "The Rise of Remix Culture: Identity, Power, and Imagination." International Communication Association, San Francisco. |
| 2005 | Conference co-organizer. Annenberg Center Social Software in the Academy Workshop. University of Southern California. |
| 2000-02 | Conference host and co-organizer. Plug.In. New York & Barcelona |

**Moderating**

| 2019 | Moderator. Civil Rights and Culture in a time of surveillance. Data Privacy Symposium, American University. |
|------|-----------|
| 2019 | Discussant. Inaugural Inter-School PhD Conference, American University. |
| 2018 | Respondent. Compensation for Online Content Distribution and the Creative Work. ICA Pre-Conference on Screen Industries, Prague. |
| 2018 | Chair. Studying Scenes and Markets: Popular Music in Time and Space. International Communication Association, Prague. |
| 2017 | Faculty Respondent. Academic Freedom 2.0.: How to Protect Digital Privacy and Why It Matters for Research. Association of Internet Researchers. Tartu, Estonia. |
| 2015 | Chair. Towards an Ethics of Copying in the Digital Age – Empirical Perspectives. International Conference: Towards an Ethics of Copying. Center for Interdisciplinary Research, University of Bielefeld. Bielefeld, Germany. |
| 2013 | Chair. Disconnected and Not Missing It: Responses to Technocultures of Connection. National Communication Association, Washington, D.C. |
| 2013 | Moderator. Keynote Discussion: Playing with Analog and Digital Media. Extending Play. Rutgers University. |
| 2008 | Moderator. The Kids Are Alright: The Tween, Teen & College Market for Music. Digital Music Forum. New York. |
| 2007 | Moderator. The Power of Music: A Roundtable Discussion About Music & Millennials. The Millennials Conference. Los Angeles. |
| 2007 | Moderator. Foundations and Parameters of Media Sociology Research. NYU/Columbia University Media Sociology Forum. |
| 2007 | Moderator. Subscription, Free, Download, or …? Music 2.0. Los Angeles. |

| 2006 | Moderator. DVDs, New and Improved. Digital Media Summit. Los Angeles. |
|------|------|
| 2006 | Moderator. When Does It Get Better? The Labels' Outlook. Music 2.0. Los Angeles. |
| 2003 | Moderator. The Next Wave for Audio Electronics. Music 2.0. Los Angeles. |
| 2001 | Moderator. Heard it Though the Grapevine: Internet Radio Makes its Mark. CMJ Music Festival. New York. |
| 2001 | Moderator. Digital Music Business Models – Version 2.0. SXSW. Austin, TX. |

MANUSCRIPT & PROPOSAL REVIEWING

**Journals**
- International Journal of Communication (Editorial board member)
- Communication Yearbook (Editorial board member)
- New Media and Society
- Popular Communication
- Journal of Computer-Mediated Communication
- Human Communication Research
- Information, Communication & Society
- Journal of Information Policy
- The Communication Review
- Popular Music
- Public Culture
- Journal of Broadcasting & Electronic Media
- Sociological Quarterly
- American Studies
- Media and Communication
- Music Theory Online
- Music, Sound and the Moving Image
- Museum Management and Curatorship

**Presses**
- NYU Press
- Yale University Press
- UC Press
- MIT Press
- Polity Press
- Routledge
- University of Massachusetts Press
- Vernon Press
- Oxford University Press
  - Advisory board, "Journalism and Political Communication Unbound" series

**Conferences**
- International Communication Association (annual)
- Association of Internet Researchers (annual)
- Extending Play 2, Rutgers SC&I
- Extending Play, Rutgers SC&I

**Awards & Grants**
- Association of Internet Researchers, Nancy Baym Book Award Committee, 2020
- Association of Internet Researchers, Dissertation Award Committee, 2018, 2019
  - Presented award, AoIR 2019, Brisbane, Australia
- National Endowment for the Humanities, Cooperative Agreement proposal, 2018
- National Endowment for the Humanities, 2018 Digital Humanities Grant Award
- Scientific Council of the European Research Council, referee, 2018
- McGannon Book Award, 2014 Award Committe

GUEST LECTURES (SINCE 2012)

| | |
|---|---|
| 2019 | Music Publishing and Copyright. American University. |
| 2018 | Complex Problems Seminar: The Art of Theft. American University. |
| 2018 | Understanding Media. School of Communication, American University. |
| 2018 | Digital Media and Culture. School of Communication, American University. |
| 2017 | Doctoral Seminar in Music Theory. Jacobs School of Music, Indiana University. |
| 2017 | Digital Media and Culture. School of Communication, American University. |
| 2017 | Tech Innovation (2-day unit instructor). School of the NY Times. |
| 2016 | Understanding Media. School of Communication, American University. |
| 2015 | The Entertainment Industry. Kogod School of Business, American University |
| 2015 | Seminar in Doctoral Research. School of Communication, American University. |
| 2015 | Understanding Media. School of Communication, American University. |
| 2015 | Digital Media and Culture. School of Communication, American University. |

| 2014 | 3D Printing and Law. Touro Law Center. |
| 2014 | Seeing 21st Century Issues in Historical Perspective. Rutgers University History Department. |
| 2013 | Collaboration in Networked Environments. New School for Social Research. |
| 2013 | Power in Entertainment. Northwestern University. |
| 2010-13 | Emerging Theories in Intellectual Property Protection. Columbia Law School. |
| 2012 | Collaboration in Networked Environments. New School for Social Research. |
| 2012 | Media Regulations and Organization. Webster University Thailand. |
| 2012 | Art, Science & Technology. Woodbury University. |
| 2011-12 | Social Media Mashup. New School for Social Research. |
| 2012 | Digital Long Form Journalism. Columbia University School of Journalism. |

Media Appearances

I have appeared as an expert source in roughly a thousand print, web, and broadcast news stories since 1998. Below is a short list of major news outlets in which I have appeared, including the number of stories (via Factiva, Nexis and individual outlets):

| Broadcast | Number of stories |
|---|---|
| *Reuters* | 80+ |
| *Billboard* | 75+ |
| *Newsbytes (TechNews)* | 70+ |
| *Associated Press* | 65+ |
| *MarketWatch* | 45+ |
| *McClatchy-Tribune* | 35+ |
| *Wired* | 30+ |
| *Mercury News* | 30+ |
| KCBS Radio | 30+ |
| Marketplace Radio (MPR) | 25+ |
| *Los Angeles Times* | 25+ |
| *The New York Times* | 25+ |
| *Christian Science Monitor* | 20+ |
| *Dow Jones Newswires* | 20+ |
| CNN | 20+ |
| *The Wall Street Journal* | 20+ |
| *Computerworld* | 20+ |
| *Business Wire* | 15+ |

Case 5:19-cv-00249-FL    Document 29-14    Filed 07/17/20    Page 46 of 60

| | |
|---|---|
| *Financial Times* | 15+ |
| *Bloomberg/BusinessWeek* | 10+ |
| *Houston Chronicle* | 10+ |
| *NY Post* | 10+ |
| *San Francisco Chronicle* | 10+ |
| *NY Daily News* | 10+ |
| *Agence France Presse* | 10+ |
| *Newsday* | 10+ |
| *USA Today* | 10+ |

**Additional outlets**:

**Audio/video:** ABC News (8 appearances), CBS News (7 appearances), Today Show (NBC), The Early Show (CBS), CNBC, All Things Considered (NPR), Morning Edition (NPR), To The Point (NPR), Diane Rehm Show (NPR), Fox Business, Al Jazeera America, Minnesota Public Radio, Wisconsin Public Radio, Oregon Public Radio, CCTV (China), Reuters TV, Love Lust (Sundance Channel), WBGO Radio, WKXW Radio, NewsTalk, WOR TV, Fox 5 TV, KGO Radio, Bloomberg TV, Caught in the Web (documentary)

**Print/web:** *Time Magazine, The Hollywood Reporter, The Times of London, Rolling Stone, Foreign Policy, Fortune, NY Daily News, The Globe and Mail (Canada), Financial Times, L'Agence France-Presse (AFP), Folha de S. Paulo, Huffington Post, Smithsonian Magazine, Fader, Ars Technica, Mashable, BoingBoing, Techdirt, TheStreet.com, Hypebot, MediaPost, Re/Code, CQ Researchers, MIT Technology Review, Bergen Record, Newark Star-Ledger, Asbury Park Press, Crain's New York Business, Critical Margins,* Money Markets And More (WSJ podcast), Upward Spiral (podcast), The Future of What? (podcast), Sounding Out! (podcast)

PUBLIC SERVICE

| | |
|---|---|
| 2019 | Guest lecturer, Georgetown Prisons and Justice Initiative, D.C. Department of Corrections, Washington, DC. |
| 2019 | Local co-host and Urban Issues Committee member, International Communication Association annual conference, Washington, DC. |
| 2018 | Panelist: Public Oversight Roundtable on Net Neutrality. Council of the District of Columbia. Washington, DC. |
| 2015 | Speaker: Career Day, Bronx Theatre High School, New York, NY. |
| 2015 | Speaker: Surveillance and Society. Sedgwick Middle School, West Hartford, CT |
| 2014 | Presenter: "3D Printing: Mo' Markets, Mo' Problems." New York State Bar Association, Intellectual Property Division annual meeting. |

| 2013 | Speaker: Career Day, Bronx Theatre High School, New York, NY. |
|------|---------------------------------------------------------------|
| 2012 | Judge: Music Discovery and Recommendation final projects. NYU Clive Davis Institute. |
| 2012 | Panelist: Laws that Hurt Us and Where They Come From. Code vs. Code 0, hosted by Kallos for Council campaign. New York, NY. |
| 2011 | Panelist: Spotlight on Cyberbullying. George St. Playhouse. New Brunswick, NJ. |
| 2011 | Speaker: Career Day, Bronx Theatre High School, New York, NY. |
| 2009 | Judge: Independent Games Festival. |
| 2007 | Invited Witness: Municipal Broadband Hearing. Offices of Manhattan Borough President and New York City Council. New York, NY. |
| 2006 | Panelist: "Art of Engagement: Techno Youth Culture". Los Angeles Department of Cultural Affairs 2006 Art Matters Conference |
| 2002 | Presenter: "Digital Music: An Overview". New York State Bar Association. |

EXPERT WITNESS & CONSULTING EXPERIENCE

| 2020 | Witness for the defense in *Bradley v. Analytical* (fair use). |
|------|----------------------------------------------------------------|
| 2019-20 | Witness for the plaintiff in *Parlux v. Carter* (publicity/contract dispute). |
| 2015-16 | Witness for the defense in *NJMG v. Fox News Network* (fair use). |
| 2015 | Witness for the defense in *Kim v. Fox News Network* (fair use). |
| 2013-15 | Expert Consulting for Amway (copyright infringement). |
| 2014 | Witness for the defense in *Mattocks v. BET* (social media). |
| 2011-14 | Witness for plaintiff in *Jackson v. Odenat* (trademark infringement). |
| 2011 | Expert consulting for defense in *Saregama India v. Timothy Mosley* (copyright infringement). |
| 2010-11 | Witness for defense in *Arista v. LimeWire* (file sharing). |
| 2006 | Witness for Class Action members in re SONY BMG CD Technologies Litigation ("rootkit" class action). |
| 2004 | Witness for plaintiff in *RealNetworks v. MLB Advanced Media.* (contractual dispute). |

Case 5:19-cv-00249-FL     Document 29-14     Filed 07/17/20     Page 48 of 60

2003      Witness for defense in *MGM v. Grokster* (file sharing suit, decided by U.S. Supreme Court).

## PROFESSIONAL ASSOCIATIONS & MEMBERSHIPS

- International Communication Association
- National Communication Association
- Association of Internet Researchers
- Internet Society, Washington DC Chapter (Board Member)
- American Society of Composers, Authors and Publishers
- National Music Publishers Association
- SoundExchange

## ADDITIONAL PROFESSIONAL EXPERIENCE

SINNREICH MEDIA RESEARCH               *2002 – 2005;  2012 – present*
Founder and President
- Custom research and consulting for media, technology and research companies
- Clients include: RealNetworks, Hitwise, Grokster, GigaOM, G-Unit Records, Coleman Research Group, Gerson Lehrman Group, Timbaland, BET/Viacom

RADAR RESEARCH               *2005 – 2012*
Co-founder and Managing Partner
- Qualitative and quantitative custom research and original publications focused on the intersection of media, technology and culture
- Clients include: Google, Sony Pictures, Electronic Frontier Foundation, Sociedad Española de Radiodifusión (SER), Nokia, YouTube, Akamai

OMD IGNITION FACTORY (OMNICOM)        *2009 - 2010*
Director, Media Innovation
- Developed innovative marketing strategies and tactics based on emerging media and cutting-edge cultural trends
- Ran business unit devoted to PepsiCo, our largest client
- Business development, including new client acquisition and entrepreneurial partnerships

JUPITER RESEARCH (NOW FORRESTER RESEARCH)    *1997 – 2002*
Senior Analyst and Research Manager, Media and Entertainment
- Syndicated research and consulting focused on media and the Internet
- Managed both the Music and Policy research divisions
- Clients include: RIAA, Microsoft, Heineken, AOL Time Warner, Disney

**CREATIVE PROFESSIONAL EXPERIENCE**

I have been a professional musician for roughly 25 years, playing bass, guitar, and other instruments, and composing songs for a variety of artists in styles including jazz, soul, R&B, reggae, ska, punk, folk, electronic, and experimental. Notable artists for whom I have played and/or composed include Ari Up (lead singer of The Slits), Vivien Goldman, Agent 99, Dunia Best, Low Lily, Annalivia, Hans Nieswandt, Benjamin Harbert Ensemble, Foot Job, Boat Burning, King Django, and Simon Chardiet & The Rooftoppers, in addition to my own groups, primarily Dubistry and Brave New Girl.

Notable recordings include:
- Brave New Girl, *I Want to Take You to Brazil,* 2019
- Brave New Girl, *Across the Street (Around the World),* 2019
- Foot Job, *The Protest Disco EP,* 2019
- Low Lily, *10,000 Days Like These,* 2018
- Empire of Two, *#letuslive*, 2016
- Dubistry, *Fuel for the Fire,* 2015
- Low Lily, *Low Lily,* 2015
- Brave New Girl, *Thanks for Being on the Show,* 2013
- Annalivia, *Barrier Falls,* 2010
- Dubistry, *Freeway*, 2003
- Brave New Girl, *No One Ever Said,* 2000
- Brave New Girl, *NYC*, 1998

In addition to my professional experience in music and sound, I have also done some work as a cartoonist and illustrator in *The New York Press, The Village Voice*, and *Truthdig,* and in numerous promotional and advocacy communications.

BOOKS

Sinnreich, A. (2019). *The Essential Guide to Intellectual Property.* New Haven, CT: Yale University Press.
- Reviewed in *International Journal of Communication, Business History Review,* *Choice* (American Library Assoc), Authors Alliance

Sinnreich, A. (2013). *The Piracy Crusade: How the Music Industry's War on Sharing Destroys Markets and Erodes Civil Liberties.* Amherst, MA: University of Massachusetts Press.
- Reviewed in *Information, Communication & Society, The Library Quarterly, Tulsa Law Review, EFF Deeplinks, and Techdirt*

Sinnreich, A. (2010). *Mashed Up: Music, Technology, and the Rise of Configurable Culture.* Amherst, MA: University of Massachusetts Press.
- Reviewed in *Journal of Communication, American Studies, Journal of Popular Culture, International Journal of Communication, Cultural Studies, Critical Studies in Improvisation, The Onion A.V. Club, and Hypebot*

JOURNAL ARTICLES

Sinnreich, A., Aufderheide, P. & Newman, D. (2020). Creative action under two copyright regimes: Filmmaking and visual arts in Australia and the U.S. *Communication, Culture & Critique.*

Sinnreich, A. & Gilbert, J. (2019). The carrier wave principle. *International Journal of Communication, 13,* 5816–5840.

Brøvig-Hanssen, R. & Sinnreich, A. (2019). Do you wanna build a wall? Remix tactics in the age of Trump. *Popular Music & Society*, *43*(5). DOI: 10.1080/03007766.2019.1650990

Sinnreich, A. (2019). Music, copyright, and technology: A dialectic in five moments. *International Journal of Communication, 13,* 422–439.

Sinnreich, A. & Carmi, E. (2019). Sonic publics: Introduction and audio transcript. *International Journal of Communication, 13,* 359–382.

Aufderheide, P., Sinnreich, A., & Silvernail, C., (2019). Norms-Shifting for Digital and Online Arts Practice: Copyright and Fair Use in the Visual Arts Community. *Visual Arts Research,* 45(2), 91–108.

Sinnreich, A. (2018). Four crises in algorithmic governance. *Annual Review of Law and Ethics, 26*, 181–190.

Sinnreich, A., Forelle, M. & Aufderheide, P. (2018). Copyright givers and takers: Mutuality, altruism and instrumentalism in open licensing. *Communication Law & Policy, 23*(3), 197–220.

Aufderheide, P., Sinnreich, A., & Graf, J. (2018). The limits of the limits of the law: How useable are DMCA anti-circumvention exceptions? *International Journal of Communication, 12,* Feature 4353–4372.

Sinnreich, A. & Brooks, L. J. A. (2016). A seat at the nerd table — Introduction. *International Journal of Communication, 10,* Forum 5664–5668.

Sinnreich, A., Lingel, J., Lichfield, G. & Rottinghaus, A. R. (2016). Everybody and nobody: Visions of individualism and collectivity in the age of AI. *International Journal of Communication, 10,* Forum 5669–5683.

Lingel, J., Sutko, D., Lichfield, G. & Sinnreich, A. (2016). Black holes as metaphysical silence. *International Journal of Communication, 10*, Forum 5684–5692.

Pluretti, R., Lingel, J. & Sinnreich, A. (2016). Towards an "other" dimension: An essay on transcendence of gender and sexuality. *International Journal of Communication, 10, Forum 5732–5739.*

Brooks, L. J. A., Sutko, D., Sinnreich, A. & Wallace, R. (2016). Afro-futuretyping generation starships and new Earths 05015 C.E. *International Journal of Communication, 10, Forum 5749–5762.*

Lingel, J. & Sinnreich, A. (2016). Incoded counter-conduct: What the incarcerated can teach us about resisting mass surveillance. *First Monday, 21*(5). DOI: http://dx.doi.org/10.5210/fm.v21i5.6172

Sinnreich, A. (2015). Sharing in spirit: Kopimism and the digital Eucharist. *Information, Communication and Society, 19*(4), 504–517.

Aufderheide, P. & Sinnreich, A. (2015). Documentarians, fair use and free expression: Changes in copyright attitudes and actions with access to best practices. *Information, Communication & Society, 19*(2), 178–187.

Sinnreich, A. & Aufderheide, P. (2015). Communication scholars and fair use: The case for discipline-wide education and institutional reform. *International Journal of Communication, 9*; 818–828.

Sinnreich, A. & Latonero, M. (2014). Tracking configurable culture from the margins to the mainstream. *Journal of Computer-Mediated Communication, 19*(4); 798–823.

Trammell, A. & Sinnreich, A. (2014). Visualizing game studies: Materiality and sociality from chessboard to circuit board. *Journal of Games Criticism, 1*(1). Published online: http://gamescriticism.org/articles/trammellsinnreich-1-1/

Latonero, M. & Sinnreich, A. (2014). The hidden demography of new media ethics. *Information, Communication & Society, 17*(5); 572–593

Bossewitch, J. & Sinnreich, A. (2013). The end of forgetting: Strategic agency beyond the Panopticon. *New Media & Society, 15*(2); 224–242.

Sinnreich, A., Graham, N. & Trammell, A. (2011). Weaving a New 'Net: A Mesh-Based Solution for Democratizing Networked Communications. *The Information Society, 27*(5); 336–345.

## BOOK CHAPTERS

Sinnreich, A. (2020). Configurable Culture in Wealthy and Developing Markets: A Comparative Cross-National Perspective. In J. Macek, P. Stepan, P. Szczepanik, and P. Zahrádka (Eds.), *Digital peripheries: Online circulation of audiovisual content from the small market perspective.* New York: Springer.

Sinnreich, A. (2019). Music, Copyright, and Technology: A Historical Dance in Five Moments. In D. Diederichsen (Ed.), *100 jahre copyright.* Berlin: Matthes & Seitz; 102–124.

Davis, D. H. & Sinnreich, A. (2018). Tweet the Press: Effects of Donald Trump's "Fake News!" Epithet on Civics and Popular Culture. In M. Lockhart (Ed.), *President Donald Trump and his political discourse: Ramifications of rhetoric via Twitter.* New York: Routledge; 195–223.

Sinnreich, A. (2018). The 'thing' about music: Hearing power at the nexus of technology, property and culture. In P. Messaris & D. Park (Eds.), *The inclusive vision: Essays in honor of Larry Gross.* New York: Peter Lang; 127–140.

Sinnreich, A. (2017). Remarks on design and copyright in the age of silicon. In S. Owens (Ed.), *Design unfolds: Contemporary creative strategies from appropriation to collaboration.* Zurich: Zurich University of the Arts.

Sinnreich, A. (2017). Collaborative. In E. Navas, O. Gallagher, and x. burrough (Eds.), *Keywords in remix studies.* New York: Routledge; 56–66.

Figueres, P., Liao, C., Gunkel, D., Kanai, A., Harrison, N., Gallagher, O., Miller, P. D., burrough, x., Nunes, M., Vallier, J., Keifer-Boyd, K., Coppa, F., Jenkins, H., Tushnet, R., Wille, J., Sinnreich, A., Navas, E., Janneke, A., Spooky, DJ, et al. (2017). Appropriation. In E. Navas, O. Gallagher, and x. burrough (Eds.), *Keywords in Remix Studies.* New York: Routledge; 14–22.

Sinnreich, A. (2016). Ethics, evolved: An international perspective on copying in the networked age. In D. H. Hick and R. Schmücker, *The aesthetics and ethics of copying.* London: Bloomsbury; 315–334.

Sinnreich, A. (2016). Slicing the Pie: The Search for an Equitable Recorded Music Economy. In P. Wikström and R. DeFillippi (Eds.), *Business Innovation and Disruption in the Music Industry.* Northampton, MA: Edward Elgar; 153–174.

Sinnreich, A. (2015). Music cartels and the dematerialization of power. In A. Bennett and S. Waksman (Eds.), *The Sage Handbook of Popular Music.* Thousand Oaks, CA: Sage; 611–626.

Sinnreich, A. (2014). The emerging ethics of networked culture. In E. Navas, O. Gallagher, and x. burrough (Eds.), *The Remix Studies Reader.* New York: Routledge; 227–245.

Sinnreich, A. & Latonero, M. (2014). Uncommon knowledge: Testing persistent beliefs about configurable culture and society. In L. Lievrouw (Ed.), *Challenging Communication Research (ICA Theme Book, 2013).* Peter Lang; 123–140.

Sinnreich, A. (2013). How bad is P2P, anyway? In R. Braga and G. Caruso (Eds.), *The piracy effect.* Cinergie Books; 49–62.

BOOK REVIEWS & ESSAYS

Sinnreich, A. (2017). A cultural approach to Carey. [Review of the book *James W. Carey and communication research: Reputation at the university's margins*, by Jefferson Pooley]. *International Journal of Media & Cultural Politics, 13*(3), 327–330.

ENCYCLOPEDIA ENTRIES

Dunham, I. & Sinnreich, A. (2018). File sharing. In B. Warf (Ed.), *The Sage Encyclopedia of the Internet.* Washington, DC: Sage; 376–378.

Garlitz, J. & Sinnreich, A. (2014). Musicians and social media in politics. In K. Harvey (Ed.), *Encyclopedia of Social Media and Politics.* Washington, DC: Sage; 861–866.

JOURNALISM, OPINION & PROFESSIONAL RESEARCH

Sinnreich, A. (2019). Naked space in a networked world: Music and ritual in the 21st century. *Naxos Musicology International.*

Sinnreich, A. (2019). Stranger Things Isn't '80s Nostalgia — It's '90s Nostalgia (and it's all about 2016). *Medium.*

Sinnreich, A. (2019). Beltway expansion threatens the American dream. *Maryland Matters.*

Sinnreich, A. (2018). Plagiarists or innovators? The Led Zeppelin paradox endures. *The Conversation.* (Republished in over a dozen major news sources, including *Salon, The Wire, Alternet,* and *The Houston Chronicle*)

Sinnreich, A. (2018). Policy Briefing Note: An International Approach to Data Privacy. *Center for Media & Social Impact.*

Sinnreich, A. (2018). What Spotify's Alarming R. Kelly Censorship Means for the Future of the Internet. *The Daily Beast.*

Sinnreich, A. (2018). Cambridge Analytica: Tip of the Iceberg as Deep as the Ocean. *The Globe Post.*

Sinnreich, A. & Romzek, B. (2018). To serve a free society, social media must evolve beyond data mining. *The Conversation.* (Republished in over a dozen major news sources, including *The Daily Beast, Salon, Newsweek,* and *Phys.org*)

Romzek, B. & Sinnreich, A. (2018). Social media companies should ditch clickbait, and compete over trustworthiness. *The Conversation.* (Republished in over a dozen major news sources, including *SF Chronicle, Seattle Post-Intelligencer, Salon, Business Insider,* and *Houston Chronicle*)

Sinnreich, A. (2018). Why I left Facebook for good: A reader explains [Letter to the editor]. *USA Today.*

Sinnreich, A. (2017). Rest in power, David Vyorst [Obituary]. *BoingBoing.*

Sinnreich, A. (2017). How facial recognition technology is turning people into human bar codes. *WSJ MarketWatch.*

Sinnreich, A. (2017). Fleeing Pogroms to Fight Nazis: My Family's Secret Refugee Past. *The Daily Beast.*

Sinnreich, A. (2017). America first. [editorial cartoon]. *Truthdig.*

Sinnreich, A. (2016). Killer robots and rebel wieners: Did Hollywood's working-class revolt fantasies fuel Trump's rise? *Truthdig.*

Sinnreich, A. (2016). Will the real Wailers please (get up) stand up? *The Daily Beast.*

Sinnreich, A. (2016). If Led Zeppelin goes down, we all burn. *The Daily Beast.*

Sinnreich, A. (2015). Islamic State's dangerous effort to wipe out humanity's past. *Truthdig.*

Sinnreich, A. (2014). Net neutrality: What's really at stake (Op-Ed). *Bergen Record.*

Sinnreich, A. (2014). *How publishers can make the most of mobile advertising.* (Research report). GigaOM Research.

Sinnreich, A. (2014). The Polish parliament, masked and anonymous. *In Media Res.*

Sinnreich, A. (2014). *Legal challenges and opportunities for 3D printing.* (Research report). GigaOM Research.

Sinnreich, A. (2014). *3D printing: Hype, hope or threat?* (Research report). GigaOM Research.

Sinnreich, A. (2013). *The revolution will be targeted: RTB and the future of programmatic advertising.* (Research report). GigaOM Pro.

Sinnreich, A. (2013). *Frenemy mine: The pros and cons of social partnerships for online media companies.* (Research report). GigaOM Pro.

Sinnreich, A. (2012). Welcome to Alphaville, Avoid the Ghetto. *Truthdig.*

Sinnreich, A. (2011). Remixing Girl Talk: The Poetics and Aesthetics of Mashups. *Sounding Out!*

Sinnreich, A. (2011). 'This Is What We Do': Why I Hated Chrysler's Super Bowl Ad. *Truthdig.*

Sinnreich, A. (2010). Controllers, controlled. *Kill Screen, 0*: 30-34.

Sinnreich, A. (2010). Book Excerpt: 'Mashed Up: Music, Technology, and the Rise of Configurable Culture. *Truthdig.*

# EXHIBIT C



https://imgflip.com/i/1ipk9k
(uploaded 3 years ago)



https://www.thepoke.co.uk/wp-content/uploads/2012/03/bfqqoc.jpg
(uploaded 8 years ago)



https://www.facebook.com/todayfm/photos/wrong-on-so-many-levels/10153926156767568/
(uploaded 4 years ago)



https://knowyourmeme.com/photos/499788-reaction-images
(uploaded 7 years ago)



https://knowyourmeme.com/photos/774344-reaction-images (uploaded 5 years ago)

**EXHIBIT D**



This is not a drill! I repeat: This is not a drill!

https://me.me/i/this-is-not-a-drill-i-repeat-this-is-not-1050222 (uploaded 4 years ago)



Everybody out! This is not a drill! It's just another pun enthusiast 🔍

https://me.me/i/this-is-not-a-drill-everybody-out-this-is-not-4739932 (uploaded 4 years ago)



https://www.reddit.com/r/bonehurtingjuice/comments/77x9rb/oof_my_toolbox/ (uploaded 3 years ago)



https://fr-fr.facebook.com/176754635675313/photos/a.926172024066900/3011181522232596 (uploaded 5 days before Plaintiff posted his meme)



https://twitter.com/McKelvie/status/879674440719708160 (uploaded 3 years ago)