**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:19-cv-249-FL**

MATTHEW BRADLEY,                                    )
                              Plaintiff,            )
                                                   )
        - against –                                 )
                                                   )
                                                   )
ANALYTICAL GRAMMAR, INC.                            )
                                                   )
                                                   )
                              Defendant.            )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

UNCONTROVERTED STATEMENT OF FACTS ..................................................... 2

LEGAL STANDARD..................................................................................................... 7

ARGUMENT .................................................................................................................. 8


POINT I:  THE LICENSE DEFENSE FAILS AS A MATTER OF LAW.................................. 8

   A.  NO EXPRESS LICENSE EXISTS UNDER FACEBOOK'S TERMS OF SERVICE............................. 8

   B.  THERE IS NO EVIDENCE TO SUPPORT AN IMPLIED LICENSE ................................................ 11


POINT II:    THE FAIR USE DEFENSE FAILS AS A MATTER OF LAW........................... 13

   A.  THE FIRST FACTOR WEIGHS HEAVILY AGAINST FAIR USE .................................................. 14

     (1)  *Defendant's Secondary Use is NOT Transformative* .................................................... 14

     (2)  *Defendant's Use is Commercial Rather Than Non-Profit*.......................................... 16

   B.  THE SECOND FACTOR WEIGHS AGAINST FAIR USE ....................................................... 17

   C.  THE THIRD FACTOR WEIGHS AGAINST FAIR USE BECAUSE  DEFENDANT PUBLISHED A FULL-COLOR, FULL-SCALE REPRODUCTIONS OF THE IMAGE WITHOUT ALTERATION 18

   D.  THE FOURTH FACTOR WEIGHS AGAINST FAIR USE BECAUSE MARKET HARM MAY BE PRESUMED AS A MATTER OF LAW ................................................................................. 19


POINT III:    DEFENDANT'S COPYRIGHT MISUSE CLAIM FAILS.................................... 22


POINT IV:  PLAINTIFF HAS A CONSTITUTIONAL RIGHT TO A JURY TRIAL ON THE ISSUE OF DAMAGES ........................................................................................ 23


POINT V:  QUESTIONS OF DISPUTED MATERIAL FACT PRECLUDE SUMMARY DISPOSITION OF PLAINTIFF'S DMCA CLAIM ................................................. 25


CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

CASES

*ABKCO Music, Inc. v. Sagan*,
   No. 15 CIV. 4025 (ER), 2018 WL 1746564, at *18 (S.D.N.Y. Apr. 9, 2018) ........................ 11

*Agence France Presse v. Morel*,
   769 F. Supp.2d 295, 305–06 (S.D.N.Y. 2011) ........................................................ 27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 249 (1986) ............................................................................... 7

*Associated Press v. Meltwater U.S. Holdings*, 9
   31 F.Supp.2d 537, 551 (S.D.N.Y. 2013) ............................................................... 14

*Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*,
   821 F.3d 297, 307 (2d Cir. 2016) ..................................................................... 12

*Barcroft Media, Ltd. v. Coed Media Group, LLC*,
   No. 16-cv-7634 (JMF), 2017 WL 5032993, *6 (S.D.N.Y. Nov. 2, 2017) .............................. 15

*Blanch v. Koons*,
   467 F.3d 244, 251 (2d Cir. 2006) ..................................................................... 14

*Boatman v. United States Racquetball Ass'n*,
   33 F.Supp.3d 1264, 1276 (D. Colo. 2014) ............................................................. 28

*BWP Media USA Inc. v. Gossip Cop Media, Inc.*,
   196 F.Supp.3d 395, 404-405 (S.D.N.Y. 2016) ......................................................... 15

*Cable/Home Commc'n Corp. v. Network Prods., Inc.*,
   902 F.2d 829, 845 (11th Cir.1990) .................................................................... 20

*Campbell v. Acuff– Rose Music, Inc.*,
   510 U.S. 569, 579 (1994) .............................................................................. 14

*Cardiff Chamber of Commerce, Inc. v. Lebherz*, ........................................................
   2016 WL 9525236, at *2 (S.D. Cal. July 15, 2016) ................................................... 24

*Castle Rock Entm't v. Carol Publ'g Group, Inc.*,
   955 F.Supp. 260 (S.D.N.Y. 1997) (Sotomayor, D.J.), *aff'd*, 150 F.3d 132 (2d Cir. 1998) ...... 29

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 324 (1986) ........................................................................................ 7

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) ...................................... 28

*Design Options Inc. v. BellePointe, Inc.,*
  940 F.Supp. 86, 92 (S.D.N.Y 1996) ........................................................................ 11

*eSilicon Corp v. Silicon Space Tech*,
  No. C-11-06184 EDL, 2013 WL 12174295, at *10 (N.D. Cal. Feb. 22, 2013) ...................... 24

*Faircloth v. United States*,
  837 F. Supp. 123, 126 (E.D.N.C. 1993) .................................................................... 7

*Feltner v. Columbia Pictures TV*,
  523 U.S. 340, 355, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998)....................................... 25

*Ferdman v. CBS Interactive, Inc.*,
  17-cv-1317 (PGG), 2018 WL 4572241, *19 (S.D.N.Y. Sept. 21, 2018)........................... 20

*Fischer v. Forrest*,
  286 F. Supp. 3d 590, 608–09 (S.D.N.Y. 2019) ......................................................... 26

*Friedman v. Live Merchandise, Inc.*,
  833 F.3d 1180, 1187-89 (9th Cir. 2016) ................................................................... 28

*Harper & Row v. Nation Enterprises*,
  471 U.S. 539, 560 (1985)........................................................................................ 13

*Hirsch v. CBS Broad. Inc.*,
  No. 17 CIV. 1860 (PAE), 2017 WL 3393845, at *8 (S.D.N.Y. Aug. 4, 2017)...................... 27

*Hirsch v. Complex Media, Inc.*,
  No. 18-cv-5488 (CM), 2018 WL 6985227, at *6 (S.D.N.Y., December 10, 2018) ................ 15

*I.A.E., Inc. v. Shaver*,
  74 F.3d 768, 776 (7th Cir. 1996) ............................................................................. 11

*In re Aimster Copyright Litig.*,
  334 F.3d 643, 649 (7th Cir. 2003) ........................................................................... 24

In re World Trade Ctr. Disaster Site Litig.,
  2014 WL 2565821, at *6 (2d Cir. June 9, 2014) ....................................................... 12

*Infinity Broadcast Corp. v. Kirkwood*,
    150 F.3d 104, 108 & n. 2 (2d Cir. 1998) ....................................................... 14

*Intergraph Corp. v. Intel Corp.*,
    195 F.3d 1346, 1362 (Fed.Cir.1999) ............................................................. 22

*Janik v. SMG Media, Inc.*,
    No. 16-civ-7308-JGK-AJP, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018) .................. 26

*Jarvis v. K2 Inc.*,
    486 F.3d 526, 533 (9th Cir.2007) ................................................................ 17

*Lasercomb Am., Inc. v. Reynolds*,
    911 F.2d 970, 976 (4th Cir. 1990) ............................................................... 22

*Mango v. BuzzFeed, Inc.*,
    356 F. Supp. 3d 368, 377 (S.D.N.Y. 2019) ....................................................... 26

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distributors*,
    No. 96 C 2966, 2002 WL 226864, at *2 (N.D. Ill. Feb. 13, 2002) ................................. 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574, 587–88 (1986) ...................................................................... 7

*Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purchaser Antitrust Litig.)*,
    585 F.3d 677, 692–93 (2d Cir.2009) ............................................................. 28

*Minden Pictures, Inc. v. Buzzfeed, Inc.*,
    390 F. Supp. 3d 461 (S.D.N.Y. 2019) ............................................................ 29

*Monster Communications, Inc. v. Turner Broadcasting*,
    935 F.Supp. 490, 494 (S.D.N.Y. 1996). .......................................................... 17

*Moses v. Apple Hosp. REIT Inc.*,
    No. 14CV3131DLISMG, 2016 WL 8711089, at *6 (E.D.N.Y. Sept. 30, 2016) ..................... 12

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295, 305 (3d Cir. 2011) ............................................................... 27

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471, 478 (2d Cir. 2004) ............................................................... 14

*Pearson Educ., Inc. v. Liu*,
    656 F. Supp. 2d 407, 409 (S.D.N.Y. 2009) ...................................................... 24

*Pers. Keepsakes, Inc. v. Personaliziationmall.com, Inc.*,

No. 11-CV-5177, 2012 WL 414803, at \*6 (N.D. Ill. Feb. 8, 2012) ........................................ 27

*Psihoyos v. Nat'l Exam'r,*
No. 97 CIV. 7624 (JSM), 1998 WL 336655, at \*4 (S.D.N.Y. June 22, 1998)........................ 17

*Ringgold v. Black Entertainment Television, Inc.,*
126 3d 70, 79 (2d Cir. 1997)................................................................................................ 14

*Rogers v. Missouri Pacific R. Co.,*
352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).............................................. 28

*Sony Corp. of America v. Universal City Studios, Inc.,*
464 U.S. 417, 450 (1984)...................................................................................................... 19

*Strauss v. Hearst Corp.,*
No. 85 CIV 10017 (CSH), 1988 WL 18932, at \*10 (S.D.N.Y. Feb. 19, 1988)...................... 25

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.,*
*1A* F.3d 488, 496 (4th Cir.1996) ........................................................................................ 25

*Viacom, Int'l Inc. v. Fanzine Int'l, Inc.,*
98 Civ. 7448, 2001 WL 930248, at \*4 (S.D.N.Y. Aug. 16, 2001) ........................................ 29

*Westmorland v. Westmorland,*
No. C07-1435 (MJP), 2007 WL 4358309, at \*2 (W.D. Wash. Dec. 10, 2007)...................... 24

## STATUTES

17 U.S.C. § 106............................................................................................................................ 20
17 U.S.C. § 107..................................................................................................................... passim
17 U.S.C. § 1202(c) .................................................................................................................... 26

Plaintiff Matthew Bradley ("Plaintiff" or "Bradley") respectfully submits this memorandum of law in opposition to Defendant Analytical Grammar, Inc. ("Defendant")'s motion for summary judgment. For the reasons explained below, as well as those set forth in Plaintiff's motion for partial summary judgment, Defendant's motion should be DENIED in its entirety.

## INTRODUCTION

Defendant's motion is based on a simple flawed premise: that once a photograph is posted to Facebook and becomes "viral," it loses copyright protection. Defendant postulates, through its expert, that viral memes necessarily become communal property, free for all to use, by the very nature of their popularity. But contrary to Defendant's position, there is no caselaw to support the notion that intense market demand for a photograph automatically suspends the rights accorded to copyright holders under U.S. Copyright law.

The point of this lawsuit is that Defendant, a sophisticated publisher which operates a Facebook *business* page to generate revenue for its for-profit enterprise, did <u>not</u> use Facebook's "Share" function to display the Photograph. Instead, Defendant expropriated the Photograph and passed the work off as its own original creation. Because Defendant did not use the share functionality provided by Facebook's platform to display the Photograph, and did not provide attribution to Plaintiff, Defendant should be held liable for copyright infringement.

With respect to Defendant's license defense, Facebook's terms of service do not permit Facebook users to re-publish as its own photographs uploaded by other Facebook users. Instead, a Facebook user may only <u>share</u> the content of other users by displaying such content through the share functionality provided by Facebook's platform. The share functionality provides proper credit to the original copyright holder and links back to the original copyright holder's Facebook

1

account.  In contrast, a Facebook user may <u>not</u> simply re-publish a photograph and pass that work off as its own original creation, as Defendant did in this case.

Indeed, Defendant admits that Facebook has a "Share" function.  *See* Defendant's Statement of Material Facts Nos. ¶ 13 (stating that Facebook users can control settings as to how photographs are "shared"); ¶ 20 (referring to "Facebook's 'Share' function"); ¶ 25 (referring to "Facebook's 'Share' icon"), ¶ 26 (referring to "Facebook Share function"), ¶31 (referring to "Facebook shares"), ¶ 72 (distinguishing between Facebook shares and reposts).  But Defendant did not employ this function.  Instead, it passed off the Photograph as its own creative work to promote its corporate brand and sell its wares.

Defendant's argument that because the Photograph qualifies as a viral "meme" that it somehow becomes communal property is unavailing.  If anything, the popularity of an image demonstrates the value of the work.  It is precisely because of the work's market popularity that Bradley is entitled to demand a license fee for use by commercial entities.

Finally, Plaintiff's second count for DMCA violation should be sustained as Defendant has established at least three out of four elements of his claim as a matter of law.  One element, namely Defendant's actual knowledge that Plaintiff's CMI had been removed or altered, presents questions of material questions of fact remaining for trial.

## <u>UNCONTROVERTED STATEMENT OF FACTS</u>

### <u>Plaintiff Matthew Bradley</u>

Bradley is a freelance technological consultant. [SOF[1] ¶ 3]  In Bradley's free time, he enjoys creating photographs of clever puns and posting them on social media. [SOF ¶ 2] A pun

---

[1] SOF shall refer to Plaintiff's Statement Pursuant to Local Rule 56.1(a), filed concurrently herewith.

makes a play on the different possible meanings of a word. [SOF ¶ 3] Photographs depicting objects used to convey a pun are also called "memes" when they become popular, i.e., "viral," in the context of social media. [SOF ¶ 3]

**Defendant Analytical Grammar, Inc.**

Defendant is a for-profit company and sophisticated purveyor in the publishing industry. [SOF ¶ 4] According to the curriculum vitae of Defendant's principal owner, Erin M. Karl, the company designs and sells literature to private schools, writes and designs market curricula, and operates a Facebook "business page [which] has engagement in the millions." Ms. Karl is also "an experienced newspaper editor" and "well-versed in social media." [SOF ¶ 5] Defendant owns, operates and manages a Facebook page at URL https://www.facebook.com/analyticalgrammar/ (the "Website"). [SOF ¶ 6]

**Initial Publication of the "Wrong on So Many Levels" Photograph – December 8, 2017**

On December 8, 2017, Bradley created a Photograph which depicts the word "wrong" handwritten on blue scotch tape and attached to various different carpentry levels, i.e., devices typically used in construction projects as measuring tools (the "Photograph"). [SOF ¶ 7] In creating the Photograph, Bradley devised the concept, arranged and positioned the carpentry levels, and wrote the word "wrong" on scotch tape in his own handwriting. [SOF ¶ 8] Bradley also selected the perspective, composition, angle, lighting, and camera equipment used to create the Photograph. [SOF ¶ 8]

After creating the Photograph, Bradley posted it to his personal Facebook account which bears his name "Matthew Bradley" directly above where the Photograph was first displayed. The caption he created to accompany the photo reads: "THIS IS WRONG ON SO MANY LEVELS." The original post is dated December 8, 2017 at 5:02 p.m. [SOF ¶ 9]

**Bradley's Initial Registration of the Photograph – December 14, 2018**

On December 14, 2018, Bradley applied for registration of the copyright with the United States Copyright Office ("USCO"). [SOF ¶ 10] Bradley registered the Photograph with the Copyright Office because he observed on-line users re-posting his Photograph and passing it off as their own work. [SOF ¶ 11] Bradley believed that his rights were violated when certain users, whether on the Facebook platform or other platforms, re-published the Photograph to their own accounts or websites and took credit for his original work. [SOF ¶ 11]

**Editing of the Original Facebook Post – December 14, 2018**

On December 14, 2018, after registering the Photograph with the USCO, Bradley edited his original Facebook post by superimposing text in the right hand corner of the Photograph which reads: "copyright 2018 Matthew J. Bradley."  [SOF ¶ 12]  He also superimposed the caption "This is wrong on so many levels" over the Photograph in white block letters.  [SOF ¶ 12]  Finally, he included the following language underneath the text of the caption:

> "please note that this picture is copyrighted.  I appreciate all of you who shared it (very unexpectedly).  Some people, however, are passing it off as their own work.  I took the picture with my phone.  This is the original photo (meme added).  If you see anyone violating this copyright, please let me know.  Thanks."  [SOF ¶ 12]

On December 14, 2017, Bradley made other edits to the original Facebook post to include a hyperlink to his blog. This was because the popularity of the Photograph could lead people to visit his personal blog.  [SOF ¶ 13]

**Defendant's Infringing Activity – December 16, 2017**

On December 16, 2017, eight days after the Photograph was initially published on Bradley's Facebook page, Defendant re-published the Photograph on its business-related

Facebook account with the same caption that Bradley had originally associated with the Photograph - "This is wrong on so many levels." [SOF ¶ 14]

Critically, Defendant did <u>not</u> re-share Bradley's original Facebook Post which included the Photograph. [SOF ¶ 14] Rather, Defendant uploaded the Photograph to its own Facebook business account and passed off the Photograph (and associated caption) as if it was Defendant's own creation. [SOF ¶ 15]

Defendant did not seek Bradley's permission or consent to re-publish the Photograph on its Facebook business page. [SOF ¶ 16] Bradley never granted Defendant authorization to copy the Photograph or distribute copies of the Photograph to the public. [SOF ¶ 16]

Prior to Defendant's publication of the Photograph on its Facebook page, there was no communication between Bradley and Defendant concerning the Photograph. [SOF ¶ 17] Prior to the filing of this lawsuit, there was no communication between Bradley and Defendant concerning the Photograph. [SOF ¶ 18]

**<u>Second Copyright Registration of the Photograph – January 3, 2019</u>**

Bradley's counsel, Liebowitz Law Firm, PLLC ("LLF"), enforces his rights against copyright infringers. [SOF ¶ 16] As part of the services it provides, LLF registers photographs with the USCO. [SOF ¶ 19] After learning that Bradley's original copyright registration contained an error, Bradley authorized LLF to register the Photograph with the USCO on his behalf. [SOF ¶ 20]

Bradley is in possession of a registration certificate for the Photograph, bearing number VA 2-133-725, with an effective date of January 3, 2019 (the "725 Registration"). [SOF ¶ 7] The Photograph is on deposit with the 725 Registration. [SOF ¶ 21] The Photograph is on deposit with the 725 Registration. [SOF ¶ 22] The registration of the Photograph on behalf of

Plaintiff was carried out in accordance with LLF's routine practice of registering clients' photographs with the USCO. [SOF ¶ 23]

Bradley obtained the 725 Registration on January 3, 2019, within five years after first publication of the Photograph, which took place on December 8, 2017. [SOF ¶ 24]

**Bradley's Efforts to Enforce the Copyright in the Photograph**

After filing for copyright registration of the Photograph, Bradley began to enforce his copyright against infringers. [Bradley Declr. ¶ 25] On or about December 24, 2018, Bradley retained LLF to enforce his copyright. [SOF ¶ 26]

**Facebook Terms of Service**

According to Facebook's terms of service effective as of the time this lawsuit was filed, Bradley owns the copyright to the Photograph even after posting it to his Facebook page. [SOF ¶ 27] Although Bradley granted Facebook a license to use the Photograph, the license does not extend to unauthorized use by Defendant because Defendant failed to share Bradley's Facebook Post, and instead re-created its own post under the false pretense that Defendant had created the Photograph and its associated caption. [SOF ¶ 28]

The terms of service that were effective as of the time Plaintiff initially published the Photograph to Facebook provide that "When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture)." [Dkt. #30-1, p. 2]

**LEGAL STANDARD**

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986).

The moving party bears the burden to establish the absence of a genuine issue of material fact; it can meet that burden by identifying "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that show the absence of dispute regarding a material fact. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248.

Once that is shown, the burden falls on the non-moving party to identify specific facts showing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must show "both the *materiality* and the *genuineness* of the alleged fact issues." *Faircloth v. United States*, 837 F. Supp. 123, 126 (E.D.N.C. 1993). That burden is not met by relying on "irrelevant or unnecessary" factual disputes; only outcome- determinative disputes "under the governing law will properly preclude the entry of summary judgment" for the defendant. *Anderson*, 477 U.S. at 248.

## ARGUMENT

**POINT I: THE LICENSE DEFENSE FAILS AS A MATTER OF LAW**

Defendant's second affirmative defense alleges that Defendant's use was subject to either an express or implied license. For the following reasons, both arguments fail.

### A.    NO EXPRESS LICENSE EXISTS UNDER FACEBOOK'S TERMS OF SERVICE

Defendant argues that because Plaintiff posted the Photograph to his Facebook account using the "Public" setting, that he automatically granted Defendant "an unconditional public license to access and use the photograph." [Answer, Dkt. #12, p. 5] But the facts do not support this argument.

Although Plaintiff granted a license to Facebook to use the Photograph in accordance with Facebook's terms of service, it did not do so to Defendant. Defendant is a separate corporation than Facebook and does not stand in the shoes of Facebook. In short, Defendant is not Facebook. Nor is there any evidence that Facebook *sub-licensed* the Photograph to Defendant pursuant to the Facebook terms of service.

Section 3 of Facebook's terms of service, last revised on July 31, 2019. [SOF ¶ 27][2] provide in pertinent part as follows:

**3. The permissions you give us**

We need certain permissions from you to provide our services:

1. Permission to use content you create and share: Some content that you share or upload, such as photos or videos, may be protected by intellectual property laws.

You own the intellectual property rights (things like copyright or trademarks) in any such content that you create and share on Facebook and the other Facebook Company Products you use. Nothing in these Terms takes away the rights you have to your own content. You are free to share your content with anyone else, wherever you want.

However, to provide our services we need you to give us some legal permissions (known as a

---

[2] Plaintiff avers that the controlling terms of service were those in effect at the time this lawsuit was filed on June 18, 2019.

'license') to use this content. This is solely for the purposes of providing and improving our Products and services as described in Section 1 above.

Specifically, when you share, post, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This means, for example, that if you share a photo on Facebook, you give us permission to store, copy, and share it with others (again, consistent with your settings) such as service providers that support our service or other Facebook Products you use. This license will end when your content is deleted from our systems.

On its face, nothing in Section 3 of Facebook's terms of service permit Facebook users to re-publish as its own photographs uploaded by other Facebook users. Instead, a Facebook user may only <u>share</u> the content of other users by displaying such content through the share functionality provided by Facebook's platform. The share functionality provides proper credit to the original copyright holder and links back to the original copyright holder's Facebook account. In contrast, a Facebook user may <u>not</u> simply re-publish a photograph and pass that work off as its own original creation, as Defendant did in this case.

<u>Defendant admits that Facebook has a share function</u>. *See* Defendant's Statement of Material Facts Nos. ¶ 13 (stating that Facebook users can control settings as to how photographs are "shared"); ¶ 20 (referring to "Facebook's 'Share' function"); ¶ 25 (referring to "Facebook's 'Share' icon"), ¶ 26 (referring to "Facebook Share function"), ¶31 (referring to "Facebook shares"), ¶ 72 (distinguishing between Facebook shares and reposts);

However, Defendant did <u>not</u> use the share functionality provided by Facebook's platform to display the Photograph, but instead re-published the Photograph as if it was Defendant's own original work. Accordingly, Defendant's license defense must fail.

To the extent Defendant relies on previous iterations of Facebook's terms of service which were in effect as of the time the Photograph was initially published, the result is no different. Under the terms that were in effect prior to April 2018, Facebook users granted

Facebook "a non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook." Once again, it was Facebook, rather than Defendant, which was the beneficiary of that license. [Dkt. #30-1, p. 2] Defendant cannot simply pretend to be Facebook and claim that its use was authorized. And there is no record evidence that Facebook actually sub-licensed the Photograph to Defendant.

Defendant's license defense primarily relies on a single phrase from Facebook's obsolete terms of service which provided that: "When you publish content or information using the Public setting, it means that you are allowing everyone, including people off of Facebook, to access and use that information, and to associate it with you (i.e., your name and profile picture)." (underline added). [Dkt. #30-1, p. 2] However, Defendant's license defense fails even under these terms.

First, when Defendant re-published the Photograph on its Facebook business page, it failed to associate the Photograph with Plaintiff's name and profile picture. [SOF ¶14] Had Defendant utilized Facebook's sharing functionality, as thousands of other users did after Plaintiff initially published the Photograph, then it would have been authorized to display the Photograph on its Facebook page. But that's not what Defendant did. Instead, Defendant re-published the Photograph on its page and failed to associate the Photograph with Bradley's account. [SOF ¶14] Such use was not within the scope of the Facebook's obsolete terms of service.

Second, the outdated provision upon which Defendant relies is ambiguous as to whether it actually covers photographs. The first part of this provision refers to "content and information" but the second part only refers to "information." The second part is more critical because it says that everyone has a right "to access and use *that information*." (italics).

Plaintiff's Photograph does <u>not</u> qualify as "information" and is therefore outside the scope of this obsolete provision.

###### B.    THERE IS NO EVIDENCE TO SUPPORT AN IMPLIED LICENSE

It is undisputed that there was never any communication between Plaintiff and Defendant before the alleged infringement took place. [SOF ¶17] Nonetheless, Defendant argues that it had an implied license to use the Photograph.

An implied non-exclusive license should be found only in narrow circumstances where one party created a work at the other's request and handed it over intending that the other copy and distribute it. *ABKCO Music, Inc. v. Sagan*, No. 15 CIV. 4025 (ER), 2018 WL 1746564, at *18 (S.D.N.Y. Apr. 9, 2018) (quotations omitted and collecting cases); *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) (finding an implied license where: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work"). Ultimately, "the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d at 124 (quotation marks and citations omitted); *see also Design Options Inc. v. BellePointe, Inc.,* 940 F.Supp. 86, 92 (S.D.N.Y 1996) (holding that there must be evidence that "*both parties* to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement"). No matter what standard applies here, Defendant cannot reasonably argue the existence of an implied license.

First, the Photograph was not created on behalf of the Defendant, nor delivered to the Defendant with the intention of copying and distribution. Indeed, there was never any

communication between Plaintiff and Defendant <u>before</u> the alleged infringement took place. [SOF ¶17] Defendant acknowledges that "direct business dealings" must exist for an implied license to be found. [Dkt. #27, p. 17 of 39] But Defendant and Plaintiff had no direct business dealings prior to the infringement. [SOF ¶17] As such, nothing in the record supports the claim of an implied license.

Second, Defendant argues that Plaintiff manifested an intent "that the Photograph be seen and shared without restriction" and that he celebrated "Facebook users clicking the 'Share' icon" [Dkt. #27, p. 17 of 39] But the crux of Plaintiff's complaint is that Defendant failed to utilize Facebook's Share function; instead, it expropriated the Photograph without giving Plaintiff any credit and passed the work off as if Defendant itself had created it. [SOF ¶15] Such unauthorized use constitutes infringement plain and simple.

Third, Defendant argues that an implied license should be constructed by the Court by reference to Facebook's *express* terms. In other words, because Defendant has failed to show the existence of an express license under Facebook's terms of service, it asks the Court to re-write Facebook's terms of service as a means to find an implied license. However, "[c]ourts should be extremely reluctant, . . . to imply a term that the parties have neglected to specifically include." *In re World Trade Ctr. Disaster Site Litig.,* 2014 WL 2565821, at *6 (2d Cir. June 9, 2014) (citations and internal quotations omitted); *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 307 (2d Cir. 2016) (courts are "not free to rewrite into a contract conditions the parties did not insert by adding or excising terms under the guise of construction."); *see also Moses v. Apple Hosp. REIT Inc.*, No. 14-CV-3131 DLISMG, 2016 WL 8711089, at *6 (E.D.N.Y. Sept. 30, 2016) ("[W]e have stated on a number of occasions that we

do not rewrite contracts to insert provisions that have been omitted by the parties.").
Accordingly, this argument should be rejected.

Fourth, Defendant asks the Court to find an implied license based on the widespread "custom" of internet users who steal or otherwise freely share viral photographs on-line (bolstered by an expert opinion who encourages such theft). Plaintiff does not deny that there is rampant intellectual property theft on the internet, but that does not mean the Court should cast the Copyright Act by the wayside. The exclusive rights accorded to copyright holders are secured by the U.S. Constitution and by Congress and cannot simply be ignored based on some widespread custom of violating photographer's rights. This argument fails.

Finally, the fact that other third-party infringers may have used Plaintiff's Photograph in other platforms, even with Plaintiff's knowledge, does not absolve Defendant of its infringing conduct in this case.

In sum, Defendant cannot meet its burden for the affirmative defense of a license, express or implied. Accordingly, this affirmative defense fails and Defendant's motion should be denied.

**POINT III:    THE FAIR USE DEFENSE FAILS AS A MATTER OF LAW**

Defendant's sixth affirmative defense alleges fair use. A court "may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work." *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 560 (1985). Thus, the Court may grant summary judgment dismissing the fair use defense. *See, e.g., Stewart v. Abend*, 495 U.S. 207 (1990); *Castle Rock*, 150 F.3d at 137; *Otto* at *12. As set forth below, examination of the statutory factors demonstrates that Defendant's secondary use of the Photograph does not constitute fair use.[3]

---

[3] Section 107 of the Copyright Act sets out four factors to consider in determining whether a

## A.     THE FIRST FACTOR WEIGHS HEAVILY AGAINST FAIR USE

The first factor under 17 U.S.C. § 107(1), which addresses the manner in which the copied work is used, is the "heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). Courts examine at least two sub-factors to determine the purpose and character of use, including whether the secondary use is (1) transformative; and (2) for commercial purposes. *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir. 2004).

### (1)     Defendant's Secondary Use is NOT Transformative

The fair use doctrine "allows for new transformative works that further the public discourse and the free exchange of ideas in order to promote science and the arts." *See Campbell v. Acuff– Rose Music, Inc.*, 510 U.S. 569, 579 (1994). The central purpose of the inquiry is to determine whether "the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Ringgold v. Black Entertainment Television, Inc.*, 126 3d 70, 79 (2d Cir. 1997) (citations omitted).

"[U]se of copyrighted material that 'merely repackages or republishes the original is unlikely to be deemed a fair use' and a 'change of format, though useful' is not transformative." *Associated Press v. Meltwater U.S. Holdings*, 931 F.Supp.2d 537, 551 (S.D.N.Y. 2013) (*quoting Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 & n. 2 (2d Cir. 1998) (citation omitted)).

---

defendant's use of a copyrighted work is a fair use. These are "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

Here, Defendant's use was not transformative because Defendant did nothing more that re-publish the original Photograph and its associated caption. Defendant did not offer any commentary or criticism directed at the Photograph, nor re-contextualize the Photograph by imparting new meaning. Defendant did not report on a political or social controversy that arose because of the very existence of the Photograph itself. Nor did Defendant transform the original purpose of use or message behind the Photograph. Defendant merely used the Photograph in the exact same manner as Plaintiff. [SOF ¶ 14]

A secondary use has "no transformative effect [where the article] display[s] the Images in the same manner and for the same purpose as they were originally intended to be used." *Barcroft Media, Ltd. v. Coed Media Group, LLC*, No. 16-cv-7634 (JMF), 2017 WL 5032993, *6 (S.D.N.Y. Nov. 2, 2017); *see also Psihoyos,* 1998 WL 336655 at *3 (rejecting fair use defense where purpose of secondary use was to display it "for precisely a central purpose for which it was created").

"Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about that work*." *Barcroft,* 2017 WL 5032993, at *6; see also *BWP Media USA Inc. v. Gossip Cop Media, Inc.*, 196 F.Supp.3d 395, 404-405 (S.D.N.Y. 2016) (not transformative where the secondary use of "photograph seems intended as a general illustration of the [celebrity] couple . . . [and] Defendant [does not] comment or report on the images in question . . .); *Hirsch v. Complex Media, Inc.*, No. 18-cv-5488 (CM), 2018 WL 6985227, at *6 (S.D.N.Y., December 10, 2018) ("Complex has not established that its Video did anything more than merely describe the subject of Hirsch's Photograph, newsworthy or not. That conduct alone does not suffice as transformative."); *Psihoyos v. National Examiner*, 1998 WL 336655, *3 (S.D.N.Y. June 22, 1998) (defendant's

"use is not transformative, because its piece uses the photo to show what it depicts."); *Otto*, 2018 WL 6510801, *8 ("It would be antithetical to the purposes of copyright protection to allow media companies to steal personal images and benefit from the fair use defense by simply inserting the photo in an article which only recites factual information—much of which can be gleaned from the photograph itself.").

Here, like the cases in Associated Press, *Otto*, *Barcroft*, *Gossip Cop, and Psihoyos* where fair use was rejected, Defendant used the Photograph to merely illustrate the subject matter depicted in the image. [SOF ¶ 14] On its face, Defendant's republication of the Photograph on its Facebook business account is essentially identical to Plaintiff's initial publication. Defendant's re-post is nothing more than a wholesale reproduction of the Photograph and associated caption, without adding any additional commentary or criticism whatsoever [SOF ¶ 14]. Accordingly, there can be no transformative effect as a matter of law.

**(2)      Defendant's Use is Commercial Rather Than Non-Profit**

The fact that Defendant used the Photograph for a commercial rather than a non-profit purpose also weighs against a finding of fair use. *Psihoyos*, 1198 WL 336655, at *3 (*citing Campbell*, 510 U.S. at 583-84). The "crux of the profit/nonprofit distinction is . . . whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

Here, there can be no dispute that Defendant is a for-profit corporate publisher which disseminates content on its Facebook business page in order to generate revenue for its owner, Erin Karl. [SOF, ¶¶ 4-5]  Contrary to Defendant's assertions that the secondary use was "educational," Defendant was plainly attempting to pass of Plaintiff's work as its own to drum

16

up business.  Accordingly, Defendant sought to profit from Bradley's copyright without paying the customary price.

Defendant's argument that no customary price exists for "viral memes" by virtue of widespread intellectual property theft is unavailing.  "[I]n situations where the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work.'" *Jarvis v. K2 Inc.,* 486 F.3d 526, 533 (9th Cir.2007).

Defendant's notion that a custom has evolved of stealing photographs on-line once such photographs become popular does not mean that Plaintiff could not have charged a $50 fee.  Bradley was certainly a willing seller.  The only reason Defendant was not a willing buyer was because it elected to expropriate for free, thereby saving itself the time and expense of creating its own Photograph. Such conduct does not qualify as fair use. *Psihoyos v. Nat'l Exam'r,* No. 97 CIV. 7624 (JSM), 1998 WL 336655, at *4 (S.D.N.Y. June 22, 1998) ("the Examiner was simply using the Psihoyos' photo to save itself the expense of obtaining its own photo").

**B.    THE SECOND FACTOR WEIGHS AGAINST FAIR USE**

The second factor examines the "nature of the copyrighted work." 17 U.S.C. § 107(2). Courts consider "(1) whether the work if expressive or creative, with a greater leeway being allowed a claim of fair use where the work is factual or information, and (2) whether the work if published or unpublished."  *Blanch,* 467 F.3d at 256.  "Photographic images of actual people, places and events may be as creative and deserving of protection as purely fanciful creations." *Monster Communications, Inc. v. Turner Broadcasting,* 935 F.Supp. 490, 494 (S.D.N.Y. 1996).

Here, the Photograph is creative in nature, given that Bradley devised the concept, arranged and positioned the carpentry levels, and wrote the word "wrong" on the scotch tape in his own handwriting. [SOF ¶ 8] Bradley also selected the perspective, composition, angle, lighting, and camera equipment used to create the Photograph. [SOF ¶ 8] Accordingly, even though the Photograph was published, this factor weighs against fair use because the Photograph is creative in nature.

Defendant's argument that Plaintiff had no commercial aspirations for the Photograph at the time it was created is unavailing. Once a photograph becomes popular, the copyright holder is entitled to enter the market and realize the fruits of his labor. *Otto*, 345 F. Supp. 3d at 432.

C. **THE THIRD FACTOR WEIGHS AGAINST FAIR USE BECAUSE DEFENDANT PUBLISHED A FULL-COLOR, FULL-SCALE REPRODUCTIONS OF THE IMAGE WITHOUT ALTERATION**

The third factor bearing on fair use is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The question is whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. The Court should consider whether the portion taken is "essentially the heart" of the copyrighted expression. *NXIVM Corp.*, 364 F.3d at 480 (citation omitted). The "most relevant" question for this factor is whether the infringer has taken "no more" than is necessary. *Infinity Broadcast Corp.*, 150 F.3d at 110. "[T]he more of a copyrighted work that is taken, the less likely the use is to be fair." *Id.* at 109.

As a quantitative matter, Defendant has taken the entire full-color Photograph and displayed it in full-scale. [SOF ¶ 14] This fact alone weighs against fair use. *See Associated Press*, 931 F.Supp.2d at 558 ("appropriation of a copyrighted work in its entirety weighs against a finding of fair use").

As a qualitative matter, Defendant has used more of the copyrighted work than was necessary to accomplish its purpose. *See Rogers*, 960 F.2d at 311. The Photograph was reproduced by Defendant in full-color without any visible modification, cropping or alteration. [SOF ¶ 14] Defendant's wholesale reproduction of the Photograph, without any aesthetic alteration, demonstrates the work's qualitative value. *See Harper & Row*, 471 U.S. at 565 ("the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression.").

Defendant argues that Plaintiff welcomed widespread publication of his Photograph. But with respect to Facebook, Plaintiff did not welcome other users such as Defendant who passed his work off as its own, rather than using Facebook's share functionality.

## D. THE FOURTH FACTOR WEIGHS AGAINST FAIR USE BECAUSE MARKET HARM MAY BE PRESUMED AS A MATTER OF LAW

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Ringgold*, 126 F.3d at 80-81 (*citing Campbell*, 510 U.S. at 590 (quotation omitted)).

As a threshold matter, the Court may presume market harm because Defendant's secondary use constituted a mere duplication of Bradley's original photograph. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) (holding that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright"). "A presumption of market

harm "makes common sense[ ] when a commercial use amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591.

Further, under *Sony*, "there is a presumption of market harm [where] Defendant's use of [] photographs were not transformative." *Ferdman v. CBS Interactive, Inc.*, 17-cv-1317 (PGG), 2018 WL 4572241, *19 (S.D.N.Y. Sept. 21, 2018). Here, because Defendant's use constituted a mere duplication of Plaintiff's unaltered Photograph and was wholly untransformative, *Sony's* presumption of market harm applies.

Defendant's secondary use also impairs the potential market for the Photograph because "unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in the substantially adverse impact on the potential market for [licensing of] the original." *Campbell*, 510 U.S. at 590 (internal quotation omitted). "Under section 107, 'potential market' means either an immediate or a delayed market, and includes harm to derivative works." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir.1990).

Here, Bradley is entitled to profit from the market demand generated by initial publication of his Photograph. *See* 17 U.S.C. § 106. But because Defendant engaged in wholesale copying of the Photograph, any authorized market for the original work was severely diminished. The record shows that once Bradley discovered in December 2018 that his work was being expropriated and that he was not being properly credited for his creation, he took steps to realize the value of the work. First, he copyrighted the Photograph with the Copyright Office. [SOF ¶¶ 10-11] Next, he sought compensation on his own behalf from third-party infringers. [SOF ¶ 25] Finally, he sought competent counsel to prosecute claims on his behalf in federal court. [SOF ¶ 26]

This case is therefore similar to *Otto v. Hearst*, where the court determined in analyzing the fourth factor that an amateur photographer had a right to monetize his work after discovering its market popularity.

> It is clear from Otto's communications with TMZ and Burke the morning after the wedding that he did have an interest in entering the market upon realizing the value of his work. The creator of a work should not be precluded from future profits should they lack the marketing prowess to capitalize on their work at the time of creation. *Duncan*, 744 F.2d at 1496 ("Copyrights protect owners who immediately market a work no more stringently than owners who delay before entering the market."). Otto's status as an amateur photographer with an iPhone does not limit his right to engage in sales of his work.

> *Otto*, 345 F. Supp. 3d at 432.

In this case, the fact that Plaintiff, an amateur photographer, waited a year after initial publication before taking steps to enforce his copyright does not shield Defendant from liability. Defendant is a for-profit publisher, and a sophisticated purveyor in the industry, which sought to capitalize on Plaintiff's work by promoting the Photograph on its Facebook *business* page. [SOF ¶¶ 4-5] This was not "educational" use as Defendant claims. Defendant was using the Photograph to generate interest about its corporate brand and garner revenues for itself. For that reason, the fourth factor weighs against fair use.

Defendant once again rests on the notion that because the Photograph qualifies as a "viral meme", any internet user can freely re-publish it, including corporate publishers such as Defendant who are trying to promote its brand to sell its wares. But the Copyright Act does not carve out exceptions for viral memes. The fact that most internet users would prefer to get stuff for free on-line doesn't make it free. After all, apples are a very popular type of fruit that literally grow on trees, but that doesn't mean consumers can eat them for free just because they are made widely available in the marketplace.

In sum, all four factors weigh heavily against Defendant and thus the sixth affirmative defense of fair use dense should be dismissed as a matter of law.

**POINT IV:** **DEFENDANT'S COPYRIGHT MISUSE CLAIM FAILS**

The Fourth Circuit recognizes a defense of copyright misuse where the "attempted use of a copyright [is] to violate antitrust law" or where "the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 976 (4th Cir. 1990). However, "market power does not 'impose on the intellectual property owner an obligation to license the use of that property to others.'" *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1362 (Fed.Cir.1999) (quoting United States Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* 4 (1995)).

Here, there is no evidence that Plaintiff's attempt to realize the value of his work violated anti-trust law. Plaintiff has not attempted to monopolize any market demand for the Photograph. Rather, Bradley registered the Photograph with the Copyright Office because he observed on-line users re-posting his Photograph and passing it off as their own work. Bradley believed that his rights were violated when certain users, whether on the Facebook platform or outside, re-published the Photograph to their own accounts or websites and took credit for his original work. [SOF 15]

Defendant argues that Plaintiff committed copyright misuse on a theory of "entrapment," namely that "Bradley publicly posted a meme on Facebook and permitted free reposting, but then sued Analytical for reposting it." [Dkt. #27, p. 30 of 39] But Plaintiff never permitted free "reposting"; he only permitted sharing via Facebook's share function. Once again, had Defendant simply employed Facebook's sharing functionality and re-shared Plaintiff's

Photograph as thousands of other Facebook users had done, this lawsuit would never have been filed. But because Defendant displayed the Photograph on its commercial webpage without giving Plaintiff proper credit in an attempt to pass off Plaintiff's work as Defendant's own original creation, Defendant must be held liable for copyright infringement.

Likewise, the equitable estoppel defense fails. Defendant claims that it "justifiably relied on shared norms of meme use" when it re-posted the Photograph and passed it off as it own creation, rather than using Facebook's share functionality to attribute Bradley and link back to his Facebook account. But it's the Facebook terms of service which are controlling, not some widespread custom of intellectual property theft. And by operating outside of Facebook's terms of service, Defendant violated Bradley's rights to the Photograph. Sharing and giving proper credit is one thing, stealing and passing off is quite something else.

**POINT V:** **PLAINTIFF HAS A CONSTITUTIONAL RIGHT TO A JURY TRIAL ON THE ISSUE OF DAMAGES**

Defendant argues that Plaintiff is barred from monetary recovery because he did not present documentary evidence of market loss during the discovery period. However, pursuant to U.S. Supreme Court law, a copyright holder is <u>not</u> required to show any damages to sustain his claim:

> The existence of damages suffered is not an essential element of a claim for copyright infringement. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (to establish a prima facie case of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"); 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.01, at 13–6 *159 (1999) ("Notably absent from this formulation of the prima facie case is damage or any harm to [the] plaintiff resulting from the infringement.").

> *Davis,* 246 F.3d at 158 (boldface added).

Indeed, federal courts have consistently held that pecuniary harm is <u>not</u> a prerequisite to sustaining a copyright infringement claim. *See, e.g.*, *Cardiff Chamber of Commerce, Inc. v. Lebherz*, 2016 WL 9525236, at *2 (S.D. Cal. July 15, 2016) ("[t]he harm is the invasion of the copyright; no financial loss is required."); *eSilicon Corp v. Silicon Space Tech*, No. C-11-06184 EDL, 2013 WL 12174295, at *10 (N.D. Cal. Feb. 22, 2013) ("Damages . . . are not a required element of a prima facie case of copyright infringement claim"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 649 (7th Cir. 2003) ("[A] copyright owner who can prove infringement need not show that the infringement caused him a financial loss."); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distributors*, No. 96 C 2966, 2002 WL 226864, at *2 (N.D. Ill. Feb. 13, 2002) ("The existence of damages suffered is not an essential element of a claim for copyright infringement").

The copyright holder's right to be free from unauthorized copying of his protected works is precisely the type of interest that Congress may define as a judicially enforceable right, irrespective of any pecuniary interest. Further, "[n]one of the enumerated rights in 17 U.S.C. § 106 includes the right to economic benefits." *Westmorland v. Westmorland*, No. C07-1435 (MJP), 2007 WL 4358309, at *2 (W.D. Wash. Dec. 10, 2007). Rather, these bundle of rights involve the copyright holder's statutory prerogative to control how, when and where his works are distributed to the public. See *Pearson Educ., Inc. v. Liu*, 656 F. Supp. 2d 407, 409 (S.D.N.Y. 2009) ("In contrast to the core copyright rights of reproduction and adaptation, the distribution right is a right to control *use* . . . . It primarily protects a copyright owner's ability to control the

terms on which her work enters the market by providing a remedy against persons who distribute copies of her work without permission.").[4]

With respect to the *amount* of damages to be awarded, the Supreme Court holds that the jury is to decide that question in copyright cases. *Feltner v. Columbia Pictures TV*, 523 U.S. 340, 355, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998); see also *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., 1A* F.3d 488, 496 (4th Cir.1996) (jury's award is entitled to significant deference). Defendant concedes that Plaintiff demanded $50 for use of the Photograph. Simply because Plaintiff does not have further documentary evidence to support market value does not mean that the Photograph has no value. The jury should be entitled to decide the question.

**POINT VI:**     **QUESTIONS OF DISPUTED MATERIAL FACT PRECLUDE SUMMARY DISPOSITION OF PLAINTIFF'S DMCA CLAIM**

Defendant seeks dismissal of Plaintiff's second cause of action for Defendant's violation of section 1202(b)(3) of the DMCA, which prohibits the alteration of Copyright Management Information ("CMI"), which is defined in part as identifying information about the author of a work "conveyed in connection with" the work. 17 U.S.C. § 1202(c).

To establish a DMCA claim pursuant to 17 U.S.C § 1202(b)(3), a plaintiff must establish: "(1) the existence of CMI on the infringed work; (2) distribution of the infringed work containing missing and/or altered CMI; (3) that the distribution was done knowing that the CMI was removed and/or altered without permission; and (4) that the distribution was done knowing

---

[4]   *Accord Strauss v. Hearst Corp.*, No. 85 CIV 10017 (CSH), 1988 WL 18932, at *10 (S.D.N.Y. Feb. 19, 1988) (recognizing that "'unjust enrichment' is the injury that all copyright holders suffer in the event that their exclusive rights to control the reproduction and display of their works are transgressed")

that it would induce, enable, facilitate, or conceal an infringement." *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 377 (S.D.N.Y. 2019).

Further, with respect to the double *scienter* requirement embodied in the third and fourth elements of a section 1202(b)(3) claim, the third element require a showing of actual knowledge, whereas the fourth element only requires a showing of constructive knowledge. *Mango*, 356 F. Supp. 3d at 377 ("The last paragraph of section 1202(b) makes clear what plaintiffs may prove only by constructive knowledge: knowledge that the alteration, removal, or distribution induces, enables, facilitates, or conceals infringement. *See* 17 U.S.C. § 1202(b). However, the three numbered subparts prohibiting alteration, removal, and distribution require plaintiffs to prove actual knowledge of the alteration or removal of CMI itself"); *see also Janik v. SMG Media, Inc.*, No. 16-civ-7308-JGK-AJP, 2018 WL 345111, at *12 (S.D.N.Y. Jan. 10, 2018).

With respect to the first element, Plaintiff readily establishes "the existence of CMI on the infringed work." *Mango*, 356 F. Supp. 3d at 377.

The DMCA defines CMI as "any of the following information conveyed in connection with copies . . . of a work or performances or displays of a work, including in digital form":

   (1) The title and other information identifying the work, including the information set forth on a notice of copyright.

   (2) The name of, and other identifying information about, the author of a work.

   (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

17 U.S.C. § 1202(c).

"The CMI must be attached to, depicted in, or broadly 'conveyed in connection' with a copyrighted or copyrightable 'work.' *Fischer v. Forrest*, 286 F. Supp. 3d 590, 608–09 (S.D.N.Y. 2019) (citing 17 U.S.C. §1202(c)). "CMI exists to inform the public that a work is copyrighted

and by whom." *Id.; see also Pers. Keepsakes, Inc. v. Personaliziationmall.com, Inc.*, No. 11-CV-5177, 2012 WL 414803, at *6 (N.D. Ill. Feb. 8, 2012) ("[T]he point of CMI is to inform the public that something is copyrighted and to prevent infringement.").

Courts consistently held that photographs which are published in connection with the name of the photographer constitutes CMI under the statute. *See, e.g., Mango,* 356 F. Supp3d at 377 (determining that a "gutter credit" under the photograph qualified as CMI); *Hirsch v. CBS Broad. Inc.*, No. 17 CIV. 1860 (PAE), 2017 WL 3393845, at *8 (S.D.N.Y. Aug. 4, 2017) (same); *Agence France Presse v. Morel*, 769 F. Supp.2d 295, 305–06 (S.D.N.Y. 2011) (finding credit lines fall within the scope of CMI under the plain language of the statute); *Janik,* 2018 WL 345111, at *12 (finding name on a contact sheet to qualify as CMI); *see also Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 305 (3d Cir. 2011) (determining that a "gutter credit" under the photograph qualified as CMI).

Here, there can no dispute that the Photograph as originally displayed by Bradley contains qualifying CMI, i.e., the name of the photographer adjacent to the photograph. [SOF ¶ 9]  Defendant argues that Bradley's name shown directly above the Photograph does not qualify as CMI because his name is not watermarked (i.e., superimposed over) the Photograph, or because his name does not appear in the metadata.  But as the above caselaw authorities show, Plaintiff's name need only be conveyed in connection with or adjacent to the Photograph, as is the case here.

With respect to the second element, Plaintiff has established "distribution of the infringed work containing . . .  altered CMI."  *Mango*, 356 F. Supp. 3d at 377.  Here, Defendant re-published the Photograph on its business Facebook page without any attribution to Plaintiff. [SOF ¶ 15] Accordingly, Plaintiff has satisfied the second element

Under the third element of a section 1202(b)(3) claim, Plaintiff is required to show that Defendant distributed the Photograph with actual knowledge that Plaintiff's CMI had been altered. *Mango*, 356 F. Supp. 3d at 377; *Morel*, 769 F. Supp. 2d at 305. The third element requires a showing of actual knowledge. *Mango*, 356 F. Supp. 3d at 377. Actual knowledge may be proven by direct evidence, circumstantial evidence, or a combination of the two. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Id.* (*quoting Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)). Here, Defendant knew that it did not create the Photograph and yet passed it off as its own work. [SOF ¶ 15] Such evidence creates a question of material fact for trial as to the third element thereby precluding summary judgment.

With respect to the fourth element of a section 1202(b)(3) claim, Plaintiff is required to show that Defendant distributed the Photograph with reasonable grounds to know (i.e., constructive knowledge) that alteration of the CMI would "induce, enable, facilitate, or conceal an infringement." *Mango*, 356 F. Supp. 3d at 377. This element is ordinarily reserved for trial. *See,e.g., Friedman v. Live Merchandise, Inc.*, 833 F.3d 1180, 1187-89 (9th Cir. 2016) (finding that trier of fact can infer knowledge required under § 1202(b)(3) from evidence that defendant reproduced plaintiff's image without CMI after gaining access to those images with CMI); *Boatman v. United States Racquetball Ass'n*, 33 F.Supp.3d 1264, 1276 (D. Colo. 2014) (same); see also *Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purchaser Antitrust Litig.),* 585 F.3d 677, 692–93 (2d Cir.2009) (reversing the district court's grant of a motion to dismiss because "scienter issues . . . . are appropriate for resolution by the trier of fact").

Indeed, "whenever state of mind is at issue, direct proof of one's specific wrongful intent is rarely available and so recourse to circumstantial evidence is most often necessary." *Friedman*, 833 F.3d at 1189. In *Friedman*, 833 F.3d at 1189, the Ninth Circuit sustained a DMCA claim under section 1202 on grounds that a reasonable jury could infer from circumstantial evidence that defendant Live Nation, who was sophisticated about copyright law, knew that its distribution of photographs would facilitate or enable infringement.

In the context of U.S. Copyright law, courts routinely impose constructive knowledge on sophisticated purveyors of copyrighted materials. *See, e.g., Mango,* 356 F. Supp. 3d at 373–74 (imposing liability under section 1203(b)(3) where Buzzfeed's reporter was a "veteran" who was "familiar with the importance of obtaining permission to use photographs and the use of gutter credits"); *Minden Pictures, Inc. v. Buzzfeed, Inc.*, 390 F. Supp. 3d 461 (S.D.N.Y. 2019) (noting that "[c]ourts may consider the relative sophistication of parties in a copyright suit" and imposing constructive knowledge on a sophisticated plaintiff with experience in litigating copyright cases in the context of the discovery rule); *Castle Rock Entm't v. Carol Publ'g Group, Inc.*, 955 F.Supp. 260 (S.D.N.Y. 1997) (Sotomayor, D.J.), *aff'd*, 150 F.3d 132 (2d Cir. 1998) (district court finding willful infringement because, inter alia, the "defendants are sophisticated with respect to such matters").[5]

Here, the evidence shows that Defendant is a for-profit company and sophisticated purveyor in the publishing industry. [SOF ¶ 4] According to the curriculum vitae of Defendant's principal owner, Erin M. Karl, the company designs and sells literature to private schools, writes

---

[5] *Accord Viacom, Int'l Inc. v. Fanzine Int'l, Inc.,* 98 Civ. 7448, 2001 WL 930248, at *4 (S.D.N.Y. Aug. 16, 2001) (finding willful infringement where defendant was "a multi-national publishing company that publishes over 200 magazine releases a year" and "[a]s such ... is or should be familiar with copyright law and particularly with the general practices of securing permission before reproducing copyrighted works").

and designs market curricula, and operates a Facebook "business page [which] has engagement in the millions." Ms. Karl is also "an experienced newspaper editor" and "well-versed in social media." [SOF ¶ 5]

Given the wide-ranging breadth and depth of Defendant's involvement in exploiting copyrighted materials, a strong inference can be drawn that Defendant is sophisticated about copyright law and licensing procedures. *See Friedman*, 833 F.3d at 1188 ("a reasonable jury could certainly conclude that Live Nation had knowledge that photographs are often copyrighted"). Accordingly, not unlike LiveNation in the *Friedman* case, or Buzzfeed in the *Mango* case, Defendant must be charged with the utmost knowledge of U.S. copyright law, including applicable provisions of the DMCA.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be DENIED. Further the Court should award attorneys' fees and costs.

Respectfully submitted:

LIEBOWITZ LAW FIRM, PLLC

**By:/Richard Liebowitz/**
Richard Liebowitz
N.Y. Bar No. 5357702
11 Sunrise Plaza, Suite 305
Valley Stream, NY 11580
T: (516) 233-1660
F: (516) 233-1660
RL@LiebowitzLawFirm.com

*Counsel for Plaintiff*
*Matthew Bradley*

ALLAN LAW FIRM, PLLC

**By:/Albert P Allan/**
Albert P. Allan

N.C. Bar No. 18882
435 East Morehead Street
Charlotte, NC 28202
T: 704-371-5605
F: n/a
alallan@allaniplitigation.com

*Local Civil Rule 83.1(d) Counsel*