**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:16-cv-249-FL**

| | |
|---|---|
| MATTHEW BRADLEY, ) | **DECLARATION OF DAN BOOTH IN** |
| ) | **SUPPORT OF ANALYTICAL** |
| Plaintiff, ) | **GRAMMAR, INC.'S MOTION FOR** |
| v. ) | **ATTORNEYS' FEES, COSTS, AND** |
| ) | **EXPENSES PURSUANT TO 28 U.S.C.** |
| ANALYTICAL GRAMMAR, INC., ) | **§ 1927 AND THE COURT'S INHERENT** |
| ) | **AUTHORITY** |
| Defendant. ) | |

I, Dan Booth, declare as follows.

1.      I am an attorney licensed to practice in the commonwealth of Massachusetts and I have entered a notice of special appearance in the above-captioned action on behalf of Analytical Grammar, Inc. ("Analytical"), the defendant in this action. I am the founder and principal of the law firm Dan Booth Law LLC and counsel of record for Analytical. I submit this affidavit based on my own personal knowledge, and upon information and belief based on investigation into the facts stated herein, in support of Analytical's Motion for an Award of Attorneys' Fees, Costs and Expenses Pursuant to 28 U.S.C. § 1927 and the Court's Inherent Authority and to place before the Court evidence relied upon by Analytical in its accompanying memorandum.

2.      On August 20, 2019, Analytical engaged my firm as its lead counsel in this action, and I sent an email to the plaintiff Matthew Bradley's then-counsel Richard Liebowitz and Seth Hudson, in which I reiterated Analytical's earlier offer "to accept entry of judgment for $500 to resolve the matter." I received a call from Mr. Hudson the next morning, August 21, 2019, in which he assented to a brief extension of time for Analytical to obtain local counsel and answer the complaint, and to facilitate settlement discussions. Mr. Hudson deferred all settlement

discussions on Mr. Bradley's behalf to his lead counsel Mr. Liebowitz. I emailed Mr. Liebowitz and Mr. Hudson again that afternoon to memorialize the discussion and to again offer to discuss settlement. In Mr. Hudson's reply to my email he asked Mr. Liebowitz: "Richard- please contact Dan and speak with him directly about the proposed settlement offer." Mr. Liebowitz did not respond to any of those emails and did not otherwise respond to my request to discuss settlement before an answer would be required. When he would not respond and forced Analytical to incur fees, it committed to defending in earnest and prevailing on the merits. Analytical filed a true and correct copy of those August 20 and 21, 2019 email exchanges in this action as Document 31-6.

3. On September 17, 2019, four days after Analytical filed its answer to the complaint, the Court entered an Initial Order Regarding Planning and Scheduling. I emailed Mr. Liebowitz and Mr. Hudson later that morning to propose times for a scheduling conference. That afternoon, Mr. Liebowitz sent an email to Analytical's local counsel Christopher Thomas and Catherine Lawson asking them to conduct the Rule 26(f) conference the next day. Analytical filed a true and correct copy of his email in this action in Document 31-7. I filed my Notice of Special Appearance at 3:40 that afternoon, and emailed Mr. Liebowitz and Mr. Hudson again at 3:48 p.m. to arrange our scheduling conference. Mr. Liebowitz then sent an email to Analytical's counsel at 3:55 p.m. that day, offering $5,500 to settle the case. True and correct copies of that email appear at Document 31-7, and at page 4 of Exhibit 1 to this declaration.

4. I responded to Mr. Liebowitz by email the next day, September 18, 2019, "Our client expects to prevail and does not accept your offer." A true and correct copy of that email appears at page 3 of Exhibit 1 to this declaration.

5. Mr. Liebowitz and I scheduled the Rule 26(f) conference for October 7, 2019. On that day, he proposed that we postpone the conference by a day and return to our clients to see if

a settlement could be reached. He said that he would see if Mr. Bradley would accept $1,000 to settle the case, and he asked if Analytical's $500 offer of judgment was "still on the table." I informed him that Analytical's offer of judgment had expired by its express terms, and that Analytical would seek to recoup the thousands of dollars in legal fees it had incurred defending the lawsuit after he did not timely respond to its offers. When I asked why he had proposed $5,500 three weeks earlier, Mr. Liebowitz said, "we thought her business was larger."

6.     The next morning, October 8, 2019, Mr. Liebowitz sent me an email stating, "We can resolve for $500." I responded by email later that morning, "Analytical Grammar expects to prevail on the merits and does not accept your offer." I further stated, "Analytical Grammar is currently open to an offer to pay all of its attorneys' fees accrued to date. Alternatively, at any time, you can voluntarily dismiss with prejudice, and my client can seek its fees from the court. Those fees will continue to accrue as long as your client maintains this action, so if he has interest in limiting his exposure, the sooner the better." A true and correct copy of those October 8, 2019 emails appears at page 1 of Exhibit 1 to this declaration.

7.     On November 11, 2019, while counsel for the parties were discussing mediation, I informed Mr. Liebowitz by email, "Our client has already incurred more than $20,000 in fees and intends to prevail both on the merits and in obtaining an award of all attorney's fees. That amount will only rise as the case progresses. So if you and your client want to limit the legal fees you face, you should dismiss with prejudice as soon as possible." A true and correct copy of that email appears at page 1 of Exhibit 2 to this declaration. I reiterated the offer by phone on November 15, 2019, telling Mr. Liebowitz that Analytical would accept payment of $20,000 toward the fees it had incurred, or seek an award of all of its fees at the end of the case. In that call, I explained that Mr. Bradley had authorized Analytical's use, and that it constituted fair use

in any event. He disputed the legal analysis and rejected the settlement offer out of hand in that call, without presenting it to Mr. Bradley.

8.      Analytical filed a true and correct copy in this action at Document 30-1 of the Statement of Rights and Responsibilities that set forth Facebook's terms of service effective from January 2015 through April 2018 ("SRR"). The Court's Order granting summary judgment to Analytical on the copyright infringement claim cited the SRR terms of service as reflecting that Analytical had "reposted the photograph pursuant to an express license." DE 63 p. 1. At the summary judgment stage, Mr. Liebowitz argued that later terms of service governed the parties' actions in 2017. DE 36 p. 21 & n. 2; DE 47 p. 14 & n. 2; DE 54 ¶¶ 10-14. He filed a copy of Facebook's Terms of Service as revised July 31, 2019 as an exhibit to Mr. Bradley's motion for summary judgment. DE 38-10 p. 11.

9.      Mr. Liebowitz spoke at B&H Photo's OPTIC 2019 conference for photographers on June 2 and 3, 2019, giving two versions of a presentation on "Protecting Your Copyrights in the Age of Social Media." In each presentation, Mr. Liebowitz recited sections of the terms of service governing Facebook and other social media sites. In both presentations, he displayed and quoted verbatim from ¶ 2(1) of the SRR. His June 2, 2019 presentation is currently available on B&H Photo's Facebook page at facebook.com/watch/live/?v=481308992439124 and at his law firm's Facebook page at facebook.com/liebowitzlawfirm/posts/2364839307128265. True and correct copies of screenshots of those pages appear at Exhibit 3 to this declaration. Mr. Liebowitz's recitation from the Facebook SRR began about 31 minutes into that presentation.

10.     Mr. Liebowitz's June 3, 2019 presentation at OPTIC 2019 is currently available on B&H Photo's website at bhphotovideo.com/explora/videos/photography/optic-2019-protecting-your-copyrights-in-the-age-of-social-media-with-richard. A true and correct copy of a

screenshot of that web page appears at Exhibit 4 to this declaration. Approximately three minutes into that presentation, Mr. Liebowitz said, "when you sign up for these sites, there's actually licenses that are granted to the social media sites when you sign up, so it's very important to know your rights." Approximately one hour into the presentation, he told the photographers, "It's very important that you guys understand, when you use social media, what the terms of service are. So, when you use social media, you still own the copyright, but read the terms of services to see about certain licenses you grant when you post on social media." His recitation from the Facebook SRR began approximately one minute later.

11.    On October 24, 2019, Mr. Liebowitz served his client's initial disclosures, which was filed in this action as Document 33-3, and propounded 42 requests for production and 18 interrogatories. On November 22, 2019, Analytical served its initial responses to the requests for production and interrogatories and produced 201 pages of responsive documents. The first document in the production set, stamped AG0001 and thereafter filed in this action as Document 30-21, was a copy of the Facebook Messenger message by which Mr. Bradley's photograph was conveyed to Analytical, without any copyright management information.

12.    Analytical's November 22, 2019 production set also included the Facebook SRR, stamped AG0194-0197 and thereafter filed in this action as Document 30-1. On December 2, 2019, Liebowitz served his response to Analytical's requests for production of documents. The response was later filed as Document 33-4 in this action. In his response to Analytical's Request No. 11, which sought "Documents showing the terms of service of Facebook … effective as of the date when you posted the Photograph thereon," Liebowitz did not produce the SRR, which he had quoted at length at the Optic 2019 Conference five months earlier, and objected that Mr. Bradley "does not have any documents in his possession responsive to Request No. 11."

5

13.     A page on Mr. Liebowitz's law firm website entitled "Considerations Before Filing Copyright Suit" is available at liebowitzlawfirm.com/copyright-litigation/photograph-infringement/considerations-before-filing-copyright-suit/. A true and correct copy of the page appears as Exhibit 5 to this declaration. It informs prospective clients, "You may receive actual damages and profits. However, calculating these requires evidence of licensing history, the market value, and any earnings received by the accused because of the infringement. It can be difficult to prove actual damages, but in certain cases they can also be quite high."

14.     On October 30, 2019, I served Mr. Liebowitz with Analytical's requests for production of documents and interrogatories for Mr. Bradley, and a notice for Mr. Bradley's deposition on December 12, 2019, noting that his discovery responses would be due on or before November 29, 2019. On December 1 and 2, 2019 I sent Mr. Liebowitz several emails noting that his responses were overdue. On December 2, 2019, Mr. Liebowitz's associate James Freeman produced written responses to the request for production and interrogatories without producing documents or a privilege log. I served a letter on Mr. Liebowitz later that day noting deficiencies in the production and demanding prompt supplementation. On December 3, 2019, Mr. Freeman emailed all counsel of record to state, among other things, "Plaintiff will make a production of all non-privileged responsive documents in his possession this evening by no later than 9:00 pm EST." He sent a production of nine documents that evening.

15.     However, the production proved materially incomplete. I served Mr. Liebowitz a second letter detailing deficiencies in the production on December 4, 2019. Mr. Freeman produced Mr. Bradley's privilege log that afternoon. A true and correct copy of that privilege log appears as Exhibit 6 to this declaration. It reflects that Mr. Bradley's counsel failed to communicate with him at any point between August 18, 2019 (when, upon information and

belief, Mr. Liebowitz falsely informed him that Analytical had defaulted without having mentioned Analytical's offers to settle, DE 73 ¶ 5(c)) and September 15, 2019 (two days after Analytical filed its answer, DE 12), despite Analytical's multiple offers of judgment and offers to discuss settlement in mid-August. It also reflects that Mr. Bradley's counsel failed to communicate with him between October 8, 2019 (when Analytical offered to settle for its fees then accrued, see Exhibit 1 hereto) and December 4, 2019.

16.     Catherine Lawson and I conferred by telephone with Mr. Liebowitz and Mr. Freeman on December 5, 2019 regarding the remaining deficiencies in their production. The next day, December 6, 2019, Mr. Freeman produced five more documents and revised written responses to Analytical's requests for production and interrogatories. He produced a fifteenth document on December 9, 2019.

17.     However, the production remained materially incomplete. Bradley testified at his December 12, 2019 deposition that "[t]here is metadata on the photograph itself which identifies ne as the photographer," and that he had produced that metadata "to my legal counsel." DE 29-2 p. 23. The metadata was withheld from production until January 23, 2020. A true and correct copy of the metadata produced on that date was filed in this action at Document 29-5, and true and correct copies of correspondence between counsel on January 20 and 23, 2020 reflecting that production were filed in this action at Document 33-5 and Document 33-6.

18.     Liebowitz multiplied Analytical's workload at summary judgment by obfuscating the applicable Facebook SRR terms of service, requiring several additional filings. He did not disclose to Analytical his position that Facebook terms of service issued in 2019 controlled the parties' actions in 2017 until he raised it in a footnote in support of Mr. Bradley's motion for partial summary judgment, filed July 17, 2020 in this action at Document 36 p. 21 n. 2. To rebut

7

that position and establish the correct, governing terms, Analytical was obligated to file a second Statement of Material Facts at Document 50 pp. 19-21 and further supporting documents (*see* DE 43 pp. 19-20, DE 51) evidencing what Facebook's counsel identified as its relevant user policies at the relevant times. Liebowitz then requested that the Court strike the additional filings he had necessitated (*see* DE 55 pp. 2-3), requiring Analytical to make yet more filings: a motion for leave to file a surreply, with supporting memorandum and a proposed surreply (*see* DE 58, DE 58-2, DE 58-3, DE 59, DE 60).

19.     I graduated from Columbia Law School in 2005 with honors as a Harlan Fiske Stone Scholar and I have been regularly engaged in the practice of law ever since. I was admitted to practice of law in the courts of the state of New York in 2006, in the courts of the Commonwealth of Massachusetts in 2008, and in the United States District Court for the District of Massachusetts in 2010. I have since been admitted to practice in the United States Circuit Courts of Appeals for the First Circuit, the Seventh Circuit, and the Ninth Circuit. I have also been admitted to appear *pro hac vice* in cases in the United States District Courts for the Central and Southern Districts of California, the District of Columbia, the Northern and Southern Districts of Illinois, the District of Oregon, and the Western District of Washington. I have handled copyright cases in each federal court mentioned in this paragraph other than the District of Oregon.

20.     I worked as a litigation associate at Hughes Hubbard & Reed LLP in New York from 2005 to 2007 and at Goodwin Procter LLP in Boston from 2007 to 2009. From 2010 to 2019 I was a partner in Booth Sweet LLP, a boutique intellectual property firm in Cambridge, Massachusetts. I founded my current firm in 2019, Dan Booth Law LLC, based in Concord, Massachusetts. Further biographical information is available at https://danboothlaw.com/about/.

21. Intellectual property law has been the primary focus of my legal practice since 2007. Since early 2010, my practice has been primarily concentrated on litigation of intellectual property and free speech issues, chiefly involving copyrights, trademarks, domain names, defamation, and intermediary liability issues. I have been lead counsel in dozens of copyright infringement matters. My article "The 'One Satisfaction' Rule: A New Approach to Curbing Copyright Trolls," 7 *Landslide* 22 (Jan./Feb. 2015), appeared in the ABA's intellectual property journal. My prior experience yielded efficiencies that minimized the time I was required to spend on this case. I have substantial experience in disputes involving claims of copyright infringement over online uses of photographic works, including *Affordable Aerial Photography, Inc. v. Gorman Assocs.*, 20-cv-11405 (D. Mass.), *Craig v. PopMatters Media, Inc.*, 18-cv-1713 (S.D. Ill.), *id.*, 19-cv-5596 (N.D. Ill.), *Dermansky v. Open Source Media, Inc.*, 19-cv-10202 (D. Mass.), *Kuhmstedt v. Consequence Holdings, LLC*, 21-cv-1963 (C.D. Cal.), *MLTSHP, Inc. v. 7410, Inc.*, 20-cv-1258 (C.D. Cal.), *Panoramic Stock Images Ltd. v. Alcove Realty, LLC*, 21-cv-10054 (D. Mass.), *Pierce v. Lifezette, Inc.*, 20-cv-693 (D.D.C.), *Ward v. Consequence Holdings, LLC*, 18-cv-1734 (S.D. Ill.), and *Zlozower v. Euclid Media Grp.*, 20-cv-343 (W.D. Tex.). I capitalized on knowledge of legal issues developed in those and other cases to expedite the resolution of this case.

22. I charged Analytical $425 per hour for my services as counsel in this matter. That was my usual rate for copyright litigation matters when this case began. I now charge clients $440 per hour but I have continued to charge Analytical the $425 per hour rate throughout this action. On occasion, when paralegal-type services were required, I billed for my time for such services at 25%, yielding an effective rate of $106.25 per hour for such work.

23. Several courts have approved attorney's fees awards for my services at

comparable rates in other copyright and copyright-related matters. The United States District Court for the Southern District of Illinois awarded a client fees for my services at $409 per hour in 2013 as sanctions against the opposing party's copyright attorneys. *Lightspeed Media Corp. v. Smith*, No. 12-cv-889, 2013 U.S. Dist. LEXIS 168615, *18-21 (S.D. Ill. Nov. 27, 2013). The presiding judge commented, "that's what you call bargain rates around here." *Id.*, ECF No. 101 at 17:11-13 (S.D. Ill. filed Dec. 10, 2013) (hearing transcript). The United States Court of Appeals for the Seventh Circuit affirmed the award. *Id.*, 731 F.3d 699, 707 (7th Cir. 2014). The United States District Court for the District of Massachusetts awarded fees to my client at $409 per hour in 2014, in a putative class action alleging fraudulent copyright claims. *Shirokov v. Dunlap, Grubb & Weaver PLLC*, No. 10-12043-GAO, 2014 U.S. Dist. LEXIS 40642 (D. Mass. Mar. 27, 2014). Another session of that court awarded fees for my time pursuant to 17 U.S.C. § 505 at the same rate in a copyright infringement action in 2015 and remarked, "the actual attorney rates billed were less than prevailing rates." ECF No. 158, Order, *Small Justice LLC v. Xcentric Ventures LLC*, No. 13-cv-11701 (D. Mass. Dec. 31, 2015), *additional findings in support*, 2016 U.S. Dist. LEXIS 190461 (May 2, 2016). The United States Court of Appeals for the First Circuit affirmed the award. *Id.*, 873 F.3d 313, 329 n. 21 (1st Cir. 2017). In 2020 the United States District Court for the Northern District of Illinois specifically found that the $425 hourly rate I had charged was reasonable as it awarded fees to my client at that rate pursuant to 17 U.S.C. § 505. *Craig v. PopMatters Media, Inc.*, 448 F. Supp. 3d 844, 848-49 (N.D. Ill. 2020).

24.     My billing rate, agreed upon with Analytical, is well within the usual rate charged in intellectual property litigation by similarly experienced attorneys in this Court. In citites in the Southeast including Raleigh, according to the American Intellectual Property Law Association's (AIPLA) latest biennial survey issued in 2019, the average rate charged by partners in

intellectual property matters is $418 per hour, while the rate charged among the 90th percentile of such attorneys is $746 per hour. The survey further reflects that the average rate charged for such attorneys nationwide is $521 per hour and the 90th percentile charges $796 per hour. And nationwide among attorneys with 10 to 14 years of experience in intellectual property law, as I had in 2019 when first engaged in this matter, the survey reflects that the average rate charged by partners in intellectual property matters is $438 per hour and the rate charged among the 90th percentile is $668 per hour. A true and correct copy of pages excerpted from the AIPLA Report of the Economic Survey 2019 is filed as Exhibit 7 to this declaration.

25.    That AIPLA survey further supports the request for fees incurred by the attorneys at local counsel Parker Poe. Christopher Thomas, a partner who also charged $425 per hour, has been in practice for 17 years, and also concentrates on intellectual property rights and disputes. The AIPLA survey reflects that partners with 15 to 24 years experience nationwide charged $505 per hour, and $750 per hour at the 90th percentile. Catherine Lawson, who was admitted to practice in 2012, charged $350 per hour as a senior associate beginning in 2019. According to the survey, associates in intellectual property litigation in cities in the Southeast including Raleigh charged an average of $422 per hour, while such associates nationwide charged an average of $387 per hour, and those with 7 to 9 years experience charged an average of $364 per hour. Sloan Carpenter was admitted to practice in 2018 and charged $275 per hour as an associate beginning in 2020. According to the survey, associates in intellectual property litigation nationwide with less than 5 years experience charged an average of $309 per hour.

26.    True and correct copies reflecting contemporaneous billing statements issued by my firm, for costs and attorney's fees that Analytical incurred for time that I expended on its behalf in connection with this action, are filed as Exhibit 8 to this declaration. As reflected in the

billing statements, Analytical seeks a total of $ 152,532.50 in compensation for 358.9 hours that I have expended on this matter from August 20, 2019 through today, which Analytical has paid or agreed to pay.

27.     As a solo practitioner, I could not have staffed this matter more leanly. I operated efficiently, striving to avoid any unnecessary, duplicative, or unproductive hours. I conferred with local counsel as needed, dividing tasks and working in tandem to further avoid duplicated effort and unnecessary expense. As lead counsel, I conducted almost all of the substantive motion practice and discovery practice myself. To minimize costs, local counsel Catherine Lawson conducted Mr. Bradley's deposition in Raleigh and appeared as Analytical's sole representative at the mediation conference.

28.     I have reviewed the billing statements submitted at Exhibit 8 carefully to ensure that the fee request excludes any redundant or unproductive hours. I exercised billing discretion in not charging Analytical for certain tasks over the course of the case, and the billing statements reflect certain of those unbilled tasks. I have waived my fees for all time spent in June 2021 related to three subpoenas that Analytical served and ultimately withdrew; and on Mr. Liebowitz and his firm's Motion to Quash and for a Protective Order, which was rendered moot by the withdrawal of Analytical's subpoenas. The billing statements reflect time necessarily expended in this action.

29.     As a solo practitioner with primary responsibility for this case, I was required to dedicate most of my time to this case at several stages of the discovery process, and again over several months of motion practice, in lieu of my other pending matters.

30.     Mr. Liebowitz was opposing counsel in several of my other copyright cases, including the *Craig*, *Dermansky*, *Ward*, and *Zlozower* cases identified above. Based on my prior

experience in those cases and knowledge about his other cases, I anticipated a difficult litigation. However, I had not anticipated that he would be disqualified before the case concluded, and I had expected that he would inform his client of Analytical's settlement offers and of the risks of proceeding on claims without prospect of recovery.

31.     Analytical incurred substantial costs and expenses in this action. My firm's billing statements reflect $283.10 total in expenses that were necessary to perform the services within the scope of the representation, and were routinely and regularly charged to Analytical pursuant to our retainer agreement. Those expenses include $10 legal research charges per month that such research was conducted for Analytical through Lexis; PACER research charges for specific filings pertinent to Analytical's research and briefing for this case; and $46.50 in postage expenses, for service of Rule 31 depositions by written questions upon Analytical customers pertinent to the issue of actual damages.

32.     Analytical paid $5,190 directly to Analytical's expert witness Dr. Aram Sinnreich, who provided a written report pertinent to Analytical's fair use defense, for 17.3 hours of work billed at $300 per hour, substantially discounted from his standard rate of $500 per hour. Analytical also paid $150 directly to the Court-appointed mediator Michele Ledo, which was Analytical's half of her $300 fee for 1.5 hours worked at $200 per hour, substantially discounted from her standard rate of $300 per hour. True and correct copies of invoices issued by Dr. Sinnreich and Ms. Ledo for those amounts appear at Exhibit 9 to this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of July, 2021 in Concord, Massachusetts.

_____

DAN BOOTH